# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

OHIO DEMOCRATIC PARTY,

                         Plaintiff,

     v.

OHIO REPUBLICAN PARTY, DONALD J. TRUMP FOR PRESIDENT, INC., ROGER J. STONE, JR., and STOP THE STEAL INC.,

                        Defendants.

Civil Action No. 1:16-cv-02645-JG

JUDGE JAMES S. GWIN

MAGISTRATE JUDGE THOMAS M. PARKER

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

A temporary restraining order (TRO) is urgently needed to protect the right of Ohio's voters to vote free from intimidation, harassment, and coercion. As further explained herein, the allegations and evidence set forth in the accompanying Complaint justify temporary injunctive relief in order to prevent irreparable harm. An injunction against Defendants' planned intimidation tactics is the only way to protect countless lawfully registered voters from

harassment, threats, and intimidation that could interfere with their ability to vote in the rapidly approaching election.

To obtain a TRO or preliminary injunction, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)); *NMS, Inc. v. Brey & Co.*, No. 16-CV-00545, 2016 WL 3944719, *1 (N.D. Ohio March 23, 2016) (Gwin, J.).

Immediate relief should be granted here because (1) Plaintiff is likely to succeed on the merits of its claims under Section 11(b) of the Voting Rights Act and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3); (2) irreparable harm to Plaintiff, candidates, and voters will occur in the absence of immediate relief; (3) the balance of equities tip in favor of temporary relief barring Defendants from carrying out their plans to intimidate, harass, and suppress voters; and (4) an injunction barring such unlawful and flagrantly anti-democratic conduct is in the public interest.

## I.    STATEMENT OF FACTS

Donald J. Trump For President, Inc. (the "Trump Campaign"), Trump's close advisor Roger J. Stone, Jr., Stone's organization Stop the Steal Inc., and the Ohio Republican Party ("ORP") are conspiring to threaten, intimidate, and thereby prevent minority and other voters in urban neighborhoods from voting in the 2016 election. The stated goal of the Trump Campaign, as explained by an unnamed official to Bloomberg News on October 27, 2016 is to depress voter turnout, and particularly minority voter turnout—in the official's words:  "We have three major voter suppression operations under way" that target African Americans and other groups of

voters.  Declaration of Donald J. McTigue, Esq. (hereinafter "McTigue Decl.") at Ex. 17 (Joshua Green, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek (Oct. 27, 2016)).  It has also become clear in recent weeks that Trump has sought to advance his campaign's goal of "voter suppression" by using the loudest microphone in the nation to implore his supporters to engage in unlawful intimidation at polling places in Ohio and elsewhere.  Trump's exhortations have been amplified by direct and tacit assistance from the ORP and Stone, who helped pioneer similar tactics in the 1980s before those efforts were blocked by the federal courts.  *See* McTigue Decl. at Ex. 30 (Jeffrey Toobin, *The Dirty Trickster*, The New Yorker, June 2, 2008).  All Defendants have sought to organize, fund, and assist Trump's supporters to carry out the conspiracy's goals.  And Trump's supporters have responded with pledges to descend upon polling places in "certain areas" where many minority voters live in order to interfere with their efforts to exercise the franchise.

### a.  Trump and Stone Call for Voter Intimidation Based on Bogus Fraud Claims

In the months leading up to the 2016 election, Trump has made an escalating series of statements, often racially tinged, suggesting that his supporters should go to particular precincts on Election Day and intimidate voters—and intimating that unless his supporters act, he will lose the election because of purported voter fraud.  It does not matter that voter fraud is practically nonexistent.  That reality has not stopped Trump from telling his supporters that certain people, in certain precincts, will vote "15 times" for Secretary Hillary Clinton.  McTigue Decl. at Ex. 18 (Louis Nelson, *Trump: Without ID Law, Voters Will Vote '15 Times' for Clinton*, Politico, Aug. 9, 2016).

For example, Trump told a crowd in Altoona, Pennsylvania, in August 2016 that "I hope you people can . . . not just vote on the 8th, [but] go around and look and watch other polling

places and make sure that it's 100-percent fine. We're going to watch Pennsylvania—go down to certain areas and watch and study—[and] make sure other people don't come in and vote five times." McTigue Decl. at Ex. 11 (David Weigel, *Trump Fires Up Recruitment of Poll Watchers as He Warns of Election 'Cheating*,' Wash. Post, Aug. 13, 2016). He continued, "[t]he only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on." McTigue Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016).

Ten days later, at a speech in Akron, Ohio, Trump explained that he did not just mean that supporters should "watch": "You've got to get everybody to go out and watch, and go out and vote," Trump said. "And when [I] say 'watch,' you know what I'm talking about, right?" Trump has explained that his "watchers" should act in a capacity similar to law enforcement, even though they will not in fact be acting in a law enforcement capacity. *Id.* In other words, Trump is encouraging his supporters to act as vigilantes.

In the midst of these comments, the Trump campaign rolled out a form on its website for supporters to sign up to be "Trump Election Observers" in order to "Stop Crooked Hillary From Rigging This Election!" McTigue Decl. at Ex. 3 ("Volunteer to be a Trump Election Observer"), further encouraging his supporters to join in a common plan to "watch" voters in "certain areas" of states like Ohio for voter fraud.

Trump has specifically encouraged his supporters who work in law enforcement to use their official authority to assist in "watching" Democratic-leaning communities. For example, he stated at the August Altoona rally that to protect against supposed voter fraud, "[w]e have to call up law enforcement" and "we have to have the sheriffs and the police chiefs and everybody

watching."  McTigue Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico, Oct. 2, 2016).

Trump's exhortations have grown more ominous and more specific as the election draws closer.  At an October 1, 2016 rally in Manheim, Pennsylvania, for example, Trump instructed his supporters to "go check out [other] areas because a lot of bad things happen, and we don't want to lose for that reason."  McTigue Decl. at Ex. 20 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016).  Trump and Trump Campaign surrogates like Rudy Giuliani have told supporters that voters of color should be suspected of fraud.  McTigue Decl. at Ex. 21 (Greg Stohr, *Giuliani, Gingrich Raise Specter of Voter Fraud Ahead of Election*, Bos. Globe (Oct. 16, 2016)).  Trump has suggested that Latino voters are undocumented immigrants whom the federal government has allowed to "pour into this country" specifically to vote in the election.  McTigue Decl. at Ex. 22 (Jonathan Swan, *Trump: Government Bringing in Illegal Immigrants to Vote*, The Hill, Oct. 7, 2016).  And in a nationally televised interview on October 16, Giuliani expressed that voter fraud is concentrated in predominantly minority communities in "inner cities" that support "Democrats," like "Philadelphia and Chicago."  McTigue Decl. at Ex. 23 (*CNN's Jake Tapper vs. Rudy Giuliani: You're Saying Only Democrats Rig Elections?*, RealClearPolitics, Oct. 16, 2016).

While speaking in Ambridge, Pennsylvania, on October 11, 2016, Trump warned that it is "[s]o important that you watch other communities"—which, he clarified, meant Philadelphia—"because we don't want this election stolen from us . . . . And everybody knows what I'm talking about."  McTigue Decl. at Ex. 20 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016).  Trump was referring in particular to stories he had circulated earlier in the summer about precincts in Philadelphia and Cleveland

comprised nearly exclusively of African-American voters in which Mitt Romney had received no votes in 2012. At that same rally, a prominent Trump supporter, U.S. Representative Bill Shuster, made clear that Trump supporters should focus their voter intimidation in Philadelphia, stating: "The people in Western and Central Pennsylvania have to overcome what goes on down in Philadelphia—the cheating." McTigue Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016). Another prominent Trump surrogate, former Speaker of the House Newt Gingrich, has similarly stated that the election might be "stolen" because of voter fraud in Philadelphia and other Democratic-leaning communities with large minority populations: "You look at Philadelphia, you look at St. Louis, you look at Chicago, I mean, again, I'm old enough, I remember when Richard Nixon had the election stolen in 1960 . . . . So to suggest that we have—that you don't have theft in Philadelphia is to deny reality." McTigue Decl. at Ex. 24 (Tim Hains, *Gingrich: 20 Media Executives Are Launching a "Coup d'Etat" Against Millions of Trump Voters*, RealClearPolitics, Oct. 16, 2016).

Trump now asserts at rallies that the presence of fraud at the polls will prevent him from winning the November 8 election. His comments are consistently directed at Democratic-leaning communities in states including Ohio. For example, at an October 18 rally in Colorado Springs, Colorado, Trump warned his supporters about voter fraud, starting: "take a look at Philadelphia, what's been going on, take a look at Chicago, take a look at St. Louis. Take a look at some of these cities, where you see things happening that are horrendous." McTigue Decl. at Ex. 2 (Trip Gabriel, *Donald Trump's Call to Monitor Polls Raises Fears of Intimidation*, N.Y. Times, Oct. 18, 2016).

At an October 20, 2016 rally in Delaware, Ohio, Trump told the crowd that Secretary Clinton is "truly capable of anything, including voter fraud." *See* "Full Event: Donald Trump Rally in Delaware, Ohio (10/20/2016) Post Final Debate vs Hillary Clinton," at 5:21-26, YouTube (Oct. 20, 2016), https://www.youtube.com/watch?v=h7AIGi5u328. At the same rally, Trump repeated what he called "terrible, frightening statistics" (which also happen to be false), like the claim that "fourteen percent of non-citizens are registered to vote," or that "1.8 million people are dead, but they're registered to vote, some of whom voted even though they're dead. Which is really a hard thing to do. But it's easy, if fraud is involved. . . . One was a Republican, and after death, became a Democrat. It's true!" *Id.* at 10:03-41.

At an October 17, 2016 rally in Ohio, Governor Pence urged Trump supporters to sign up to be poll watchers to combat purported voter fraud, claiming that the media is trying to "rig" this election "with their biased coverage." McTigue Decl. at Ex. 39 (Joe Crowe, *Pence Urges Supporters to Watch Polls for Fraud*, Newsmax, Oct. 17, 2016). Pence explained that any Trump supporter who has not volunteered to participate to provide "accountability at a polling place" has not "yet done all that you can do." *Id.*

At a rally in Golden, Colorado on October 29, 2016, Trump accused postal workers of throwing out ballots that they don't "like." Trump told the crowd, "I have real problems with ballots being sent. Does that make sense? Like people saying, 'Oh here's a ballot,' being, 'here's another ballot - throw it away, throw it away. Oh, here's one I like, we'll keep that one. I have real problems—so get your ballots in. We're trying to have some pretty good supervision out there. We got a lot of people watching you people that collect the ballots. We got a lot of people watching the people that collect the ballots. Now, the, you know, dishonest media will say 'oh, that wasn't nice. Everything is so honest. Everything in our country—' We have 1.8

million people that are dead registered to vote.  Right?  And some of them vote.  I wonder how that happens.  We have 2.7 million people on more than one state, they're registered two states, and sometimes more than that. And I could go on and on and on."  *See* "Full Speech: Donald Trump Rally in Golden, Colorado," at 43:05-44:02, YouTube, (Oct. 29, 2016) https://www.youtube.com/watch?v=_6I1xXf_QmE.

Defendant Stone has amplified Trump's message.  Stone is a far-right-wing political operative who has served as a close advisor to Trump throughout his run for President.  Stone has a history of engaging in voter intimidation, racist and misogynist hate speech, and incitement to violence.  McTigue Decl. at Ex. 40 (Eric Hananoki, *Trump Ally Roger Stone Has Repeatedly Urged the Killing of Public Figures*, MediaMatters, May 2, 2016).  Stone has publicly called for the execution of Secretary Clinton, Senator Bernie Sanders, and George Soros, among others. *Id.*

Stone's super PAC, Stop the Steal, is currently running a website called "StopTheSteal.org," through which Stone is actively signing up Trump supporters to "volunteer" to fight "voter fraud."  Stop the Steal, https://stopthesteal.org/ (last visited Oct. 31, 2016). #StopTheSteal is a popular hashtag among Trump supporters on Twitter, and Stone's group maintains an active Facebook presence.  Stone and his organization have also widely disseminated messages via websites such as stopthesteal.org and through social media under hashtags such as #StopTheSteal, falsely claiming that "Hillary and Democrats RIG ELECTIONS."  One image states: "HILLARY CLINTON CHEATED AND STOLE THE PRIMARY FROM BERNIE . . . WE THE PEOPLE CAN STOP HER FROM STEALING THE GENERAL."  McTigue Decl. at Ex. 25 (Roycan79, Twitter (Oct. 17, 2016, 9:53 AM EST)). Another states that "25% of Votes needed to win, is decided by illegals" and that hundreds of

"electoral votes [are] at RISK of being RIGGED." McTigue Decl. at Ex. 26 (Soniafarace, Twitter (Oct. 11, 2016, 5:11 PM EST)). Through these and other messages, Stone has sought to encourage Trump supporters to engage in unlawful voter intimidation.

Stone has also participated directly in a campaign to sow misinformation among supporters of Secretary Clinton. On October 23, 2016, Stone sent out a (now deleted) message via his Twitter feed deliberately designed to mislead Democratic voters by representing—using Secretary Hillary Clinton's likeness and logo—that supporters can "VOTE the NEW way on Tues. Nov 8th" by texting "HILLARY to 8888," after which voters would apparently "receive official confirmation." *See* Declaration of Marc E. Elias, Esq. at Ex. 1. On the same day, Stone's media outlet "Stone Cold Truth" tweeted out the same image, accompanied by a similar message. McTigue Decl. at Ex. 34. Other Republican officials have picked up the theme. For example, Joshua Lorenz, a Republican City Councilman from Murrysville, Pennsylvania posted on Facebook an image with the phrase: "Vote Hillary November 8th" and "YOU CAN VOTE AT HOME COMFORTABLY ONLINE!" with instructions for how only Clinton supporters could purportedly vote online. Lorenz included with his post a statement: "More proof that the election process is rigged. Only Hillary supporters can vote from their smartphones or in the comfort of their own homes." McTigue Decl. at Ex. 31 (*'Rigged?' Western PA Republican Circulates Fake Meme About Online Voting in PA*, BillyPenn.com, Oct. 18, 2016). A similar image being circulated online features a photo of Clinton and the statement: "Did you know? Pennsylvania now has online voting?" in a font that is similar to that used in official Clinton campaign advertising. *Id.* Of course, these statements are false.

Further, Stone and Stop the Steal Inc. are actively recruiting Trump supporters for "exit polling," specifically targeting nine Democratic-leaning cities, including Cleveland, Ohio, with

large minority populations. *See* McTigue Decl. at 4 Oliver Laughland and Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016). As of November 2, 2016, Stone claimed to have organized 2,734 volunteers to engage in this "exit polling" operation. Stop the Steal, https://stopthesteal.org/ (last visited Nov. 2, 2016). Specifically in Ohio, Stop the Steal claims to have signed up 107 of "registered exit pollers," including volunteers in the congressional districts comprising the Northern District of Ohio. *See* Stop the Steal, https://stopthesteal.org/states/ohio (last visited Nov. 2, 2016). Various comment pages on the same website are presently being used to coordinate volunteers from Ohio and neighboring states in order to monitor the polls. *See id.*, https://stopthesteal.org/ohios-finest-unite/ (last visited Oct. 31, 2016) (discussing voter from Kentucky volunteering to travel to Ohio for purported "exit polling"); *id.* https://stopthesteal.org/info-warriors/ (last visited Oct. 31, 2016) (discussing voter from Oklahoma planning to "go to swing states").

Through a program called "Vote Protectors," Stone has also recruited volunteers to watch polling places. The Vote Protectors website permits any volunteer to download and print official-looking identification badges, and provides scripts for volunteers that instruct them on how to interrogate voters on Election Day. McTigue Decl. at Ex. 36 (Christina Wilke, *Trump-Linked Voter Intimidation Group Releases New Script for 'Citizen Journalists,'* The Huffington Post, Oct. 26, 2016). Volunteers are permitted to tally up votes on the Stop the Steal website—for Trump or any other candidate—without any proof that they had spoken to voters or visited a polling site. *See* "Popular Vote (Citizen Exit Polls)," *available at* http://stopthesteal.org (last accessed Oct. 31, 2016). Vote Protectors and Stop the Steal discontinued some, but not all, of these practices after they were exposed by a national media outlet.

Stone's purported polling exercise serves no legitimate purpose. The attached expert report of noted polling expert and public opinion researcher Mark S. Mellman, which draws upon 34 years of experience in the field, establishes that Stone's operation is a sham. *See* Expert Report and Declaration of Mark S. Mellman. Mellman "routinely design[s] and implement[s] polls to project the results of elections" and "perform[s] polling and surveys for public interest organizations . . . as well as for corporate clients. *Id.* at 1. Based upon his examination of publicly-available sources on Defendant Stone's purported exit-polling operation, including materials and videos in which Stone describes the operation in his own words, Mellman has concluded as follows:

> [I]t is my conclusion that the "Exit Poll" that Roger Stone purports to be employing in the 2016 General Election is not in keeping with the accepted methodology, purpose, or practices in this field. The polling that he plans to conduct is unlikely to produce unbiased, reliable results, and, moreover, does not appear to be designed to meet such ends. Mr. Stone's effort seems oblivious to the fundamental techniques accepted throughout the industry as based on reliable principles and methods, as well as very basic well-known facts about exit polling. Given Mr. Stone's stated political biases and the methodology he has employed—i.e., targeting Democratic and minority precincts—his exit polling strategy appears only designed to intimidate voters in an attempt to influence the election and suppress the vote. *Id.*

"Exit polls are scientific surveys conducted with a random sample of voters shortly after they have cast their ballot." *Id.* at 3. As Mellman testifies, "[c]onducting exit polls is a difficult, laborious and highly technical process that requires considerable expertise and training." *Id.* To meet these rigorous standards, polling experts demand that exit polls have a number of controls designed to ensure objectivity and independence, none of which appear to be built into Stone's initiative.

First, "meaningful exit polling—polling designed to capture the likely outcome of a potential election—requires months of planning. For example, the planning and execution

process for network exit polling in the U.S. takes over a year and substantial funding." *Id.* at 4. Stone's effort, by contrast, appears "to have begun just 2 weeks ago and he admits it is 'underfunded.'" *Id.*

Second, sound "exit polling requires careful deployment of random sampling techniques to determine which precincts are included and to randomly sample voters within each precinct. Failure to employ proper sampling methods renders any poll, including an exit poll, completely invalid." *Id.* at 4-5. By contrast, Stone's initiative "appears to have no sampling method. From his own accounts of his polling, he is herding his followers to specific precincts he has selected, apparently without even an attempt at a random process." *Id.* at 5.

Third, to ensure independence, exit polls "typically keep their sampled precincts confidential to prevent anyone from intervening to alter the results," *id.*, and the "interviewers themselves must be thoroughly non-partisan and rigorously trained. Past errors in exit polls have been attributed in part to inadequate training." *Id.* Not so with Stone's initiative, which has "publicized the locations he wants his so-called 'interviewers' to go," *id.*, is rushing to complete purported "training" operations, and has intentionally recruited "mostly partisan" interviewers to advance Stone's "avowedly partisan purpose" to maximize the chances that Trump will win the election, *id.*

Fourth, Stone's initiative makes no effort to produce an accurate picture of the voting pool. His plan does not appear to address important issues regarding early and absentee voters, without whom no exit poll can hope to be accurate. *Id.* at 6. At the same time, unlike established exit polling operations, Stone's initiative is nearly certain to lack continuous coverage at his hand-selected precincts—continuous coverage is vitally important because certain "demographic groups are more likely to vote before or after work, for instance . . . and it

is important that any biases observed during those times be mitigated by coverage throughout the day." *Id.*

Finally, and perhaps most importantly, "[e]xit polls are conducted to project the outcome of an election as accurately as possible, not to prevent fraud. . . . [A]ll polls have statistical margins of error and other non-sampling error. No one can be certain any poll is 100% accurate. Indeed, the intricately crafted exit polls used by the networks have had meaningful bias in their results for many years. The network polls become more accurate because the projects they display . . . take into account both poll results and actual precinct results—the kind of data Mr. Stone seems determined to challenge." *Id.* at 7. But Stone's efforts are not designed to accomplish that objective—they are designed to prove the existence of a purported conspiracy to "rig" the election by "rigging" election machines and election machine software. Unfortunately, "[e]xit polls cannot fulfill that objective." *Id.*

In sum, "Mr. Stone's effort seems oblivious to the fundamental techniques of, and facts about exit polling and is plainly not designed to achieve the accepted purpose of an exit poll." *Id.*

Moreover, the notion of widespread voter fraud in modern American politics is itself a fraud. Every attempt to verify the presence of voter fraud has proven fruitless. *See generally* Lorraine C. Minnite, *The Myth of Voter Fraud* (2010) (concluding that the notion of widespread voter fraud is a "myth"). One 2014 study found only 241 potentially fraudulent ballots had been cast nationwide over a 14-year period—*out of 1 billion ballots cast*. McTigue Decl. at Ex. 16 (Justin Levitt, *A Comprehensive Investigation of Voter Impersonation Finds 31 Credible Incidents Out of One Billion Ballots Cast*, Washington Post, Aug. 6, 2014). Those statistics help explain why, as described below, the courts that examined the evidence concluded that

widespread voter fraud does not exist. Indeed, Ohio's Republican Secretary of State Jon Husted rejected the notion of widespread in-state voter fraud, saying there is "no evidence" of widespread voter fraud in Ohio, and that "there are no facts that support" Trump's claims to the contrary. McTigue Decl. at Ex. 41 (*Ohio Secretary of State Calls Trump's Rigged Election Claims 'Irresponsible,'* NPR.org, Oct. 17, 2016).

The fact that voter fraud is a myth does not prevent many people—particularly those who are listening most closely to the RNC, Trump, and their surrogates such as Stone—from believing it is real. As a recent Washington Post-ABC poll showed, 69% of Trump's supporters (but less than half of all voters) believe that voter fraud happens "very often" or "somewhat often." McTigue Decl. at Ex. 28 (Emily Gustkin & Scott Clement, *Poll: Nearly Half of Americans Say Voter Fraud Occurs Often*, Wash. Post, Sept. 15, 2016). Certain elements of the Republican Party, including Stone and Trump's allies in the so-called "alt-right" media ecosystem (such as the Breitbart website that was run until recently by Trump Campaign CEO Steve Bannon) have stoked this widespread belief for decades, despite a total lack of evidence to support it. In the last few months alone, Breitbart has run dozens of articles on supposed voter fraud, with ominous, headlines about "Obama forces" and "Soros-backed" cover-ups, *see, e.g.*, McTigue Decl. at Ex. 29 (Patrick Howley, *Wikileaks: John Podesta Believed 'Obama Forces' Committed Voter Fraud*, Breitbart, Oct. 15, 2016), and Stone has appeared on Breitbart-affiliated radio stations to echo Trump's fearmongering about a stolen election, *see, e.g.*, Milo Yiannopoulos, *The Milo Show Teaser: Roger Stone on How Trump Can Stop Voter Fraud*, YouTube (July 29, 2016), https://www.youtube.com/watch?v=1bPR846gO8U. Stone's "Stop the Steal" campaign has fanned these flames by widely distributing messages via social media and elsewhere falsely claiming that the election will be "rigged" by "illegals." *See* McTigue

Decl. at Ex. 5 (Stop the Steal home page). And, appearing on Face the Nation on October 23, 2016, RNC Chairman Reince Priebus declared that voter fraud "is real," and that what Trump is doing is "trying to also tell his folks to watch out for this fraud that might occur." McTigue Decl. at Ex. 14 (*Face the Nation Transcript October 23, 2016: Priebus, Axelrod*, CBS News, Oct. 23, 2016).

Trump's calls for unlawful vigilantism to stop purported voter fraud advance a coordinated effort to harass and intimidate voters at the polls. Many of these supporters have responded to Trump's call to action.

    **b. Defendants Conspire to Suppress Democratic and Predominantly Minority Voting Rights**

As the Republican Party nominee for President, Trump and his campaign coordinate closely with the RNC and ORP on a wide variety of matters, including overall campaign strategy, public messaging, voter outreach, and field operations. On May 17, 2016, the RNC created a joint fundraising committee with the Trump Campaign specifically to fund the Trump Campaign and its operations, and to elect Republicans "up and down the ballot." McTigue Decl. at Ex. 1 (Press Release: *RNC & Trump Campaign Announce Joint Agreements*, May 17, 2016). The Trump Campaign "relinquished control over many of its tactical decisions" to the RNC. McTigue Decl. at Ex. 17 (Joshua Green, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek (Oct. 26, 2016)). Indeed, shortly after Trump became the Republican nominee, the RNC met with the Trump Campaign to discuss what they described as "the merger." *Id.* The Trump Campaign and RNC "negotiated a partnership," in which the RNC "buil[t] assets and infrastructure and the nominee gets to benefit from it." *Id.*

The Trump Campaign has decided largely to refrain from setting up its own offices and staff in Ohio and elsewhere, as past Republican Party nominees have done. Instead, the Trump

Campaign is relying predominantly on the RNC and Republican state party entities (such as the ORP) to manage get-out-the-vote operations in contested states such as Ohio. *See* McTigue Decl. at Ex. 20 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016).

The Trump Campaign's coordination with the RNC and ORP extends to efforts to monitor polling locations for purported voter fraud. The ORP has taken responsibility for the "appointment of poll watchers for the Trump campaign throughout the state" of Ohio. *See* McTigue Decl. at Ex. 2 (Trip Gabriel, *Donald Trump's Call to Monitor Polls Raises Fears of Intimidation*, The New York Times, Oct. 18, 2016). Trump's running mate, Governor Mike Pence, publicly confirmed that the Trump campaign is working with the RNC and state Republican parties on ballot security measures. At an August 3, 2016 town hall rally in Denver, Colorado, Pence was asked "how is the Trump-Pence campaign going to . . . prevent" Hillary Clinton from "steal[ing] this election." Pence responded: "I will tell you that the Trump campaign and the Republican National Committee are working very, very closely with state governments and secretaries of states all over the country to ensure ballot integrity. . . . We are working hard all over the country, the Republican National Committee is working all over the country, but I would encourage everyone within the sound of my voice, get involved, participate, be a poll worker on election day . . . be a part of that process, and uphold the integrity of one person one vote in America." *8-3 Replay: Pence Denver Rally Town Hall*, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16/, at 16:22 - 17:27 (last accessed Oct. 31, 2016).

Last week, Trump's campaign manager Kellyanne Conway confirmed that the Trump campaign is "actively working with" the RNC and other branches of the Republican Party

apparatus, such as the ORP, to "monitor precincts around the country." *See* McTigue Decl. at Ex. 9 (Tierney Sneed, *Why the RNC Wants Nothing to Do with Trump's Poll Watcher Call to Arms*, Talking Points Memo, Oct. 21 2016); *see also Trump Poll Watching Call a Legal Risk for RNC*, MSNBC.com (Oct. 20, 2016), http://www.msnbc.com/rachel-maddow/watch/trump-poll-watching-call-a-legal-risk-for-rnc-790392387688. The RNC and ORP have continued this close coordination even after Trump's widespread and racially charged pleas to his supporters to engage in voter intimidation in areas like Cleveland that contain large communities of racial minorities.

Just days ago, the Trump Campaign distributed talking points to Republican Party surrogates directing that they "[m]ust make points on rigged system," and encouraging them to claim there has been "an increase in unlawful voting by illegal immigrants." McTigue Decl. at Ex. 10 (Jonathan Swan, *Trump Campaign Encouraging Surrogates to Double Down on Ballot Fraud*, The Hill, Oct. 21, 2016).

### c. Co-conspirators Respond with Promises to Intimidate Voters

The available evidence demonstrates that Trump's supporters in Ohio, and elsewhere, are responding to his calls to engage in voter intimidation, thereby creating an immediate threat of harm to Ohio voters. The *Boston Globe* reported on Trump supporters who are planning to engage in unlawful voter intimidation, and who understand themselves to be doing so at Trump's behest:

> "Trump said to watch your precincts. I'm going to go, for sure," said Steve Webb, a 61-year-old carpenter from Fairfield, Ohio.
>
> "I'll look for . . . well, it's called racial profiling. Mexicans. Syrians. People who can't speak American," he said. "I'm going to go right up behind them. I'll do everything legally. I want to see if they are accountable. I'm not going to do anything illegal. I'm going to make them a little bit nervous."

McTigue Decl. at Ex. 6 (Matt Viser & Tracy Jan, *Warnings of Conspiracy Stoke Anger Among Trump Faithful*, Boston Globe, Oct. 15, 2016).

Another Trump supporter named Leon Neisius, who resides outside of Pickerington, Ohio, told the Columbus Dispatch that he intends to engage in poll monitoring, but not near his home in Fairfield County, which is mostly rural. Instead, Mr. Neisius intends to watch the polls in Franklin County, which is home to Columbus, because in Neisius's words, "Fraud's more likely up there." McTigue Decl. at Ex. 44 (Darrel Rowland & Randy Ludlow, *Trump Backers Walking Shaky Legal Line in Monitoring Voters*, The Columbus Dispatch, Oct. 24, 2016).

One Twitter user who goes by the name "Deplorable Patriot" tweeted that she is "getting trained on Nov 3 to be a poll watcher in Columbus Ohio! I'd suggest everyone call your RNC sign up!" The tweet was accompanied by a link to a "DONALDTRUMPNEWS.co" article titled "TRUMP IS TOTALLY RIGHT! Look What's Happening at Voting Machines Everywhere . . . ." "Deplorable Patriot," who tweets from the handle @Lady_Lbrty, describes herself in her Twitter bio as "U.S.F.A pro military, pro police, pro 2nd amendment. Anti Liberal BS. Anti-multicultural. anti-Islamic." The bio is followed by an emoji representing "Pepe the Frog," and a #Trump2016 hashtag. McTigue Decl. at Ex. 33 (@Lady_Lbrty, Twitter.com, Oct. 26, 2016, 9:28 A.M.).

Another Twitter user "mildredgouveia," who tweets from the handle @MillieGouviea, and purports to be from "Ohio, USA," tweeted on October 24: "ALL TRUMP VOTERS WEAR A RED SHIRT ON NOV. 8. I ALREADY VOTED EARLY BUT WILL BE A POLL WATCHER AND WILL WEAR MY RED SHIRT." McTigue Decl. at Ex. 43 (@MillieGouveia, Twitter.com, Oct. 24, 2016, 6:28 P.M.).

These problems are occurring in this District. According to Pat McDonald, the Republican Director of the Cuyahoga County Board of Elections, Trump supporters have already visited the county elections board identifying themselves as poll observers, even though they did not appear to be credentialed as poll observers as required under Ohio law. McTigue Decl. at Ex. 38 (Andrew J. Tobias, *Donald Trump's 'Rigged' Talk Concerns Cuyahoga County Elections Officials*, Cleveland.com, Oct. 19, 2016). Indeed, Trump's fearmongering has caused Cuyahoga County election officials to express concerns of instability on Election Day and to raise the prospect of deploying law enforcement officials to the polls if necessary to address polling place issues. *Id.*

On October 29, 2016, a person dumped a truckload of manure outside the Ohio Warren County Democratic Party headquarters. McTigue Decl. at Ex. 45 (*Arrest Made After Manure Dumped Outside Warren County Dems HQ*, Dayton Daily News, Oct. 29, 2016). The Warren County Sherriff's office arrested a suspect, James R. Pinell, of Lebanon, Ohio. *Id.* A Facebook account purporting to belong to a "James Pinell" from Lebanon, Ohio includes posts with messages hostile to President Obama—for example, one post has a picture of a Coca-Cola can with Arabic lettering, which Pinell labeled "the new Obama approved coke cola can"—as well as claims to supporting Republicans. McTigue Decl. at Ex. 47 (Pinell Facebook Screenshots, at 1-2). According to a tweet by a local news reporter, Pinell has a bumper sticker that says, "STOP HILLARY." McTigue Decl. at Ex. 46 (@MikeSFOX45NOW, Twitter (Nov. 1, 2016, 11:26 AM EST), https://twitter.com/MikeSFOX45NOW/status/793489412621492224).

Similar responses have emerged outside of Ohio. For example, Harry Miller, purportedly of Palm Beach, Florida, tweeted in response to Trump's calls for election observers that he would be "wear'n red at polls. . . . We gonna be watch'n fer shenanigans . . . haul ya away . . . ."

McTigue Decl. at Ex. 7 (Jackbgoode1, Twitter (Aug. 19, 2016, 7:43 PM EST), https://twitter.com/jackbgoode1/status/766827980840505344). The tweet included a picture of a pickup truck with Florida plates and a person-sized cage built into the bed, surrounded by American flags. *See id.* Miller has over 20,000 Twitter followers and tweets almost exclusively about Trump, Secretary Clinton, and racially-charged political themes such as deporting "Muzzys." *See generally* Harry Miller (@jackbgoode1), Twitter, https://twitter.com/jackbgoode1 (last visited Oct. 28, 2016). A typical tweet asserts that "Our Muzzy Commander in Chief" is "shov'n Sharia Law down our throats . . . & Crooked Hiltlery follow'n his every move. . . ." McTigue Decl. at Ex. 8 (Jackbgoode1, Twitter (July 14, 2016, 9:14 AM EST), https://twitter.com/jackbgoode1/status/753623729419063296).

At a "poll watcher training" class for Trump supporters organized by the Republican Party of Virginia, would-be watchers expressed their belief that "there is going to be massive voter fraud, and it definitely will be to ensure Hillary Clinton wins." McTigue Decl. at Ex. 37 (Beth Reinhard, *At Poll Watcher Training Class, Republicans Trade Rumors, Fears of Fraud*, Wall St. J., Oct. 27, 2016). The leader of the class listed purported voter-fraud schemes "orchestrated by liberal groups," including "civil rights leaders coercing severely disabled people into voting." *Id.* One Trump supporter seeking to be a poll watcher said her "biggest concern" was "[i]llegals voting," and noted as an example of said phenomenon that in 2012 she saw people voting who did not appear to speak English. *Id.*

In Virginia, on October 13, 2016, two armed Trump supporters staged a purported "protest" in front of the office of a Virginia Democratic candidate for Congress, Jane Dittmar. The armed Trump supporters, one of whom wore a signature Trump campaign hat, stood for nearly twelve hours outside Dittmar's campaign office, turning sideways so that those inside

could see they were carrying firearms. McTigue Decl. at Ex. 42 (Taylor Cairns, *Legally Armed Protester Stands Outside Dittmar Campaign Offices for Hours*, Newsplex.com, Oct. 13, 2016).

All the while, Trump continues to induce his supporters to engage in polling place harassment targeting non-white voters in urban areas, and continues to invoke the baseless claim that the unlawful conduct that his supporters are planning, at his behest, is justified by fictitious "voter fraud."

## II.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### a.     Defendants Have Violated Section 11(b) Of The Voting Rights Act

Plaintiff is likely to prevail on its claim that Defendants have violated Section 11(b) of the Voting Rights Act, codified at 52 U.S.C. § 10307(b). That statute provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b).[1] Section 11(b) was passed as part of the Voting Rights Act "to banish the plight of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), but Congress intentionally drafted Section 11(b) "not [to] require proof that racial discrimination motivated the intimidation, threats, or coercion," *Willingham v. Cty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); *see Cameron v. Johnson*, 262 F. Supp. 873, 884 n.9 (S.D. Miss. 1966) (same); H.R. Rep. No. 89-439, at 30 (1965) ("The prohibited acts of intimidation need not be racially motivated."), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.[2]

_____

[1] Section 11(b) affords a private right of action. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 555-56 & n.18 (1969); *Gray v. Main*, 291 F. Supp. 998, 999-1000 (M.D. Ala. 1966); *see also* 28 U.S.C. § 1343(a)(4).

[2] Attorney General Nicholas Katzenbach, who drafted much of the Voting Rights Act, explained to the Senate that "defendants [sh]ould be deemed to intend the natural consequences of their acts." Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965).

Section 11(b) "on its face prohibits *any* intimidation, threat, or coercion, whether done by a public official or by a private individual." *Whatley v. Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968); *see Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (Section 11(b) "is to be given an expansive meaning").

The operative words of Section 11(b)—to "intimidate," "threaten," and "coerce," or to attempt to do so—should be given their commonly understood meaning. *See, e.g.*, *Deutsche Bank Nat. Trust Co. v. Tucker*, 621 F.3d 460, 462 (6th Cir. 2010) (internal quotation marks omitted) (unless otherwise defined, statutory terms will be interpreted as taking their "ordinary, contemporary, common meaning"). That ordinary meaning provides that Section 11(b) makes actionable any conduct that is designed to "make timid or fearful," or "compel or deter or as if by threats," *see* Merriam Webster ("intimidate"); to "utter threats against" or "cause to feel insecure or anxious," *see id.* ("threaten"); or to "compel to an act or choice" or "achieve by force or threat," *see id.* ("coerce").[3] The statutory terms cover not only the most powerful levers of the state, such as "arrest and prosecution," *see Cameron*, 262 F. Supp. at 897, but also plainly apply to threatening, intimidating, and coercive acts carried out by private individuals.

Section 11(b)'s reach is not restricted to overt acts of violence. Indeed, courts assessing comparable language in other civil rights statutes have held that "intimidating" and "threatening" includes subtler conduct. For instance, the Ninth Circuit found that it constituted "intimidation" to send a mass mailing to 14,000 newly registered voters with Hispanic surnames warning them that if they voted in the election, their personal information would be collected and made available to organizations that were "against immigration." *United States v. Nguyen*, 673 F.3d 1259, 1261 (9th Cir. 2012) (interpreting a criminal voter intimidation provision of the California

---

[3] *Available at* http://www.merriam-webster.com/dictionary.

election code).   As the Ninth Circuit held, "intimidation" is "not limited to displays or applications of force, but *can be achieved through manipulation and suggestion*," including "through subtle, rather than forcefully coercive means."   *Id.* (emphasis added).   In another example, the Seventh Circuit found that conduct involving the writing of a racial slur on property was proscribed under the Fair Housing Act.   *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (Posner, J.).   The court explained that even if the intimidating and threatening conduct was not as "ominous, frightening, or hurtful [as] burning a cross . . . or assaulting the [victim] physically," there exist "less violent but still effective[] methods" by which an offender can frustrate a victim's protected rights, such as through "a *pattern* of harassment."   *Id.*; *see also, e.g.*, *Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 613 (D.N.J. 2000) ("violence or physical coercion" is not "a necessary prerequisite" under a Fair Housing Act provision barring "coerc[ion], intimida[ion], [and] threaten[ing]").

Courts assessing voter intimidation claims look to whether the challenged conduct would reasonably intimidate, threaten, or coerce voters.   For example, during the 2004 election cycle, Senator Tom Daschle argued that certain conduct committed by Republican candidate John Thune, the South Dakota Republican Party, and their agents violated Section 11(b): "[f]ollowing Native American voters at [a] polling place . . . and standing two to three feet behind Native American voters, and ostentatiously making notes"; "[f]ollowing Native American voters out to their cars after they have voted, walking up to their vehicles, and writing down their license plate numbers"; and "[h]aving a loud conversation in a polling place, where Native Americans were voting, about Native Americans who were prosecuted for voting illegally in Minnesota." *Daschle v. Thune*, Complaint at 5-6, Civ. 04-4177, (D.S.D., Nov. 1, 2004).   Daschle claimed that

"[t]he persons carrying out these activities are part of a large group of Republican Thune supporters who have come to South Dakota from across the country, and who are poised to repeat the same conduct in Native American voting places across South Dakota . . . on Election Day." *Id.* at 6. The district court granted a temporary restraining order and found Daschle was "likely to succeed" on his Section 11(b) claim, "as the Court finds that there was intimidation particularly targeted at Native American voters . . . by persons who were acting on behalf of John Thune." TRO at 2, Civ. 04-4177 (D.S.D. Nov. 2, 2004). Although Daschle alleged intent, the district court explained that "[w]hether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters." *Id.*; *see also United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (concluding that the "inevitable effect" of challenged conduct would be to deter voters).

Just as in the *Daschle* case, such intimidating conduct should be enjoined here. The allegations in the Complaint and the material set forth herein and provided with this motion show that Defendants and their agents are engaged in a concerted effort to intimidate, threaten, and coerce lawful voters from exercising their right to vote. Even if those efforts have not yet achieved success, Defendants have already *attempted* to induce fear and anxiety among minority voters in Ohio, and likewise taken steps designed to prevent minority voters from voting. The Trump Campaign is exhorting its supporters to go to Democratic-leaning, majority-minority areas like Cleveland to watch over minority voters, with Trump adding that "when [I] say 'watch,' you know what I'm talking about, right?" McTigue Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016). Trump Campaign surrogates have explicitly linked voter fraud to "inner cities" that support Democrats. Trump's advisor and surrogate Roger Stone adopted similar rhetoric to justify his

calls for "exit polling" volunteers and "Vote Protectors." McTigue Decl. at Ex. 4 (Oliver Laughland & Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016); *id.* Ex. 36 (Christina Wilke, *Trump-Linked Voter Intimidation Group Releases New Script for 'Citizen Journalists,'* The Huffington Post, Oct. 26, 2016).

Plaintiff is likely to succeed on the merits in showing that Defendants, and those in concert with them, plan to engage in unlawful voter intimidation. As described *supra*, available news reporting demonstrates that Trump supporters are already responding to the candidate's call to intimidate voters in Ohio and beyond. *See, e.g.*, McTigue Decl. at Ex. 6 (Matt Viser & Tracy Jan, *Warnings of Conspiracy Stoke Anger Among Trump Faithful*, Bos. Globe, Oct. 15, 2016) (quoting Ohio Trump supporter's goal to "make them a little bit nervous"); McTigue Decl. at Ex. 7 (@jackbgoode1, Twitter.com Aug. 19, 2016, 7:43 P.M.) (tweet from Florida Trump supporter that he will be "wear'n red at polls" and will "haul ya away" if he sees any "shenanigans"). Other Trump supporters plan to target Columbus, and Cuyahoga County elections officials have expressed significant concerns about disruptions on Election Day. McTigue Decl. at Ex. 44 (Darrel Rowland & Randy Ludlow, *Trump Backers Walking Shaky Legal Line in Monitoring Voters*, The Columbus Dispatch, Oct. 24, 2016).

Such planned conduct at issue here is legally indistinguishable from the allegations that the *Daschle* court found more than sufficient to constitute intimidation and threats in violation of Section 11(b) and therefore support a TRO.[4] Plaintiffs need not wait for intimidators to arrive at

---

[4] *Summit County Democratic Central and Executive Committee v. Blackwell*, 388 F.3d 547 (6th Cir. 2004), presents no obstacle to Plaintiff's likely success on the merits in this litigation. In that case, the Sixth Circuit stayed orders enjoining Ohio election officials from permitting persons appointed as "challengers" to act under then-operative Ohio election law. *Id.* at 550-51; *see also* Ohio Rev. Code Ann. § 3505.20-21 (Anderson 2004). Plaintiffs there had

polling stations in Ohio before obtaining relief against Defendants for attempting to fund, organize, and support their arrival.

For these reasons, Plaintiff has provided more than sufficient information to establish Defendants' intent to intimidate and threaten voters under Section 11(b). Plaintiffs are likely to succeed on the merits of this claim.

### b. Plaintiff Is Likely To Show That Defendants Have Violated The Ku Klux Klan Act, 42 U.S.C. § 1985(3)

Plaintiff is also likely to prevail on its claim that Defendants have violated the Ku Klux Klan Act of 1871 (the "Klan Act"). The relevant provision of the Klan Act, codified at 42 U.S.C. § 1985(3), creates liability for three different kinds of conspiracies. *See United B'hd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 839 n.1 (1983) (Blackmun, J., dissenting); *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc). Plaintiff's claim arises under § 1985(3)'s provision barring conspiracies to suppress voters, which provides: "[I]f two or more persons conspire to prevent by force, intimidation or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy," and "one or more persons engaged" in that conspiracy commit an act in furtherance of the conspiracy that injures a person or

---

brought actions arising under 42 U.S.C. § 1983 and 52 USC § 10301(a), challenging the constitutionality of the application and enforcement of the Ohio "challenger" provisions. *Summit County* is inapposite for at least two reasons. First, the plaintiffs brought claims under provisions of federal law requiring a showing of racial or other class-based animus. Second, the statute that plaintiffs challenged in Summit County was later held unconstitutional in *Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006).

deprives that person of a federal right, "the party so injured or deprived may have an action . . . ." 42 U.S.C. § 1985(3).

The Ninth Circuit has referred to this type of a § 1985(3) conspiracy as "a conspiracy to interfere with federal elections." *Bretz*, 773 F.2d at 1027 n.3. A straightforward reading of the statutory text, coupled with case law interpreting other Klan Act claims, makes clear that Plaintiff's claim in this case is likely to succeed.[5]

In construing § 1985(3) conspiracy claims, the Supreme Court has explained that:

> to make out a violation of § 1985(3), as construed in *Griffin v. Breckenridge* [which construed the section's first clause], the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United B'hd. of Carpenters*, 463 U.S. at 828-29. It follows that to make out a violation of the latter part of § 1985(3) at issue here, a plaintiff must allege and prove the following four elements: (1) a conspiracy; (2) to prevent a lawful voter from supporting a candidate in a federal election by force, intimidation, or threat; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

First, Plaintiff is likely to succeed on the merits of its claim that Defendants have engaged in a conspiracy. "A civil conspiracy is combination of two or more persons to an unlawful or

---

[5] Plaintiff is not required to prove that Defendants are motivated by racial or other class-based animus, as would be required to prevail on a claim for violations of the other two conspiracy bars in § 1985(3). *Kush v. Rutledge*, 460 U.S. 719, 721 (1983) (analogizing the anti-voter suppression conspiracy bar at issue here to 42 U.S.C. § 1985(2), which does not require a racial or other class-based animus). But even were that requirement to apply, the explicit targeting of minority areas and voters alleged in the Complaint is sufficient to demonstrate a likelihood of success on that aspect as well.

criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Ammlung v. City of Chester*, 494 F.2d. 811, 814 (3d Cir. 1974). As the Sixth Circuit has elaborated,

> [a] civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).

Plaintiff has alleged facts likely to prove that Defendants have agreed, tacitly and explicitly, to a "single plan" to suppress voting by Democratic, and predominantly non-white, voters in the 2016 Election, and that each individual Defendant shares in the "general conspiratorial objective." A "senior official" at the Trump Campaign recently admitted to Bloomberg Businessweek that the Campaign is engaged in "major voter suppression operations" designed to prevent minority and Democratic-leaning voters from casting lawful ballots. McTigue Decl. at Ex. 17 (Joshua Green & Sasha Issenberg, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 27, 2016). Trump repeatedly warns his followers that the election will be "rigged," and exhorted his followers to monitor other voters. *See supra* at 3-5; McTigue Decl. at Ex. 20 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016); McTigue Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016).

Agents of the Trump Campaign have supported Trump's message. Trump's running mate, Indiana Governor Mike Pence, admitted in public that "the Trump Campaign and the Republican National Committee are working very very closely with state governments and secretaries of states all over the country to ensure ballot integrity." *8-3 Replay: Pence Denver*

*Rally Town Hall*, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16/, at 16:22 - 17:27 (last accessed Oct. 28, 2016). Trump's campaign manager Kellyanne Conway confirmed to a reporter that the Trump Campaign is "actively working with" the RNC and state-level Republican Party organizations, such as the NRP, to engage in "ballot security" initiatives. McTigue Decl. at Ex. 9 (Tierney Sneed, *Why the RNC Wants Nothing to Do with Trump's Poll Watcher Call to Arms*, Talking Points Memo, Oct. 21 2016); *see also Trump Poll Watching Call a Legal Risk for RNC*, MSNBC.com, Oct. 20, 2016, http://www.msnbc.com/rachel-maddow/watch/trump-poll-watching-call-a-legal-risk-for-rnc-790392387688 (last accessed Oct. 26, 2016). Thus, Defendants not only agreed on a common plan; they are boasting about it in public, and seeking to recruit new conspirators to their cause.

Similarly, Stone and his organization Stop the Steal Inc. have amplified Trump's recruiting call, by signing up Trump supporters to "volunteer" to fight "voter fraud," spreading false claims and encouraging his audience to engage in unlawful voter intimidation, and encouraging "exit pollers" to intimidate minority voters. *See supra at* 8-10; McTigue Decl. at Ex. 32 ("Defend Donald – Stop the Steal," StopTheSteal.org); McTigue Decl. at Ex. 4 (Oliver Laughland & Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016). These efforts have the backing of the ORP and RNC. *See supra* at 15-17; McTigue Decl. at Ex. 9 (Tierney Sneed, *Why the RNC Wants Nothing to Do with Trump's Poll Watcher Call to Arms*, Talking Points Memo, Oct. 21 2016); *see also Trump Poll Watching Call a Legal Risk for RNC*, MSNBC.com, Oct. 20, 2016, http://www.msnbc.com/rachel-maddow/watch/trump-poll-watching-call-a-legal-risk-for-rnc-790392387688 (last accessed Oct. 31, 2016).

Second, Plaintiffs will likely prove that the conspiracy is directed at preventing lawful voters from voting "by force, intimidation, or threat." For the reasons laid out above Defendants' efforts are plainly designed to threaten, coerce, and intimidate Democratic and minority voters, and to encourage Trump's supporters to engage in activities outside of the ordinary election procedures established by Ohio law.

Third, each co-conspirator has performed an act in furtherance of that conspiracy. *See supra*, 3-5, 8-17; McTigue Decl. at Ex. 11 (David Weigel, *Trump Fires up Recruitment of Poll Watchers as He Warns of Election 'Cheating,'* Wash. Post, Aug. 13, 2016). McTigue Decl. at Ex. 1 (Press Release: *RNC & Trump Campaign Announce Joint Agreements*, May 17, 2016); McTigue Decl. at Ex. 17 (Joshua Green & Sasha Issenberg, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 27, 2016). McTigue Decl. at Ex. 4 (Oliver Laughland & Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016); McTigue Decl. at Ex. 27 (Register at Stop The Steal to become a Vote Protector Exit Poller), https://stopthesteal.org/register/ (last visited Oct. 28, 2016). Each of these acts, and many others, has furthered the conspiracy to prevent lawful voters from voting by intimidation.

Finally, each of those acts has injured Plaintiff in its capacity as the Democratic Party organization in the State of Ohio, both by harming its prospects in the upcoming election, and by depriving the lawful voters whose interests it represents of their legal right to vote in that election free of intimidation. Without immediate relief, Ohio voters will face the deprivation of their right to vote on account of the co-conspirators' intimidation.

  **c. Defendants Have No Legally Cognizable Interest In Voter Intimidation Tactics**

Defendants cannot rely on the First Amendment for permission to intimidate and harass voters under the guise of poll-watching, as "poll watching is not a fundamental right which enjoys First Amendment protection." *Dailey v. Hands*, No. 14-cv-423-KD-M, 2015 WL 1293188, at *4 (S.D. Ala. Feb. 20, 2015), *report and recommendation adopted*, Mar. 23, 2015; *see Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 596 (D.N.J. 2009) (rejecting as "meritless" the argument that consent decree bar on RNC "ballot security activities" "infringes on activity protected by the First Amendment"), *aff'd*, 673 F.3d 192 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 931 (2013); *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("poll watching . . . has no distinct First Amendment protection"); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("no authority" for "the proposition that" a person has "a first amendment right to act as a pollwatcher"). The "position of poll-watcher," rather, is "a mere creature of state statute," *Cotz*, 476 F. Supp. 2d at 364, so any individual's supposed "right" to be a poll-watcher "derive[s] solely from state law," *Turner*, 583 F. Supp. at 1162; *see Dailey*, 2015 WL 1293188, at *5 (rejecting the argument that "poll watching is actually a First Amendment right that 'transcends' merely serving as a poll watcher"; "Plaintiff provides no case law to support [that] argument"). "[T]he State is not constitutionally required to permit pollwatchers." *Turner*, 583 F. Supp. at 1162.

It is sensible and unsurprising that courts reject extending the First Amendment to poll-watching activities, as that conduct is a form of law enforcement delegable by States, rather than a form of expressive speech. *See Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008) (poll-watching involves "a citizen challeng[ing] another citizen's right to vote"); *Tiryak v. Jordan*, 472 F. Supp. 822, 823-24 (E.D. Pa. 1979) ("the position of poll-

watcher" is "a state responsibility" that constitutes "delegation" of the State's authority over "the conduct and organization of elections" to "the political parties").

Further, courts have recognized that the official responsibility States have entrusted to poll-watchers is vulnerable to abuse. In *Eaton*, for example, Republican Party officials invoked state law to file "*en masse* challenges to the right to vote of 6,000 Montana citizens" that were "frivolous." *Eaton*, 581 F. Supp 2d at 1078-79. The court noted that the state law permitting such challenges could be used "to execute a tawdry partisan ploy" in which "[v]oters might be intimidated, confused, or even discouraging from voting." *Id.* at 1079. The *Eaton* court's holding is consistent with the straightforward principle that otherwise lawful activities such as poll watching pursuant to state election procedures nonetheless violates Section 11(b) where the purpose and effect of such activities is to interfere with the right to vote. *See, e.g.*, *United States by Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 348 (E.D. La. 1965) (noting that "acts otherwise lawful may become unlawful and be enjoined under [Section 11(b)] if the purpose and effect of the acts is to interfere with the right to vote").

Thus, even assuming *arguendo* that a hypothetical First Amendment right to watch polls did exist, which it does not, such a right would be further circumscribed as speech by agents of the State. *Tiryak*, 472 F. Supp. at 824-25 (poll-watchers' activities constitute state action under 42 U.S.C. § 1983); *see Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (government may regulate speech by employees made "pursuant to their official duties").

Separately, any purported expressive right to engage in poll watching must give way to the compelling state interest in securing the franchise by preventing voter intimidation and the "right to cast a ballot free from threats or coercion," *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1051 (6th Cir. 2015). "Poll watching, . . . although ostensibly aimed at combatting voter

fraud, has a pernicious history of intimidation of minority voters." *Ne. Ohio Coal. for the Homeless v. Husted*, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part and rev'd in part*, __ F.3d __, 2016 WL 4761326 (6th Cir. 2016); *see Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79 ("Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater threat to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the [Consent] Decree."), *aff'd*, 673 F.3d 192 (3d Cir. 2012). In another case, a district court noted the "fear and intimidation" racial minorities face in some areas where "poll watchers . . . dress in law enforcement-style clothing for an intimidating effect." *Veasey v. Perry*, 71 F. Supp. 3d 627, 636-37 (S.D. Tex. 2014), *aff'd in part and rev'd in part and remanded*, 830 F.3d 216 (5th Cir. 2016).

### III. PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

In the absence of injunctive relief, Defendants are likely to carry out their plans to intimidate minority voters. That harm will be occasioned both by the loss of votes for Plaintiff's supported candidates, and by loss of voting rights by voters associated with the Plaintiff. *See, e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 n.7 (2008) (citing *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law.")); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004). U.S. political history shows that Defendants' schemes are neither anomalous nor unthreatening—to the contrary, voter intimidation efforts have been known to compromise the integrity of both federal and state elections. *See, e.g.*, *Ne. Ohio Coal. for the Homeless*, 2016 WL 3166251, at *28 ("Poll watching, . . . although ostensibly aimed at combatting voter fraud,

has a pernicious history of intimidation of minority voters."); *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79 ("Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater threat to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the [Consent] Decree."), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

A plaintiff demonstrates irreparable harm where, as here, the harm is "based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see ACLU of Kentucky v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (same). Defendants seek to intimidate and suppress Ohio voters, and "[a] restriction on the fundamental right to vote . . . constitutes irreparable injury." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see United States v. Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part) ("voter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits").

Courts find irreparable harm based upon the right to vote being threatened, even where the harm is not yet complete. For example, the Third Circuit found irreparable harm in the context of an upcoming election based on the notion that denial of "voting and associational rights"—including the ability to "vote for candidates who represent their beliefs"—"cannot be alleviated after the election." *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997). That is because "[t]here can be no 'do-over' or redress of a denial of the right to vote after an election," so "denial of the right to vote constitutes a strong showing of irreparable harm." *Fish v. Kobach*, __ F.3d __, 2016 WL 6093990, at *30 (10th Cir. Oct. 19, 2016) (irreparable harm where "over 18,000 Kansans stood to lose the right to vote in the coming general elections"); *see, e.g.*, *Lucas v. Townsend*, 486 U.S. 1301, 1305 (1988) (Kennedy,

J., in chambers) (granting injunction enjoining a bond referendum election because "[p]ermitting the election to go forward [without statutory protection] would place the burdens of inertia and litigation delay on those whom the statute was intended to protect"); *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury. . . . This makes sense generally and here specifically because whether the number is thirty or thirty-thousand, surely some North Carolina minority voters will be disproportionately adversely affected in the upcoming election. And once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done . . . ."); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) (finding irreparable harm based on the notion that denial of "voting and associational rights"—including the ability to "vote for candidates who represent their beliefs"—"cannot be alleviated after the election"); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon.").

In the absence of preliminary relief, Plaintiff will suffer irreparable harm: Defendants' voter intimidation and suppression scheme is likely to cause significant and widespread harm to voters' ability to exercise the franchise, preventing voters affiliated with Plaintiff from having their votes counted, and impairing the candidates supported by Plaintiff.

## IV.     THE BALANCE OF EQUITIES FAVORS PLAINTIFF

### a.  Preventing Voter Intimidation And Coercion Is A Critical Interest Enshrined In Federal Law

"[V]oter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits." *Madden*, 403 F.3d at 352 (Boggs, C.J., concurring in part and dissenting in part). Indeed, the constitutional interest at stake in this litigation is the voters' "most precious"

"right . . . , regardless of their political persuasion, to cast their votes effectively" and free of intimidation. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion of Blackmun, J.), and laws that protect voters from intimidation safeguard the "fundamental political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The Constitution secures the "citizen's right to a vote free of arbitrary impairment by state action," including intimidation by state-authorized poll-watchers. *Baker v. Carr*, 369 U.S. 186, 208 (1962).

Given the fundamental importance of the franchise, in the aftermath of previous voter suppression efforts in American history Congress responded forcefully by enacting laws that unequivocally prohibit voter intimidation. In the 1870s, in response to threats of political violence and harassment against former slaves and their white supporters by the newly formed Ku Klux Klan, Congress banned private conspiracies to intimidate or threaten voters. In the 1960s, in response to the menacing of African Americans who sought their full rights at the ballot box, Congress prohibited any threats or intimidation against any and all persons engaged in the democratic process. Through these actions, Congress created tools in federal law—the laws that Plaintiff invokes here—to ensure that elections in the United States will be free from harassment and intimidation at the polls.

There is no countervailing right of Defendants and their agents to poll-watch or observe elections. Rather, the ability to poll-watch is entirely a state-created interest; thus, poll-watching activities in federal elections are permissible only insofar as they comply with the federal laws proscribing voter intimidation. *See* 42 U.S.C. § 1985(3); 52 U.S.C. § 10307(b); *see also* U.S. Const. art. I, § 4 ("Congress may at any time by Law make or alter [state] Regulations"

governing congressional elections); *Smiley v. Holm*, 285 U.S. 355, 366 (1932) (the Elections Clause "embrace[s] authority to provide a complete code . . . in relating to . . . protection of voters"); *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2257 (2013) ("the Elections Clause empowers Congress to regulate *how* federal elections are held"). And, as previously discussed, even activities that comply with the strict letter of state election procedures will violate Section 11(b) where the purpose and effect of such activities is to interfere with the right to vote. *See Katzenbach*, 250 F. Supp. at 348 (noting that "acts otherwise lawful may become unlawful and be enjoined under [Section 11(b)] if the purpose and effect of the acts is to interfere with the right to vote").

### b. Widespread Or Systemic Voter Fraud Is A Myth

The claimed rationale for the conspiracy in which Defendants are engaged is to combat alleged "voter fraud." But widespread voter fraud is a myth. One recent study discovered only "31 credible incidents" of in-person voter fraud—out of *one billion* votes cast. McTigue Decl. at Ex. 16 (Justin Levitt, *A Comprehensive Investigation of Voter Impersonation Finds 31 Credible Incidents Out of One Billion Ballots Cast*, Washington Post, Aug. 6, 2014). The actual frequency of substantiated claims of voter fraud reveals that efforts to combat it are misguided at best and pretextual at worst, with the true purpose of suppressing voter turnout.

The courts that have examined the evidence have concluded that widespread voter fraud does not exist. In a challenge to Pennsylvania's voter ID law, for example, "[t]he parties [we]re not aware of any incidents of in-person voter fraud in Pennsylvania and d[id] not have direct personal knowledge of in person voter fraud elsewhere. *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014). A federal judge in North Dakota recently determined that "[t]he undisputed evidence before the Court reveals that voter

fraud in North Dakota has been virtually non-existent." *Brakebill v. Jaeger*, No. 16-civ-00008 (DLH), Dkt. No. 50 (Aug. 1, 2016). A federal judge in Wisconsin has similarly observed that "[t]he Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities." *One Wis. Inst. v. Thomsen*, No. 15-civ-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016); *see also Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) ("[T]he evidence before the Legislature was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14's passage."); *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) ("North Carolina asserts goals of electoral integrity and fraud prevention. But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable."); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194 (2008) ("The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places. The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history."); *Frank v. Walker*, 17 F. Supp. 3d 837, 848 (E.D. Wis. 2014) ("[I]t appears that there have been zero incidents of in-person voter-impersonation fraud in Wisconsin during recent elections."), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Lee v. Va. State Bd. of Elections*, No. 15-cv-357 (HEH), 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016) ("evidence of actual voter impersonation-type fraud was scant").

## V. TEMPORARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

### a. The Temporary Relief Plaintiff Seeks Would Simply Enforce Federal Law

The temporary relief that Plaintiff seeks would enforce federal law securing the right to vote, which clearly advances the public interest. Plaintiff asks this Court to enjoin Defendants from voter intimidation activity and other violations of federal law. As described above, voter intimidation is expressly prohibited by Section 11(b) of the Voting Rights Act, which provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). Defendants are also conspiring to intimidate lawful voters into staying away from the polls, in violation of the Klan Act, 42 U.S.C. § 1985(3). Plaintiff's requested injunctive relief does no more than to effectuate the mandate of federal law.

### b. The Public Interest Is Advanced By Securing The Right To Vote, Not By Its Suppression

"In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of . . . candidates, and their potential supporters." *Hooks*, 121 F.3d at 883-84. "By definition, [t]he public interest . . . favors permitting as many qualified voters to vote as possible." *League of Women Voters*, 769 F.3d at 247; *see Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (the public has a "strong interest in exercising the fundamental political right to vote") (internal quotation marks omitted); *Husted*, 697 F.3d at 437 ("That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful."). Voters have a "right against voter intimidation"—"the right to cast a ballot free from threats or coercion." *Lundergan-Grimes*, 784 F.3d at 1051.

For all of these reasons, the public interest clearly would be advanced by the injunction sought here. Against a backdrop of widespread past and threatened future voter intimidation and minimal evidence of voter fraud, Defendants cannot be permitted to engage in conduct that

threatens the most basic right in American democracy—the right of voters to cast their votes free of coercion and intimidation. "[O]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

## VI. CONCLUSION

This Court should grant Plaintiff's motion for a TRO and/or preliminary injunctive relief.

Respectfully submitted,

November 2, 2016

/s/ Steven S. Kaufman
Steven S. Kaufman
Chad D. Cooper
KAUFMAN & COMPANY, LLC
1001 Lakeside Avenue – Suite 1710
Cleveland, Ohio 4414
Tel: (216) 912-5500
Fax: (216) 912-5501
Steve.Kaufman@Kaufman-Company.com
Chad.Cooper@Kaufman-Company.com

Donald J. McTigue
Derek S. Clinger
MCTIGUE & COLOMBO LLC
545 East Town Street
Columbus, OH 43215
Tel: (614) 263-7000
Fax: (614) 263-7078
dmctigue@electionlawgroup.com

N. Zachary West
OHIO DEMOCRATIC PARTY
340 East Fulton Street
Columbus, OH 42315
Tel: (614) 221-6563
Fax: (614) 221-0721
zwest@ohiodems.org

Marc E. Elias
Perkins Coie LLP
700 13th Street, Suite 600
Washington, DC 20005
Tel: (202) 434-1609
Fax: (202) 654-9126
melias@perkinscoie.com

Michael J. Gottlieb
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, N.W.
Washington, DC  20015
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com

Dawn L. Smalls
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Tel: (202) 754-4216
Fax: (212) 446-2350
dsmalls@bsfllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2016, a copy of the foregoing Plaintiff's Memorandum of Law in Support of Temporary Restraining Order and/or Preliminary Injunction was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served in accordance with the Federal Rules of Civil Procedure. Parties may access this filing through the Court's system.

/s/ Steven S. Kaufman
Steven S. Kaufman
Chad D. Cooper
KAUFMAN & COMPANY, LLC
1001 Lakeside Avenue – Suite 1710
Cleveland, Ohio 44114
Tel.: (216) 912-5500
Fax: (216) 912-5501
Steve.Kaufman@Kaufman-Company.com
Chad.Cooper@Kaufman-Company.com