IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Ohio Democratic Party,** <br><br> **Plaintiff,** <br><br> v. <br><br> **Ohio Republican Party; Donald J. Trump for President, Inc.; Roger J. Stone Jr.; and Stop the Steal Inc.,** <br><br> **Defendants.** | Civil Action No. 1:16-cv-2645 |

**DONALD J. TRUMP FOR PRESIDENT, INC.'S MEMORANDUM IN SUPPORT OF THE RESPONSE TO PLAINTIFF'S COMPLAINT**

Citing opaque remarks in public speeches by political candidates in four cookie-cutter lawsuits filed across the country to garner headlines and cause chaos in the efforts of their political opponents, the Ohio Democratic Party brings to this Court and three others an emergency request that the Court prohibit hypothetical political conduct, by unidentified persons, that allegedly will improperly dissuade other unknown persons from voting.  These filings are based on miscellaneous long-ago statements, vague innuendo, rank speculation, and a heavy dose of rhetoric—all geared solely toward creating political mayhem rather than preventing actual misconduct.  Defendant Donald J. Trump for President, Inc. (the "Campaign") strictly adheres to federal

and state election laws. It will continue to do so. For the reasons detailed below, this Court should deny Plaintiff Ohio Democratic Party's request for emergency relief, because that request is as unnecessary and misguided as it is sweeping.

It is misguided because the Complaint at bottom seeks an injunction requiring that the defendants follow Ohio and federal-election rules on Election Day—this despite the fact that federal courts will not typically issue "obey-the-law" injunctions absent compelling evidence that the law will not otherwise be followed. *See E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984) ("'obey the law' injunctions cannot be sustained"). And it is sweeping because any order adopting the Complaint's numerous requests for relief threatens to dissuade Ohioans from exercising their bedrock rights to political speech and political organizing.

As a legal matter, the Complaint fails even the most basic requirements for seeking emergency injunctive relief. *First*, the Complaint cites no actual acts of "voter intimidation," even with voting in Ohio commencing *three weeks ago*. On that ground alone, the Complaint fails to demonstrate a high probability of actual or likely harm justifying injunctive relief.

Lacking any evidence of wrongdoing by the Campaign or the Ohio Republican Party, Plaintiff invokes the supposed activities of another person and another entity—one Roger Stone and his group "Stop the Steal." *See* Complt. ¶¶1, 9-10, 34-40, 64. But Mr. Stone and his group are completely independent from the Campaign and there is no basis in fact or law for ascribing or imputing their activities to the Campaign. Mr. Stone and his organization are not employed by or affiliated with the Campaign in any way. The Campaign has no knowledge of Mr. Stone and Stop the Steal's activities. Nor did the Campaign direct, control, authorize, approve, or consent to any of the statements or actions Mr. Stone and Stop the Steal are alleged to have undertaken.

Despite no evidence to support the claim, Plaintiff makes the vague yet conclusory allegation that Mr. Stone is a "longtime associate of Trump's," *Id.* ¶9, but that allegation—even if true—plainly is not enough to establish the sort of nefarious conspiracy Plaintiff imagines.

*Second*, Plaintiff's proposed remedy threatens to undermine the political and speech rights afforded the Campaign, and all Ohioans, by Ohio law and the United States Constitution. Ohioans enjoy the right to political speech, the right to volunteer for their preferred political party, and the right to support the candidates of their choosing, among a host of other speech-related rights. Yet Plaintiff would have the Court issue a broad, vaguely worded order that threatens to restrain this protected political engagement. Given the lack of evidence of actual illegal conduct in the Complaint, it is impossible to know how broadly Plaintiff's requested relief would extend, and thus what protected political conduct would be swept up under the order, in disregard of both state law and the First Amendment.

For these and other reasons explained below, Plaintiff cannot satisfy its burden to prove a right to extraordinary emergency relief. Accordingly, the requested relief should be denied.[1]

## ARGUMENT

Preliminary injunctive relief "is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In assessing whether a movant is entitled to such relief, courts apply the same standard for both preliminary injunctions and temporary restraining orders. *Summit Cty. Democratic Cent. & Exec. Comm. v.*

---

[1] Plaintiff brought suit against the Campaign, the Ohio Republican Party, Roger J. Stone Jr., and Stop the Steal. The Campaign agrees with the Ohio Republican Party's arguments in its filings here, in particular its understanding of Ohio election law and the rights afforded political parties in observing elections, and adopts them as its own. The Campaign has no relationship with the remaining defendants, Roger Stone or Stop the Steal; neither is in any way associated with the Campaign. Nonetheless, Plaintiff's claims against those defendants fail for many of the reasons articulated here—including a lack of factual support.

*Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004). Courts consider: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a [temporary restraining order] would cause substantial harm to others; and (4) whether the public interest would be served by issuance" of a temporary restraining order. *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2009)).

Plaintiff has not actually moved for a preliminary injunction or a temporary restraining order. That is the relief the Complaint requests, however, and thus the factors this memorandum addresses. As explained below, Plaintiff's request for relief fails at every step.

I. **Plaintiff Cannot Show That Anyone Will Be Irreparably Harmed By The Court's Refusal To Award A Temporary Restraining Order.**

The Campaign begins with the second part of this four-factor test, because the relevant facts illustrate just how frivolous this case is. There is no evidence—none—that any of the imagined harms will come to pass.

Plaintiff's request for emergency relief rests upon an alleged conspiracy among the Ohio Republican Party and others to "threaten, intimidate, and thereby prevent" voters from voting in the 2016 election. Complt. ¶1. Given the serious nature of these allegations—that one of our State's two venerable political parties and its Presidential candidate's campaign are seeking to deny Ohioans their fundamental right to vote—one would expect firm evidence. But that evidence is nowhere to be found in Plaintiff's 29-page complaint.

The principal source of Plaintiff's "evidence" is campaign speeches by the Republican Presidential and Vice-Presidential candidates. Setting aside the fact that these speeches by and large were not given in Ohio, did not reference Ohio, and did not urge any specific conduct in Ohio, nothing in those speeches can justify an extraordinary judicial order restricting quintessential political conduct. The speech at issue includes general references to campaign volunteers

"watching" polling places, *id.* ¶¶21–24, encouragement to supporters to "be involved" in the campaign, *id.* ¶28, invitations to supporters to participate in the election to ensure it is not "stolen," *id.* ¶27, and questions regarding the possibility of election fraud, *id.,* a notion that enters the political vernacular (and process on occasion) every election season. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J.) (explaining that states have a valid interest "in deterring and detecting voter fraud"). On its face, none of this amounts to express direction that Ohioans engage in forms of "voter suppression," or "vigilantism," Complt. ¶¶ 45–46, 65—an unfortunate, inflammatory characterization that serves only to invoke heated reactions by those on all sides of the political arena.

Plaintiff's other "evidence" is even more specious. Plaintiff relies on an anonymous hearsay quote from an "unnamed official" regarding alleged voter suppression. Complt. ¶1. It cites statements urging supporters to serve as "poll watchers," *id.* ¶30, also known as poll observers, a long-standing practice used by both parties and sanctioned by Ohio law. *See* Ohio Rev. Code 3505.21 ("Appointment of challengers and witnesses"). It also invokes statements suggesting that some on the voting rolls are dead, Complt. ¶32, a fact recently confronted by the State of Ohio, *see A. Philip Randolph Inst. v. Husted*, —F.3d—, No. 16-3746, 2016 WL 5328160, at *1 (6th Cir. Sept. 23, 2016) (addressing purging of Ohio election rolls to remove "the names of the deceased" as well as those "voters who are no longer eligible to vote"); Catherine Candisky, *Secretary of State Jon Husted sued over purge of voter rolls*, COLUMBUS DISPATCH (Apr. 7, 2016), https://perma.cc/TV5Z-QS2Z ("In recent years, Husted's office has removed 465,000 deceased voters . . . from Ohio's voter rolls."). Plaintiff suggests a nefarious motive in the Campaign seeking volunteers in urban areas like Cleveland and Philadelphia, *see* Complt. ¶¶ 27, 51, 69, yet fails to acknowledge the obvious—that these are the largest cities with the

largest concentration of voters in two states critical to the outcome of the Presidential election. And Plaintiff worries about voters wearing "red shirts" to the polls on Election Day, Complt. ¶37, something Plaintiff should know is certain to happen in light of Ohioans' deep loyalties to the Indians, Buckeyes, and Reds.

Compare this thin record to that assembled in *Daschle v. Thune*, the lone case Plaintiff cites to justify the granting of injunctive relief. *See* Complt. ¶ 20 (citing Temporary Restraining Order, *Daschle v. Thune*, No. 04-cv-4177, Dkt. No. 6 (D.S.D. Nov 2. 2004). There, a TRO was issued only after the plaintiff presented express evidence—including "[o]ral testimony" and "photographs," *id.* at 1—revealing that individuals were "follow[ing] Native Americans from the polling places," "copy[ing] [their] license plates," and recording "the license plates of Native Americans driving away for the polling places." *Id.* at 2. Nothing similar—or even in the same ballpark—has been shown here.

Perhaps best illustrating the weakness in Plaintiff's case is its reliance on stray remarks from Twitter and other places. *See* Complt. ¶¶56–57. This patchwork of hearsay came from non-parties who are not controlled by, and have no discernible connection to, the Campaign. Needless to say, they have no relevance to the question whether *the Campaign* will irreparably harm anyone. (Nor is there precedent for Plaintiff's requested remedy in this context. After all, if every social-media comment could serve as the basis for injunctive relief, our courts would be drowning in cases.)

In the end, Plaintiff's Complaint rests on rhetoric, not evidence. This deficiency is particularly surprising given that Plaintiff filed its motion knowing the burden it faces in this setting, as well as the extraordinary nature of the relief it seeks. It is also telling. Ohioans have been voting for weeks, more than enough time for the harms threatened in the Complaint to material-

ize. Yet nothing untoward has transpired, as evidenced by the dearth of evidence in the Complaint. On this record, there is no basis for awarding the extraordinary remedy Plaintiff seeks and injecting this Court into Ohio's electoral process.

### II. Awarding Injunctive Relief Would Substantially Harm Third Parties, Thereby Undermining The Public Interest.

Plaintiff's request for emergency relief should also be denied because the "issuance of a [injunctive relief] would cause substantial harm to others," and would be contrary to the public interest. *Summit Cty. Democratic Cent*, 388 F.3d at 550.

**A.** The Ohio Republican Party's contemporaneous filing effectively explains how the proposed injunctive relief is likely to dissuade citizens from exercising their rights under Ohio law, and also threatens to interfere with the State's orderly management of the election. And it effectively explains why awarding such relief would substantially harm others, and undermine the public interest. Rather than repeating those arguments, the Campaign simply adopts them as its own.

But in addition to affecting rights under Ohio law, the vague injunctive relief Plaintiff seeks is likely to abridge the First Amendment. Democracy depends upon the free exchange of ideas, and so the First Amendment forbids laws "abridging the freedom of speech." U.S. Const., Am. 1. Political speech "is at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403 (2007). The Supreme Court has thus long interpreted that Amendment as "afford[ing] the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976) (per curiam)).

The Complaint relies on numerous statements that are unambiguously protected political speech. *See, e.g.*, Complt. ¶22 ("The only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on."); *id*. ¶23 ("You've got to get everybody to go out and watch, and go out and vote."). As Plaintiff is well aware, candidates are perfectly within their rights to encourage their supporters to serve as poll watchers. *See, e.g.*, Join Victory Counsel, HILLARY FOR AMERICA (last visited Oct. 31, 2016), https://perma.cc/MV9U-35QP ("Volunteer to protect the vote as a poll observer this election cycle."). And supporters of opposing candidates are perfectly within their rights to debate whether an election is at risk of being "rigged" because of voter fraud. However upsetting or deplorable the Plaintiff may find these views, it cannot restrict them. "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). It is hard to imagine a court order more inimical to the public interest than one aimed at chilling a candidate's or citizen's political speech.

Nonetheless, based on statements like those noted above, Plaintiff asks the Court to issue vague injunctions forbidding "harassment or intimidation of voters," defined to include, among other things, "suggestions of legal or criminal action" and "'citizen journalist' initiatives.'" Complt. Prayer for Relief (b). And the Court has asked the defendants to respond to the possibility of imposing an order with similar terms. *See* Order (requesting briefing on the propriety of entering an order "limiting voter intimidation or an order limiting people at polling locations who are not authorized poll watchers or outside polling stations.") The trouble with these proposed injunctions—apart from their dubious legal foundation—is their potential breadth. Intimidating voters is illegal, and the Campaign does not remotely condone such conduct. But the terms of the proposed injunction would arguably reach all sorts of innocuous, entirely legal conduct—

conduct such as protesting against a candidate on a sidewalk several hundred feet from a polling place; "suggest[ing]" that a co-worker believed to be voting illegally may be subject to "legal or criminal action"; or even simply asking fellow citizens for whom they voted. Complt. Prayer for Relief (a).

Plaintiff's sweeping request for relief thus runs roughshod over the First Amendment. As an initial matter, the injunctive relief that Plaintiff proposes is entirely lacking in specificity; it seeks, in essence, an order directing the Campaign and others to "obey the law." But "[i]njunctions that broadly order the enjoined party simply to obey the law and not violate the statute are generally impermissible." *N.L.R.B. v. U.S. Postal Serv.*, 486 F.3d 683, 691 (10th Cir. 2007); *see also Wooster Brush*, 727 F.2d at 576 (explaining that "'obey the law' injunctions cannot be sustained.") (citation omitted). That is so because such injunctions "often lack the specificity required by Rule 65(d)." *S.E.C. v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012); *see* Fed. R. Civ. P. 65(d) (requiring that every temporary restraining order and injunction "state its terms specifically"). That "Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Temporary restraining orders should thus "be phrased in terms of objective actions, not legal conclusions." *Goble*, 682 F.3d at 950 (internal quotation marks omitted).

This is particularly critical in the speech context. Injunctions "carry greater risks of censorship and discriminatory application than do general ordinances." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994). Courts thus interpret the First Amendment to permit speech-restricting injunctive relief "only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law." *Id.* at n.3. As explained

above, the supposed legal violations are based on pure speculation. Indeed, the Ohio Democratic Party's Chairman recently acknowledged as much, admitting the lawsuit was filed to "'be safe and take action' should anything illegal occur." Eric Heisig, Ohio Democratic Party sues state Republicans, Trump campaign, alleges voter intimidation tactics, CLEVELAND.COM (Nov. 1, 2016), https://perma.cc/YTK3-6T55; *see also* Zack Lemon, Democrats sue in Ohio federal court to block Republican poll-watching efforts, TOLEDO BLADE (Oct. 31, 2016), http://www.toledoblade.com/Politics/2016/10/31/Democrats-sue-in-Toledo-federal-court-to-block-Republican-poll-watching-efforts.html ("Mr. Pepper said he had not seen any instances of voter intimidation yet, but he hoped the lawsuit will ensure federal election laws are followed."). Further, even content-neutral injunctions must "burden no more speech than necessary to serve a significant government interest." *Madsen*, 512 U.S. at 765. Yet Plaintiff has made no effort to show that the exceptionally broad relief it seeks "burdens no more speech than necessary" to serve a significant government interest. In addition, the proposed injunctions here *are* content-based, since the Plaintiff is seeking to "draw[] distinctions based on the message a speaker conveys," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)—it asks the Court to declare citizens free to speak "around polling places," but only if they do not convey certain messages. Because the injunction is content-based, it is subject to strict scrutiny—a standard the Plaintiff plainly cannot satisfy given that it cannot even satisfy the lesser standard that applies to content-neutral injunctions.

The "First Amendment embodies our choice as a Nation that, when it comes to [political] speech, the guiding principle is freedom—the unfettered interchange of ideas." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011) (internal quotation marks omitted). Despite this command, Plaintiff regrettably has made it necessary to say that which

should go without saying: court orders that punish and restrict political speech are contrary to the public interest, impose substantial costs on the electorate, and are appropriate (if ever) only in the most dramatic of circumstances.

**B.** One final reason why injunctive relief is contrary to the public interest bears mentioning—such action would undermine trust in the judiciary. This case is one of four coordinated attacks across the country that are clearly long-planned efforts to sow chaos in the Defendants' political efforts, while garnering maximum publicity for Plaintiff's unsubstantiated, inflammatory claims on the eve of the Presidential Election. Plaintiff's attempt to enlist the Court in that political crusade should be rejected, especially where, as here, Plaintiff has offered no allegations and presented no evidence of any actual misconduct by the Campaign.

That is particularly true where, as here, Plaintiff is asking the Court to take sides on a hotly debated policy issue. Specifically, the Complaint is critical of those concerned with voter fraud and those who believe our political system is "rigged" to favor certain interests over others. In one form or another, these policy debates are long-running and legitimate ones. Defendants respectfully submit that whether those views are right or wrong is a political question that is not for the judiciary to decide. Courts should be highly reluctant to silence the debate without concrete evidence that doing so is necessary. Here, no such evidence exists.

### III. Plaintiff Has Not Demonstrated A Strong Likelihood Of Success.

Plaintiff similarly has not shown that it has any chance to prevail on the merits, much less a "strong" chance.

As an initial matter, there is no ripe case or controversy for the Court to decide, as explained in the Ohio Republican Party's motion to dismiss. Further, as noted above, the order cannot be entered consistent with the First Amendment. *Supra*. But even were that not the case, Plaintiff *still* fails to state a claim.

**A.** To succeed on a claim brought under 42 U.S.C. § 1985(3), a plaintiff must prove "that the defendants (1) conspired together, (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, (3) and committed an act in furtherance of the conspiracy, (4) which caused injury to person or property, or a deprivation of any right or privilege of a citizen of the United States, and (5) and that the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971)).

Plaintiff has satisfied none of these elements. Most obviously, besides vague, generalized allegations of coordinated efforts "to ensure ballot integrity," Complt. ¶50, Plaintiff identifies no agreement—and thus no "conspiracy"—among any of the defendants to deprive Ohioans of their right to vote. *See Coker v. Summit Cnty. Sheriff's Dep't*, 90 F. App'x 782, 789 (6th Cir. ) ("A plaintiff must make sufficient factual allegations to link two alleged conspirators in the conspiracy and to establish the requisite 'meeting of the minds' essential to the existence of the conspiracy."); *see also* 15 Am. Jur. 2d Civil Rights § 153 ("The pleadings must specifically present facts tending to show agreement and concerted action"). Rattling off a litany of alleged statements and actions by various putative "Trump supporters" and other sundry third parties at various times in different locales simply does not, as a matter of law, establish a conspiracy by the Campaign to engage in voter suppression.

Plaintiff also does not make any effort to show that the defendants were "motivated by racial, or other class-based, invidiously discriminatory animus." *Bass*, 167 F.3d at 1050. On the contrary, Plaintiff disclaims (wrongly) any obligation to do so. *See* Complt. ¶18 (claiming that § 1985(3) "requires no showing of racial intent or animus"). The Supreme Court has made clear that "to prove a private conspiracy in violation of § 1985(3), a plaintiff must show" racial ani-

mus. *Bray*, 506 U.S. at 267-68. Plaintiff's Complaint is devoid of any articulable evidence that the Campaign's alleged statements and actions were the product of racial animus. Indeed, the Complaint asserts that the Campaign's alleged comments encouraging citizens to serve as poll observers "are consistently directed at Democratic-leaning communities with large minority populations," Complt. ¶ 29, which conflates a vital distinction between a putative racial motivation and a partisan motivation. Courts have held consistently that private conspiracies predicated on political or partisan rationales are not actionable under § 1985(3). *See, e.g.*, *Farber v. City of Paterson*, 440 F.3d 131, 142 (3d Cir. 2006) ("Allowing § 1985(3) to reach politically motivated conspiracies would involve the federal courts in policing the political arena in ways that the drafters of § 1985(3) could not have intended."); *Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir. 1985) ("[W]e join the conclusion of the Fourth Circuit . . . that § 1985(3) does not reach nonracial political conspiracies.").

  **B.** Plaintiff's second claim fares no better. As a threshold matter, Plaintiff fails to allege facts that would give it standing under the Voting Rights Act, as explained in the Ohio Republican Party's motion. Moreover, to prevail under Section 11(b) of the Voting Rights Act of 1965, a plaintiff must prove "(1) that there was an intimidation, threat or coercion, or an attempt to intimidate, threaten or coerce and (2) that the intimidation or attempt was for the purpose of interfering with the right to vote." *Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land*, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008). Claims under this provision are exceedingly difficult to establish. *See United States v. Brown*, 494 F. Supp. 2d 440, 477 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009) (noting that the court itself "has found no case in which plaintiffs have prevailed under this section"). Unsurprisingly, Plaintiff here fails to clear even the first hurdle. Its various allegations of "intimidation" are nothing more than legitimate exercises of free

speech. Wearing red shirts, Complt. ¶37, is common among Ohio sports fans, and plainly not the kind of activity that inspired the statute. Conducting exit polling, *id.* ¶38, which the Campaign has no intention of doing, is a regular, harmless feature of the election-day process, and an entirely proper exercise of First Amendment rights, *see ABC v. Blackwell*, 479 F. Supp. 2d 719, 738-44 (S.D. Ohio 2006). And Plaintiff itself admits that poll watching, *id.* ¶82, is a legal, statutorily sanctioned activity in Ohio, *id.* ¶¶67-68. These benign activities bear no resemblance to the conduct demonstrated in *Thune*—a case involving a concerted effort to follow a discrete class of voters (Native Americans) to record their license-plate numbers. *See Thune*, Dkt. No. 6. Moreover, even setting aside this problem, Plaintiff's claim under § 1971(b) also fails because Plaintiff offers no evidence that any of the alleged "intimidation" is animated by a "specific intent to intimidate, threaten, coerce, or attempt to do so to prevent a person from voting or attempting to vote." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016). Plaintiff's claim thus fails several times over.

In short, Plaintiff's claims lack both factual and legal support. And the relief Plaintiff requests would undoubtedly violate the First Amendment. For these reasons, Plaintiff cannot meet its burden of showing a "'strong' likelihood of success on the merits." *Leary*, 228 F.3d at 736.

## CONCLUSION

The Campaign respectfully requests that the Court deny the request for a temporary restraining order and injunctive relief. But should the Court grant any of the relief Plaintiff seeks, it should enter an injunction as to both Plaintiff and Defendants. The same rules apply to everyone and Plaintiff should not be given the unfair political advantage of being free from a judicial decree requiring that federal and state law be followed. In short, this Court's intervention is not warranted, but should the Court intervene it should do so evenhandedly.

Dated: November 2, 2016    Respectfully submitted,


                                                 s/ Chad A. Readler
                                                 Chad A. Readler (0068394)
                                                 JONES DAY
                                                 325 John H. McConnell Blvd., Suite 600
                                                 Columbus, OH 43215
                                                 (614) 469-3939
                                                 careadler@jonesday.com

                                                 Attorney for Defendant
                                                 Donald J. Trump for President, Inc.

## **CERTIFICATE OF SERVICE**

    I hereby certify that on November 2, 2016, a copy of the foregoing Donald J. Trump for President, Inc.'s Memorandum in Support of the Response to Plaintiff's Complaint was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

                                                                                                 s/ Chad A. Readler  
                                                                                                 Chad A. Readler