IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Ohio Democratic Party,** | Civil Action No. 1:16-cv-2645 |
| **Plaintiff,** | Judge James S. Gwin |
| v. | Magistrate Judge Thomas M. Parker |
| **Ohio Republican Party; Donald J. Trump for President, Inc.; Roger J. Stone Jr.; and Stop the Steal Inc.,** | |
| **Defendants.** | |

**DONALD J. TRUMP FOR PRESIDENT, INC.'S RESPONSE TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Plaintiff's Complaint rests on the absurd notion that essentially half of the electorate, led by Donald J. Trump for President, Inc. (the "Campaign"), is engaged in a "conspiracy" to suppress voter turnout. That assertion would be wild enough for most plaintiffs. But not this one. Rather, Plaintiff follows up its absurd allegations with an equally absurd request: that the Court forbid the Campaign—along with all of its "supporters" and "volunteers"—from exercising their political speech rights protected by the First Amendment and Ohio law.

The Campaign has already responded to these preposterous claims. Plaintiffs' motion contains very little new information, let alone a compelling basis for relief. Rather than swell the docket with repetitive arguments, the Campaign incorporates its previous arguments. It addresses here only the new points raised in Plaintiff's motion, in the course of explaining why Plaintiff cannot satisfy any of the four factors necessary to entitle it to injunctive relief.

I.  **Plaintiff Has Failed To Demonstrate Even A Remote Possibility Of Success On The Merits.**

Plaintiff is not likely to succeed on either of its claims. It still has not provided any evidence that the Campaign has or will intimidate anyone from voting; hardly a surprise, since the Campaign *has not* and *will not* do so. As a result, Plaintiff's claims are likely to fail.

**A.** In its earlier filing, the Campaign detailed the Complaint's many deficiencies. Among them, the Campaign explained, is that the facts alleged and the evidence presented did not support claims under Section 11(b) of the Voting Rights Act, or under 42 U.S.C. § 1985(3).

That remains the case. Plaintiff's motion is effectively a revised complaint, with the paragraph numbers removed and citations to exhibits inserted. And as was true of the Complaint, the statements Plaintiff cites as evidence of the Campaign's conspiratorial objectives are innocuous. Some are simply statements relating to policy positions. *See, e.g.*, Mot. 3 (noting the Campaign's concern with, and opposition to, voter fraud). Some relate to fears of election tampering. *See, e.g.*, Mot. 4 ("[T]he only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on.") (internal quotation marks omitted). Others are statements designed to implore voters to turn out, and to volunteer to help the Campaign. Mot. 7 ("Governor Pence urged Trump supporters to sign up to be poll watchers to combat purported voter fraud, claiming that the media is trying to 'rig' this election 'with their biased coverage.'"). But none even suggests any intention on the Campaign's part to use force, threats, intimidation, or coer-

cion to stop people from voting for the candidate of their choice.  In fact, much of the motion is spent railing against the supposed wrongdoings of Roger Stone and his Stop The Steal group—neither of which has any connection whatsoever to the Campaign.

The complete lack of evidence relating to force, threats, intimidation, or coercion, dooms Plaintiff's claims.  A successful claim under Section 11(b) of the Voting Rights Act, for example, requires proof "(1) that there was an intimidation, threat or coercion, or an attempt to intimidate, threaten or coerce and (2) that the intimidation or attempt was for the purpose of interfering with the right to vote." *Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land*, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008).  As there is no evidence of any actual or planned intimidation, threat, or coercion—"for the purpose of interfering with the right to vote," *id*., or otherwise—there is no Section 11(b) violation.  (Plaintiff disagrees with the second of these elements, and believes Section 11(b) does not require *intent* to interfere with the right to vote.  Mot. 24. That is wrong, as the Fifth Circuit explained in *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967), just two years after the law's enactment.  *Id*. at 744 ("The Act … does exempt acts done for purposes other than interfering with the right to vote").  But the Court need not address that, because Plaintiff's claim fails on the first element.)

Next, consider Plaintiff's claim under 42 U.S.C. § 1985(3).  To succeed under the portions of that section on which Plaintiff relies, there are two options.  The first requires proof that "two or more persons [have] conspir[ed] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election …" 42 U.S.C.A. § 1985(3).  As just explained, there is no evidence of any "force, intimidation, or threat," and so that option is unavailable.  The second option requires proof "that the defendants (1) conspired together, (2) for the purpose of depriving, directly or

indirectly, a person or class of persons of the equal protection of the laws, (3) and committed an act in furtherance of the conspiracy, (4) which caused injury to person or property, or a deprivation of any right or privilege of a citizen of the United States, and (5) and that the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)).  But Plaintiff has not, and could not even conceivably, cite vague policy- and get-out-the-vote statements, made during the course of a political campaign, as proof that individuals are being denied "the equal protection of the laws." *Bass,* 167 F.3d at 1050.

Take, for instance, Plaintiff's reference to an anonymous quote, supposedly made by an "unnamed official" to Bloomberg News, that the Campaign has "three major voter suppression operations under way."  Mot. 2–3, quoting Declaration of Donald J. McTigue, Esq., Ex. 17 (Joshua Green, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek (Oct. 27, 2016)).  The context of the story reveals that this source (if she exists) was *not* referring to attempts to intimidate anyone from voting.  Rather, she was referring to strategies to inform "three groups [Hillary] Clinton needs to win overwhelmingly:   idealistic white liberals, young women, and African Americans," to "turn off" those voters and "undermine [Clinton's] appeal," making those constituentices less likely to "show[] up at the polls—particularly in Florida":

> Trump's campaign has devised another strategy … . Instead of expanding the electorate, [the Campaign] is trying to shrink it. "We have three major voter suppression operations under way," says a senior official. They're aimed at three groups Clinton needs to win overwhelmingly: idealistic white liberals, young women, and African Americans. Trump's invocation at the debate of Clinton's WikiLeaks emails and support for the TransPacific Partnership was designed to turn off Sanders supporters. The parade of women who say they were sexually assaulted by Bill Clinton and harassed or threatened by Hillary is meant to undermine her appeal to young women. And her 1996 suggestion that some African American males are "super predators" is the basis of a below the radar effort

> to discourage infrequent black voters from showing up at the polls—particularly in Florida.

McTigue Declaration, Ex. 17 at 6–7 (D. Ct. Dkt. No. 8-3 at 140). The quote at issue, in other words, addresses substantive advocacy—and it makes no reference to Election Day, poll watchers, or anything of the sort. If this is actionable "suppression," what political speech rights remain?

No doubt, the Ohio Democratic Party would rather the public be barred from knowing any of this. But the First Amendment provides that its sole recourse is to engage in counterspeech, not to silence its opponents. *See United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012).

More to the point, once placed in context, this statement does not even arguably give rise to claims under Section 11(b) of the Voting Rights Act, or 42 U.S.C. § 1985(3). Again, Section 11(b) requires proof "(1) that there was an intimidation, threat or coercion, or an attempt to intimidate, threaten or coerce and (2) that the intimidation or attempt was for the purpose of interfering with the right to vote." *Am. Fed'n of State, Cty. & Mun. Employees*, 583 F. Supp. 2d at 846. Promoting an opposing candidate's flaws may be unflattering to the candidate, but it is hardly "intimidation," a "threat," or "coercion."

Neither does it support a claim under 42 U.S.C. § 1985(3). After all, emphasizing an opponent's purported political liabilities does not constitute an attempt to "derpiv[e], directly or indirectly, a person or class of persons the equal protection of the laws," *Bass*, 167 F.3d at 1050 (citing *Griffin*, 403 U.S. at 102–03), nor does it remotely suggest a conspiracy "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election . . . ." 42 U.S.C.A. § 1985(3). (As a result, the Court need not even address Plaintiff's argument, raised briefly in a footnote,

pg. 27 n.5, that the portion of § 1985(3) banning the use of force, intimidation, or threats to prevent lawful voting, requires no proof of discriminatory intent.)

In sum, Plaintiff has no evidence capable of supporting its claims.

**B.** Anyway, the Court is not likely to even reach the merits of Plaintiff's claims, because Plaintiff's complaints are unripe, and so there is no Article III case or controversy over which the Court can assert jurisdiction. Plaintiffs have Article III standing only where they have, among other things, "suffered an injury in fact." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Ripeness requires that the injury in fact be certainly impending." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997) (internal quotation marks omitted). And "a matter is considered" unripe "when the alleged injury is speculative or may never occur." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068 (6th Cir. 1998).

Here, the relevant injury-in-fact is deprivation of the right to vote. It is *at most* "speculative" whether the Campaign will cause such harms. Indeed, Plaintiff's complete failure to develop any evidence linking the Campaign to a single instance of planned or actual voter intimidation is strong evidence that the relevant injury has not occurred and will not occur—particularly since Ohioans have been voting for over three weeks. Thus, at least with respect to the Campaign, Plaintiff seeks nothing more than an advisory opinion relating to the legality of acts that are almost certain never to take place. The case is therefore unripe, and this Court will have to dismiss it for "lack [of] subject matter jurisdiction." *Dealer Computer Servs., Inc. v. Dub Herring Ford*, 547 F.3d 558, 560 (6th Cir. 2008).

**II. Neither Plaintiff Nor Anyone Else Will Be Irreparably Harmed If The Court Declines To Issue A Preliminary Injunction Or A Temporary Restraining Order.**

There is little more to say about Plaintiff's failure to show a likelihood of irreparable harm from the denial of this motion. Plaintiff has now had two chances to show that its com-

plaint is anything other than a political stunt—two chances to provide *any* evidence that the Campaign has done or will do *anything* unlawful to deter *anyone* from voting. Its inability to provide this evidence is proof that no such evidence exists, and thus that no one will be irreparably harmed by the Campaign or its supporters.

### III. The Balance Of Equities, And The Risk Of Substantial Harm To Others, Strongly Militate *Against* The Award Of Preliminary Relief.

**A.** If the Court is still uncertain of the tremendous authority Plaintiff asks the Court to assert over almost half of the electorate, consider the scope of Plaintiff's proposed prohibitions against the Campaign, and its "supporters" (which presumably means: "Donald Trump voters") and "volunteers." Proposed Order 2.

*First*, Plaintiff asks the Court to enjoin these individuals from "[e]ngaging in any 'poll watching' or 'poll monitoring' activities inside or outside of polling places that involve challenging or questioning voters or prospective voters about their eligibility to vote." Proposed Order 2. Thus, those who support Donald Trump—but not those who support Hillary Clinton, Gary Johnson, or someone else—will violate the order if they ask anyone outside the polling place who reasonably appears too young to vote whether he is in fact 18. *Id*. So if a Donald Trump supporter attempting to encourage voter turnout on a sidewalk, hundreds of feet from the polling place, asks those with whom he speaks whether they are eligible to vote (to not waste his time on non-voters), he will have violated the terms of the injunction. Unconstitutional. *See E. Connecticut Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1051 (2d Cir. 1983) ("The right to communicate freely with one's fellow citizens and with the government on issues of public importance is a cornerstone of our American polity.").

*Second*, Plaintiff asks the Court to enjoin the Campaign, and all Donald Trump "supporters," from "[i]nterrogating, admonishing, interfering with, or verbally harassing voters or pro-

spective voters inside *or outside polling locations*, or training, organizing, or directing others to do the same." Proposed Order at 2 (emphasis added). These sweeping terms would forbid Donald Trump's "supporters" even from campaigning door-to-door. After all, it is impossible to campaign without "admonishing … voters or prospective voters … *outside* polling locations." *Id*. (emphasis added); *see also* Webster's Third New Int'l Dictionary 28 (1981) (defining "admonish" to include "express[ing] a direction or explanation or giv[ing] advice or encouragement to esp. in friendly or earnest counsel," and to include "earnestly, and solicitously … urging duty, caution, or amendment"). Plaintiff thus asks the Court to forbid campaigning. Unconstitutional. *See Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) ("[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.").

*Third*, Plaintiff requests that the Campaign and its supporters be barred from "[d]istributing literature and/or stating to individuals at or around a polling place that voter fraud is a crime, or describing the penalties under any State or Federal Statute for impermissibly casting a ballot …" *Id*. A more obvious First Amendment violation is impossible to imagine. "[O]ne-on-one communication is the most effective, fundamental, and perhaps economical avenue of political discourse," and "handing out leaflets in the advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression." *McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014) (internal quotation marks omitted). Thus, citizens—whether working on a campaign or not—are free to speak with others and distribute literature. And they are free to express legal views in the course of these communications. *See Velo v. Martinez*, 820 F.3d 1113, 1118 (10th Cir. 2016) (affirming decision preliminarily enjoining enforcement state-court order that forbade leafleting near a courthouse, in a case involving plaintiffs who wished to distribute

literature on jury nullification).  To issue a content- and viewpoint-based injunction against one political group, and to do so in vague terms ("around a polling place"), is exactly what the First Amendment exists to prevent; "the First Amendment is plainly offended" when the government's "suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 785–86 (1978).

*Fourth*, Plaintiff says the Campaign and its supporters should be prohibited from "[f]ollowing, taking photos of, or otherwise recording voters, or their vehicles . . . ." Proposed Order at 3.  And it asks the Court to forbid the Campaign and its supporters from "[o]therwise organizing, supporting, or encouraging efforts to engage, or directly engaging, in voter intimidation." *Id*.  Again, the Campaign condemns "voter intimidation."  But the terms of the proposed injunction are nonetheless troubling, because they are much too vague, and much too broad.  For example, those terms would bar a voter who believes she is being harassed by precinct officials in a polling-place parking lot, from using her phone to record the misconduct.  Unconstitutional.  *See Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("[T]he Constitution protects the right of individuals to videotape police officers performing their duties in public.")

Even the phrase "voter intimidation" is too vague.  Suppose the Campaign's supporters, hundreds of feet from the polling place, chant "make America great  again!" in the presence of voters.  Is that "intimidation"?  Hard as it is to believe, some people think so.  *See, e.g.*, Jim Galloway, *Chalk one up for Donald Trump at Emory University*, ATLANTA JOURNAL CONSTITUTION (Mar. 22, 2016), https://perma.cc/6VQ5-NB59 (reporting that, after individuals wrote pro-Trump slogans such as "Trump 2016" in chalk on Emory University's campus, the President of Emory University circulated a letter explaining that some students believed "these messages were meant

- 9 -

to intimidate."). Can Campaign employees or supporters engage in this obviously protected speech without having to fear a contempt hearing? It is unclear, because the terms of the proposed injunction are much too ambiguous. And that is a problem, because "[i]t is settled that" restraints on speech "so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face." *Winters v. N.Y.*, 333 U.S. 507, 509 (1948). First Amendment rights, therefore, cannot "be imperiled by threatening" punishment "for so vague an offense as follow[ing] and harass[ing]." *McCullen*, 134 S. Ct. at 2543 (Scalia, J., concurring in the judgment) (internal quotation marks omitted). Yet Plaintiff believes the government really should punish so vague an offense. Unconstitutional.

All this confirms what the Campaign said in its initial filing: there is no way to enter the proposed injunction without trammeling the rights of Ohioans. And that tilts the balance of equities strongly in the Campaign's favor. That is particularly so here, where there is *no* evidence that the Campaign has done or will do anything improper; Plaintiff is effectively asking this Court to limit the rights of many for the purpose of solving a problem that does not exist.

Finally, it is worth noting that Plaintiff has left unclear what it is that gives this Court the authority to issue an injunction applicable to countless individuals—the Campaign's supporters, for example—who are not parties to this case. The general rule is that "an injunction cannot issue against an entity that is not a party to the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987).

**B.** Plaintiff insists that the balance of equities favors the granting of preliminary relief, because "'[v]oter intimidation and coercion [are] … obvious harm[s] that federal law strongly and properly prohibits.'" Mot. 35 (quoting *Madden*, 403 F.3d at 352 (Boggs, C.J., concurring in

part and dissenting in part)). True. The Campaign fully agrees with this policy and comports itself accordingly. And Ohio law already criminalizes such behavior.[1] So the need to protect against voter intimidation hardly tips the equities in favor of punishing a party who has not (and will not) engage in voter intimidation, and where the conduct is already outlawed.

Plaintiff further insists that "widespread voter fraud is a myth." Mot. at 37. That is currently a matter of public and scholarly debate; and the authorities are not all lined up on Plaintiff's side. *See, e.g.*, John Fund, STEALING ELECTIONS: HOW VOTER FRAUD THREATENS OUR DEMOCRACY (2008).[2] But again, that is beside the point: the Campaign is within its rights to warn of the risk of voter fraud, and to suggest that individuals volunteer to serve as poll observers to help avert that risk. Plaintiff is of course within *its* right to believe voter fraud is not a threat. But the correctness of the Campaign's view cannot possibly justify punishing it under baseless legal theories without any evidence of wrongdoing.

**C.** There is one more reason the equities cut against Plaintiff: on its own theory, the supposed conspiracy in this case has been underway (and quite public) since August. *See* Mot. 3 (relying on a report from August 9); Mot. 4 (relying on a report from August 13). But it waited to file until a week before the election, seemingly for no other reason than to waste the opposi-

---

[1] *See* Ohio Rev. Code 3599.01(A)(2) (Bribery) ("No person shall before, during, or after any primary, convention, or election . . . [a]ttempt by intimidation, coercion, or other unlawful means to induce such delegate or elector to register or refrain from registering or to vote or refrain from voting at a primary, convention, or election for a particular person, question, or issue.); Ohio Rev. Code 3599.24(A)(5) (Interference with conduct of election) ("No person shall do any of the following: . . . [l]oiter in or about a registration or polling place during registration or the casting and counting of ballots so as to hinder, delay, or interfere with the conduct of the registration or election.").

[2] For examples of vote-fraud related incidents in Ohio, *see, e.g.,* Melowese Richardson and Russell Glassop: http://www.usatoday.com/story/news/nation/2013/07/17/cincinnati-illegal-voting/2530119/; Marguerite Kloos: http://www.usatoday.com/story/news/nation/2013/04/16/nun-voter-fraud/2087893/; Jacqueline Maiden and Kathleen Dreamer (election officials, not voters):
http://www.washingtonpost.com/wp-dyn/content/article/2007/01/24/AR2007012401441.html; Roger Schantz: http://www.archboldbuckeye.com/news/2012-0926/Public_Record/Schantz_Sentenced_For_Illegal_Voting_Conviction.html

tion's time and resources, maximize the newsworthiness of the filing, and confuse the Campaign's supporters just days before the election.

"When an election is 'imminen[t]' and when there is 'inadequate time to resolve [ ] factual disputes' and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures." *Crookston v. Johnson*, — F.3d —, No. 16-2490, 2016 WL 6311623, at *2 (6th Cir. Oct. 28, 2016) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam)). So too should they decline to grant an injunction that creates confusion regarding whether and to what degree one campaign may comply with those "established election procedures." *Id*. After all, "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls," *Purcell*, 549 U.S. at 4–5, and that is true whether the party seeking relief is challenging an election law, or challenging someone's adherence to that law.

The presumption against last-minute orders of the sort proposed is especially strong "when a plaintiff has unreasonably delayed bringing his claim, as [Plaintiff] most assuredly has." *Id*. One of equity's foundational maxims is: "Equity aids the vigilant, not those who slumber on their rights." Pomeroy, 1 A TREATISE ON EQUITY JURISPRUDENCE § 418, at 572 (2d ed. 1892). Plaintiff could have brought its fact- and evidence-free claims long ago. That it slept on those rights is yet another reason to deny relief.

**IV. Issuing Preliminary Relief Will Contradict Public Policy.**

For all the reasons that the equities favor denying relief, relief would also run contrary to public policy. More specifically, it is against public policy to punish and chill speech for no reason at all.

And it is even more regrettable for a political party to entangle a court of law in the Party's political endeavors. The Ohio Democratic Party has made this proceeding a vehicle for

painting anyone who votes for Donald Trump a bigot (why else bring a frivolous claim under a statute Plaintiff describes as the "Klan Act"?), a conspiracy theorist, and, in fact, an actual conspirator. It is a shame this case was ever filed. Not because it is frivolous (though it is), but because it will no doubt signal to many that a prominent political party is willing to make any number of wild accusations if it helps to discredit and silence the opposition.

The motion for extraordinary relief must be denied.

.

Dated: November 4, 2016	Respectfully submitted,

                                              s/ Chad A. Readler
                                              Chad A. Readler (0068394)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215
(614) 469-3939
careadler@jonesday.com

Attorney for Defendant
Donald J. Trump for President, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2016, a copy of the foregoing Donald J. Trump for President, Inc.'s Response To Plaintiff's Motion For A Temporary Restraining Order And/Or Preliminary Injunction was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

s/ Chad A. Readler
Chad A. Readler