1           IN THE DISTRICT COURT OF THE UNITED STATES
                FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3

OHIO DEMOCRATIC PARTY,        )
4                             )
              Plaintiff,      )    Judge Gwin
5                             )    Cleveland, Ohio
         vs.                  )
6                             )    Civil Action
OHIO REPUBLICAN PARTY,        )    Number 1:16CV2645
7                    et al,   )
                             )
8           Defendants.

9

10

11                     - - - - -
              TRANSCRIPT OF PROCEEDINGS HAD BEFORE
12
               THE HONORABLE JAMES GWIN
13
                JUDGE OF SAID COURT,
14
              ON FRIDAY, NOVEMBER 4, 2016
15                     - - - - -

16

17

18

19  Official Court Reporter:      Shirle M. Perkins, RDR, CRR
                                  U.S. District Court
20                                801 West Superior, #7-189
                                  Cleveland, OH 44113-1829
21                                (216) 357-7106

22

23

24  Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.

25

```
1    APPEARANCES:

2    For the Plaintiff:                STEVEN S. KAUFMAN, ESQ.,
                                       CHARLES COOPER, ESQ.,
3                                      Kaufman & Company
                                       Suite 1710
4                                      1001 Lakeside Avenue
                                       Cleveland, OH 44114
5                                      (216) 912-5500

6                                      DAWN SMALLS,
                                       GREG DOBINSKY, ESQ.,
7                                      Boies Schiller & Flexner -
                                        New York
8                                      7th Floor
                                       575 Lexington Avenue
9                                      New York, NY 10022
                                       (212) 446-2300
10
                                       DONALD J. McTIGUE, ESQ.,
11                                     McTigue & McGinnis
                                       545 East Town Street
12                                     Columbus, OH 43215
                                       (614) 263-7000
13
                                       N. ZACHARY WEST, ESQ.,
14                                     Ohio Democratic Party
                                       340 East Fulton Street
15                                     Columbus, OH 42315
                                       (614) 221-6563
16

17   For the Defendants:               MARIA ARMSTRONG,
                                       CHRISTOPHER M. ERNST, ESQ.,
18                                     Bricker & Eckler
                                       100 South Third Street
19                                     Columbus, OH 43215
                                       (614) 227-8821
20

21
     For Donald J. Trump for           CHAD A. READLER
22   President, Inc.:                   Jones Day -Columbus
                                       Suite 600
23                                     325 John H. McConnell Blvd.
                                       P.O. Box 165017
24                                     Columbus, OH 43216-5017
                                       (614) 469-3939
25
```

1          FRIDAY SESSION, NOVEMBER 4, 2016, AT 10:06 A.M.

2                  THE COURT:  We're here on Case 2016CV2645,

3    Ohio Democratic Party versus Ohio Republican Party and

4    others.

5          The case is here today.  The Court had received an

6    application for a temporary restraining order, together with

7    a preliminary injunction.

8          The Court had set this up for a hearing.  It was

9    somewhat unclear as to whether it would be a preliminary

10   injunction hearing and/or whether it would strictly go

11   forward as to an argument on the restraining order request.

12                 But, given the time line, it would seem in some ways,

13   that it's kind of a distinction -- it's a distinction

14   without a real difference because of the fact that if a

15   restraining order was issued, given the 14-day period, it

16   would largely be over anyways in terms of the issues through

17   the election.  So I had not originally envisioned that there

18   would be witnesses, but we got a request, I believe

19   yesterday afternoon, and I thought it was from somebody on

20   the Ohio Republican Party making inquiry generally as to

21   whether witnesses would be permitted.  And we reached out, I

22   believe, to both parties, my Deputy did, asking whether they

23   had believed witnesses would be appropriate and whether they

24   had any.

25         So I'm kind of -- and I've been advised that there has

```
 1            been some witnesses identified as potential.

 2                 Do you have any comment on that, Mr. Kaufman, in terms

 3            of whether this should go forward on the restraining order

 4            and affidavits or whether it should go forward with

10:08:49 5    witnesses or some combination?

 6                      MR. KAUFMAN:  Your Honor, thank you very much.

 7            And it was our understanding that we were going to go

 8            forward on a temporary restraining order.  We certainly

 9            intend to rely upon the declarations that we filed in

10:09:08 10   support of that.  We do not intend to duplicate those with

11            live witnesses, although we have a witness to supplement the

12            information that we provided in the declarations.

13                 I understand the Court's point, but we're -- we're

14            here with the evidentiary record that we'd like to present

10:09:26 15   to the Court, and then argue, and any additional witnesses

16            we thought were part of the TRO process, but we don't have

17            to call a witness for purposes of our TRO application.  So

18            that is really where we're coming from today.

19                      THE COURT:  Okay.

10:09:44 20        Let me ask Mr. Ernst, I mean do you have a preference

21            one way or the other?

22                      MS. ARMSTRONG:  Your Honor, Maria Armstrong

23            with Bricker & Eckler as well.

24                 We were simply trying to comply with the Court's order

10:09:58 25   and tried to bring a witness.  We do have witnesses here.
```

1    She is willing to and prepared to testify here as to the TRO

2    and the injunction.

3             THE COURT:  Okay.  The reason being, of

4    course, is that temporary restraining orders almost never

10:10:13  5    have evidentiary witnesses.  Frequently, preliminary

6    injunction will be advanced and consolidated with the

7    evidentiary, you know, record created with witnesses, but

8    it's -- it's somewhat unusual, typically for temporary

9    restraining orders.

10:10:33 10             MS. ARMSTRONG:  Yes, your Honor.

11             THE COURT:  I'll afford the parties an

12    opportunity, if they have witnesses, but I'm not sure it's

13    necessary.  But, do you have a position one way or the

14    other, Readler?

10:10:49 15             MR. READLER:  No, your Honor.  Thank you for

16    hearing us today.  We do not have witnesses.

17             THE COURT:  Okay.

18             MR. READLER:  So I will defer to our

19    co-parties.

10:10:57 20             THE COURT:  Okay.

21         Well, why don't we go forward.  If you feel a need to

22    offer witnesses, you know, we'll receive those, and -- but,

23    let me ask Mr. Kaufman or anybody else from the Plaintiff's

24    side who wants to make opening statements.

10:11:19 25             MR. KAUFMAN:  Yes, your Honor.  I want to

1    introduce Dawn Smalls, who's lead counsel for the

2    Plaintiffs.

3              THE COURT:  Okay.

4              MR. KAUFMAN:  And she's going to be presenting

10:11:27  5    the argument today.  Mr. Greg Dobinsky is with her from her

6    firm, Mr. Don McTigue is also counsel of record and will

7    probably address some issues and possibly a witness.

8    Mr. Chad Cooper's here from my firm and Zack West may very

9    well present a witness.

10:11:43 10              THE COURT:  This case is kind of the Full

11    Employment Bill for attorneys.

12         (Laughter.)

13              MR. KAUFMAN:  No comment, your Honor.

14              THE COURT:  Does anybody here practice in

10:11:51 15    Chicago that hated city?

16         (Laughter.)

17              THE COURT:  Well, they sometimes -- there's a

18    local rule in Chicago courts that no rulings are ever made

19    on paper submissions.  And so if you move the Court for an

10:12:11 20    additional three days to answer a complaint, there has to be

21    a hearing, and they refer to it as the Full Employment for

22    Attorney Rule because it keeps people at the courthouse.

23         (Laughter.)

24              THE COURT:  So why don't you go ahead, Ms.

10:12:27 25    Small.

1          MR. KAUFMAN:  Thank you, your Honor.

2          MS. SMALLS:  Thank you, your Honor.

3          THE COURT:  And it might be better for the

4     Court Reporter if you would go to the podium.

10:12:36  5          MS. SMALLS:  Great.  Okay.

6          OPENING STATEMENTS ON BEHALF OF THE PLAINTIFF

7          MS. SMALLS:  Your Honor, Plaintiffs are here

8     today to enjoin what we believe is a concerted effort of

9     voter intimidation; specifically against nonwhite and

10:13:03 10    minority voters that Defendants believe support our

11    Plaintiff's candidates and Plaintiff's initiatives.

12         We believe that we have established on the strength of

13    our papers that we have a likelihood of success on our claim

14    under the Voting Rights Act, Section 11(b), as well as the

10:13:33 15    Ku Klux Klan Act, which both were established to assure that

16    all voters, but specifically voters of color and

17    African-Americans, were able to exercise unencumbered one of

18    the most fundamental rights; the right to vote.

19         Defendants have acted in concert to broadly encourage

10:13:56 20    their supporters to come from other parts of the state,

21    rural, exurban and suburban parts of the city to descend on

22    urban centers where they believe that there are high

23    concentrations of nonwhite voters.

24         THE COURT:  In the, you know, the opposition

10:14:15 25    to the temporary restraining order, it sounds like Defendant

1   Republican Party makes the argument that evidence against it

2   is relatively minimal, even if there's significant evidence

3   against the other Defendants.

4                  MS. SMALLS:  And --

10:14:35   5                  THE COURT:  What specifically do you think --

6   other than the general notion that there will be a

7   coordination between the Trump Campaign and the National and

8   State Parties, what more specific evidence do you have as to

9   the State Party?

10:14:52   10                  MS. SMALLS:  Thank you, your Honor.

11        The state -- the distinction of the State Party is

12   trying to distinguish between the National Party and the

13   Trump Campaign.

14                  T-HE COURT:  They're all separate

10:15:03   15   institutions.

16                  MS. SMALLS:  They are, that have joint

17   fundraising agreement, that live in the same campaign

18   offices, that are inextricably coordinated as part of a

19   coordinated campaign.  And we would offer that you cannot

10:15:21   20   distinguish the State Party from the efforts of the National

21   Party and the Trump Campaign.  Alternatively --

22                  THE COURT:  If they're not individually trying

23   to solicit people to harass voters --

24                  MS. SMALLS:  That --

10:15:36   25                  THE COURT:  -- what difference does the State

1      Party make?

2                    MS. SMALLS:  Right.

3           Well the -- under Ohio law, the State Party is

4      necessary to actually certify or appoint poll observers.  So

10:15:49  5      they're a necessary party to this lawsuit, notwithstanding.

6                    THE COURT:  Well, I'm still not sure I --

7      where that goes.  So they certified the -- what is it, one

8      poll watcher from the Democrats and one from the Republicans

9      at each polling location?

10:16:04 10                    MS. SMALLS:  I'm sorry.  I didn't understand

11      the question.

12                    THE COURT:  I thought the -- so do the -- does

13      the State Republican Party and the State Democratic Party

14      each certify one poll observer for each location?

10:16:20 15                    MS. SMALLS:  I think it's more than that.

16      But, they -- they each have the ability to certify poll

17      observers for each polling.

18                    THE COURT:  But, you're not really concerned

19      about that, right?

10:16:30 20                    MS. SMALLS:  Well, we want to make sure that

21      the poll observers are properly trained and are not

22      challenging or questioning voters' ability to be there.  I

23      mean the Ohio law specifically prescribes what is proper

24      activity for a poll observer.

10:16:44 25           And it's not as, you know, the head of the --

1    Republican head of the Board of Elections called being watch

2    dogs.  We've already had incidences of people showing up to

3    early vote sites calling themselves poll observers or --

4                    THE COURT:  Were they people certified by the

10:17:03   5    State Republican Party?

6                    MS. SMALLS:  They were not because they were

7    turned away.  But, this is -- this gets to the crux of why

8    we're here.

9                    THE COURT:  I guess I thought your principal

10:17:15  10    argument was that state law gave the Republican Party and

11    the Democratic Party the ability to appoint poll observers

12    and that those poll observers sufficiently and accurately

13    avoided election fraud and that the real concern was people

14    in addition to those poll observers interfering with voters

10:17:42  15    attempt to vote.

16                    MS. SMALLS:  I think it's two-fold.

17         So you're correct.  There is a -- a very large concern

18    about people that are outside of the official certified poll

19    observers, that they not be encouraged to come to polling

10:18:01  20    locations, that they not be told that they're poll observers

21    and watch dogs, and that they are somehow deputized to

22    question and challenge people that do not look like them

23    about whether they have the right to vote.  I think it's the

24    second concern -- sorry.

10:18:17  25                    THE COURT:  What specific injunction are you

1    seeking against the people who have been designated as poll

2    observers?

3              MS. SMALLS:  Well, we would ask the Court to

4    enjoin any -- any activity that would be seen to harass or

10:18:37 5    intimidate voters.  They are entitled to observe.  They are

6    entitled to go to the Board of Elections official and ask

7    questions.  They are not entitled to go up to individual

8    voters, but they don't like the looks of, and ask whether

9    they have a right to be there.

10:18:57 10              THE COURT:  Okay.

11         So what you're seeking then is an injunction against

12    those -- against any designated poll worker from doing any

13    of that?

14              MS. SMALLS:  Yes.

10:19:11 15         Again, under Ohio law, they're observers.  They're

16    not -- and there are very specific activities that are

17    allowed as an observer.  Some of the things that Defendants

18    have encouraged their supporters to do, we believe, goes

19    beyond the permissible activities that are allowed as an

10:19:33 20    observer under Ohio law.

21              THE COURT:  Okay.

22              MS. SMALLS:  So -- sorry.  I lost my train of

23    thought.

24         So as I said, the argument is two-fold.  And back to

10:19:48 25    your question about the Ohio Republican Party, you know, the

1    Trump Campaign, unless they're joined before the candidates,

2    does not have the right to certify, or any poll observers.

3    It has to be done by the State Party.  We have -- and I

4    think we offered in as an exhibit, you know, on the Trump

10:20:10   5    website saying, "Sign up as a poll observer," using the

6    language under Ohio law, "Sign up as a poll observer."

7    Where does that information go?  I would proffer it goes to

8    the State parties, that they can contact these people and

9    presumably get them certified.

10:20:26  10        So the distinction between the State Party and the

11    Trump Campaign and the National Republican Party really is a

12    very false one for these purposes.  They are a necessary --

13    they are playing a critical role in the Trump Campaign's

14    calls, calls to action to their supporters, to, you know, be

10:20:54  15    a watch dog at the polls.

16        I would also offer to your Honor that these are not

17    just citizens that are seeking to fulfill their civic duty.

18    These are people that are specifically reacting to the

19    racially tinged and racially charged language, and that

10:21:15  20    these are the people that are being fed to the State Party,

21    not, you know, Republicans of a normal year, that would feel

22    compelled to sign up as a poll observer, you know.

23        In our briefs, we talked about -- I think his name is

24    Steve Webb from Fairfield, Ohio, that thought he was

10:21:34  25    deputized to go around, and I'm going to look for anybody --

1          THE COURT:  We're within the -- there's an

2    11-day designation, right, 11 days before the --

3          MS. SMALLS:  That's correct, your Honor.

4          THE COURT:  Has he been designated as a poll

10:21:48  5    observer by the State Republican --

6          MS. SMALLS:  We have no way of checking that.

7    We did seek to check that beforehand, but that would be a

8    great question to ask.

9          So he has specifically deputized himself in response

10:21:59  10    to Trump's calls to action saying, "I'm going to hold them

11    accountable.  I'm going to make sure that they're doing

12    everything right."

13          Who is this man?  Has he been certified?  Is he

14    qualified to be a poll observer?  And it's one thing to have

10:22:15  15    these calls to action and know that these people -- and

16    incite them and encourage them to come and then look the

17    other way and say I don't know why they're there.

18          THE COURT:  Okay.

19          With regard to the Trump Campaign, what's the -- going

10:22:33  20    forward, what would be the remedy you're seeking as to them?

21          MS. SMALLS:  Well, I think the remedy that

22    we're seeking, again, to your first point, your Honor, about

23    these broad calls to action for people that -- Ohio law is

24    very clear about who can be a poll observer, who -- and what

10:22:54  25    the process is to be certified as a poll observer.

1        THE COURT:  Yeah.

2        MS. SMALLS:  Encouraging people -- sorry.

3        THE COURT:  Is that the one we talked about

4    where you have to be designated 11 days before?

10:23:03  5        MS. SMALLS:  That's right.  So their continued

6    exhortations to try to get people that do not -- the 11 days

7    is done.  We're a few days before the election.  There

8    should be nobody -- we know who the poll observers are.

9        THE COURT:  As far as you know, is that

10:23:18 10    sign-up page still existent?

11        MS. SMALLS:  As far as I know.  But we would

12    need to check that, your Honor.

13        THE COURT:  Okay.

14        So your argument, some evidence that Trump is trying

10:23:31 15    to solicit people to --

16        MS. SMALLS:  To troll the polls, yes.

17        THE COURT:  Okay.  So as to the remedy on

18    that, what would it be?

19        MS. SMALLS:  Well, I think that we could, you

10:23:45 20    know, we have asked for an injunction that would make clear

21    to anybody that they are communicating with that only

22    specified people that have met the requirements under Ohio

23    law and have already been certified pursuant to the 11-day

24    requirement are allowed at the polls to watch and observe.

10:24:12 25        You know, people are also allowed to check the voter

1    list.  We understand that, that any Ohio voter can go and

2    check the roles and see who's voted.  We're not -- but,

3    solely for that purpose.  They have to come in, look at the

4    list and leave; not talk to anybody and ask them and

10:24:28  5    challenge.  Them, photograph them, I mean the things that

6    the Defendants are talking about doing are really, really

7    disturbing.

8         And so we have examples of their supporters in their

9    own words of what they are planning to do, which is in

10:24:45 10    contravention of the federal law and the protections under

11    the Voting Rights Act.  So what we are specifically

12    asking -- you know, the head of the Board of Elections says

13    he's worried about instability on Election Day, given these

14    racially charged calls to action for these people that think

10:25:06 15    that they're going to act like vigilantes and take the law

16    into their own hands and ensure that the integrity of the

17    election -- -

18              THE COURT:  So with regard to -- is it similar

19    relief you're seeking as to the Stone group?

10:25:22 20              MS. SMALLS:  Yes.  We're asking for them to

21    cease again with respect to Ohio.  It is very clear that who

22    wants to, can't just show up and challenge another voter

23    about why they're there.

24         And so these increasing calls, the incitement to come

10:25:42 25    and look for people that don't look like them, we are -- we

1   are asking for an injunction to stop those calls and to make

2   clear that the only people that are allowed to show up at

3   the polls are people that are certified as official poll

4   watchers, and these are the prescribed activities that are

10:26:04  5   allowed as an observer.

6                    THE COURT:  Okay.

7          Is there anything else?  Because I'll give counsel for

8   the Defense an opportunity to --

9                    MS. SMALLS:  I think my counsel has a few

10:26:14  10   points that he'd like to make about Ohio law if that's

11   permissible.

12                    THE COURT:  Well, it's usually one person each

13   side.

14                    MS. SMALLS:  Okay.  All right.

10:26:21  15                    THE COURT:  So I'll give you a chance when we

16   finish if he wants to make an argument or suggest an

17   argument to you at that time.

18                    MS. SMALLS:  Okay.  Thank you, your Honor.

19                    THE COURT:  Okay.

10:26:29  20          On behalf of the State Party?

21          OPENING STATEMENTS ON BEHALF OF THE DEFENSE

22                    MS. ARMSTRONG:  Thank you, your Honor.  Maria

23   Armstrong on behalf of the State Party.

24          I'm feeling a little lonely over here, but I am joined

10:26:45  25   by my co-counsel, Christopher Ernst, from Bricker and

1    Eckler, and Dan Gibson from Bricker and Eckler as well.

2              THE COURT:  Before you get started, Stone was

3    served; is that what you filed this morning?

4              MS. SMALLS:  I did.

10:26:58  5              THE COURT:  Has anybody here entered an

6    appearance or is anybody appearing on behalf of him?  Okay.

7         Why don't you go ahead, Ms. Armstrong.

8              MS. ARMSTRONG:  Thank you, your Honor.

9         It would be an understatement to say that this was an

10:27:14 10   unusual election.  It would be an understatement to say it

11   was contentious.  There have been problems on both sides,

12   but as the questions from your Honor pointed out already

13   this morning, it is unfair and inaccurate to lump all of the

14   Defendants in as one.

10:27:30 15              THE COURT:  Let me ask -- so you designated

16   all the poll observers that you have already?

17              MS. ARMSTRONG:  As of --

18              THE COURT:  Already designated the poll

19   observers for each location?

10:27:44 20              MS. ARMSTRONG:  Yes, sir, that was completed

21   11 days before the --

22              THE COURT:  Did you -- are these kind of local

23   party people or did you use the Trump list to do that?

24              MS. ARMSTRONG:  Poll observers come from a

10:27:57 25   wide variety of places, including all of the Republican

1    candidates and local.

2              THE COURT:  Was there a coordination?  Did you

3    receive any names from the Trump Campaign as recommended

4    poll observers?

10:28:10  5              MS. ARMSTRONG:  There's a witness here to

6    testify to that, but yes.

7              THE COURT:  I mean what -- what percentage of

8    the poll observers can you -- came at the request of Trump?

9              MS. ARMSTRONG:  Your Honor, I couldn't tell

10:28:20  10   you.

11             THE COURT:  Ball park?  I mean 5 percent, 50,

12   75 percent?

13             MS. ARMSTRONG:  I really have no idea.  I

14   could ask our witness, she's here, if you want me to get

10:28:29  15   that information, but I really have no idea.  I can --

16             THE COURT:  It sounds like the Plaintiff's

17   complaint principally deals with limited number of polling

18   locations; specifically, it sounds like Cleveland, you know,

19   the major cities, and at issue where there may be a greater

10:28:49  20   Hispanic or African-American population.  Any idea what

21   percentage of the poll observers in those locations were

22   suggested by Trump?

23             MS. ARMSTRONG:  No, I don't know specifically.

24   Our witness may.  I can tell you that we have poll observers

10:29:10  25   in every poll location identified.  I can also tell you that

1    they were vetted and trained and duly certified by the

2    Boards of Elections in those counties.

3         THE COURT:  So trained not to say anything to

4    anybody, right?

10:29:23    5         MS. ARMSTRONG:  Very most definitely.  They

6    were trained.  There are training manuals we're prepared to

7    present here today that speak exactly to that.

8         THE COURT:  Okay.

9         MS. ARMSTRONG:  So, your Honor, a careful

10:29:36  10    examination of the Plaintiff's memorandum, their motion,

11    their complaint reveals not one single statement by the Ohio

12    Republican Party, not one tweet, not one campaign speech

13    that implicates anything the ORP has done in furtherance of

14    any kind of a voter intimidation effort here, including the

10:29:56  15    11th-hour affidavit that was filed by the Chairman of the

16    Ohio Democratic Party last night, even knowing that this was

17    a significant weakness.  Pointed out in the Republican

18    Party's pleadings, that affidavit contains a number of

19    wonderful public policy statements but still not a single

10:30:14  20    statement as to what the ORP has done in furtherance of the

21    complaint of activities.

22         Your Honor, a political party simply cannot be held

23    liable for the hyperbole statements, words of the supporters

24    of its candidates, of its voters, of its contributors, or

10:30:33  25    even of its candidates.

1          THE COURT:  I mean you -- I'm not sure who the

2     Ohio Republican Party is, but that's mostly Husted's

3     position, right, that there is not voter fraud in Ohio?

4          MS. ARMSTRONG:  Husted is the Ohio Secretary

10:30:49 5     of State.  He's an elected official.  And, yes, he is

6     charged with the duty to make sure that Ohio elections run

7     correctly.

8          THE COURT:  But, he's a Republican.

9          MS. ARMSTRONG:  Yes, he is.  So he is one of

10:31:00 10     the people who is represented by and assisted by the Ohio

11     Republican Party.

12          THE COURT:  But, hasn't he stated that there

13     is no election fraud in Ohio?

14          MS. ARMSTRONG:  I believe he has stated

10:31:10 15     something to that effect, yes.

16          THE COURT:  I mean do you have any evidence

17     that there is?

18          MS. ARMSTRONG:  Our witnesses do not.  As Ms.

19     Small has referenced --

10:31:18 20          THE COURT:  Has anybody ever been charged or

21     convicted in the last five years of identity theft or

22     election fraud?

23          MS. ARMSTRONG:  I am not aware of any, your

24     Honor.  And even in this particular election, in the last

10:31:31 25     few weeks when we've had early voting, we're not aware of

1     any.

2                    THE COURT:  Okay.

3          Well, we'll get an argument on behalf of Readler, but

4     it -- the Plaintiffs are suggesting that it was largely

10:31:45  5     racially tinged.  And, you know, I suppose the question

6     becomes whether Hispanics or illegal immigrants are voting

7     at high numbers.  But, you don't have any information that

8     they do?

9                    MS. ARMSTRONG:  Absolutely vehemently not.  To

10:32:12 10     the contrary, our witness will be able to present the kind

11     of training and talk about these issues.

12          There is absolutely no evidence presented.  There's no

13     indication, no intention, and Ohio laws do prohibit the

14     Republican Party from engaging in that type of activity.

10:32:27 15                    THE COURT:  So they've sought injunctive

16     relief as to apparently designated observers.  What happens

17     at a polling location if a designated observer violates the

18     directions that have been given him or her regarding not

19     approaching electors?

10:32:52 20                    MS. ARMSTRONG:  First of all, observers are so

21     advised both by us in our training as well as by Secretary

22     of State manuals and laws.  I think that would be up to the

23     individual poll workers who are deputized to be on scene and

24     eventually the Board of Elections.

10:33:09 25                    THE COURT:  Well, what would happen if

```
          1    somebody starts accosting voters, or demanding

          2    identification, or demanding that the people submit a

          3    provisional ballot or something of that nature?  What would

          4    happen to the particular polling location?

10:33:29  5              MS. ARMSTRONG:  Our poll workers are

          6    specifically trained.

          7              THE COURT:  No, I'm not -- I appreciate and I

          8    think that --

          9              MS. ARMSTRONG:  So if we had a rogue poll

10:33:38 10    worker despite the training and --

         11              THE COURT:  Right.

         12              MS. ARMSTRONG:  -- it would be up to the

         13    election officials at the precinct and the Board of

         14    Elections to deal with that.  However our poll workers,

10:33:50 15    observers are specifically trained to look for that, to

         16    absolutely refrain from that, and to take any activity they

         17    see by others engaged in that manner to the official Board

         18    of Elections workers and employees.

         19              THE COURT:  Say that happens, what happens at

10:34:06 20    the polling location?  Say, irrespective of the training,

         21    some poll worker starts either individually or

         22    systematically impeding voters, what would happen at a

         23    particular poll location?

         24              MS. ARMSTRONG:  Well, your Honor, you're

10:34:28 25    asking me to speculate.  I can only tell you that Ohio law
```

1    prohibits it, that Board of Elections workers, the actual

2    deputized people who sit there and have folks sign in when

3    they come, are trained by the Secretary of State office to

4    call law enforcement if necessary to enforce Ohio law.

10:34:46  5              THE COURT:  Okay.

6              MS. ARMSTRONG:  Our poll workers, observers

7    are trained similarly.

8              THE COURT:  Would that be the same if there's

9    somebody wearing political buttons or wearing political

10:34:56  10    shirts?

11             MS. ARMSTRONG:  Absolutely, your Honor.  Yes

12    or within 100 feet.  There's a litany of things prohibited

13    in Ohio law and the Board of Elections officials have the

14    authority to stop that activity.

10:35:12  15              THE COURT:  Okay.

16        So it would be a local -- at each polling location, is

17    there one person who is in some ways kind of in charge of

18    the whole operation?

19             MS. ARMSTRONG:  I believe so, your Honor, and

10:35:26  20    at the Board of Elections as well.  I would hesitate to say

21    that it's one person because everything is done on a

22    bipartisan basis.  When it comes to poll observers, poll

23    workers, people who have these kind of checks and balances

24    all the way out throughout the system is in a bipartisan

10:35:43  25    basis so it would be two people.

1           THE COURT:  Okay.  Any other thoughts or

2      comments?

3           MS. ARMSTRONG:  Yes, your Honor.

4           The Plaintiff here is asking you essentially to

10:35:54  5      restrain the Republican Party from undertaking action that

6      it is statutorily permitted to undertake, without any

7      evidence or indication that anything has happened to the

8      contrary.

9           It is a very slippery slope if we start applying --

10:36:12 10           THE COURT:  You said statutorily authorized to

11      undertake.  So I thought they were seeking in some ways to

12      restrain people from, for example, approaching prospective

13      voters within the 100 feet of the polling location.  I

14      thought that was -- so is that statutorily authorized if

10:36:35 15      somebody wants to campaign or solicit or harass somebody

16      within 100 feet of a polling location?

17           MS. ARMSTRONG:  Yes, your Honor.  That's

18      absolutely prohibited.

19           THE COURT:  It's prohibited.  So why -- if the

10:36:48 20      order went out that nobody was to do that, why would that be

21      restraining you or your supporters from something they're

22      entitled to do?

23           MS. ARMSTRONG:  Your Honor, we will -- we are

24      very hesitant and reluctant to agree to any kind of an

10:37:05 25      order.  There has been no showing here that the Republican

1    Party --

2            THE COURT:  No, let me take you back to

3    where I think you started.  The Plaintiff here is asking you

4    essentially to restrain the Republican Party from

10:37:44  5    undertaking action that is statutorily permitted, that it is

6    statutorily permitted to undertake.  So I thought what they

7    were trying to avoid was somebody being accosted within

8    proximity to the voting location.

9            MS. ARMSTRONG:  My understanding of their

10:38:06 10    complaint is that that is one of about a dozen things that

11    they're seeking to restrain.

12            THE COURT:  Okay.

13      So you would agree that you don't have a right to

14    accost somebody, or your supporters don't have a right to

10:38:17 15    accost somebody within 100 feet?

16            MS. ARMSTRONG:  I would agree that Ohio law

17    prohibits anyone from accosting someone within 100 feet.  I

18    would disagree that our supporters or Defendants cover the

19    Ohio Republican Party.  To the extent there should be a TRO

10:38:34 20    issued, it should be against the actors who are engaged in

21    this activity.

22      I have an exhibit here that shows the training that we

23    undergo, your Honor, which I can present to you now or later

24    with a witness that specifically addresses this point.

10:38:46 25            THE COURT:  Okay.  But -- so looking at

1    3501.35(A)(2), individuals are restrained, or forbidden

2    from, in any manner, hindering or delaying the elector

3    reaching or leaving a place fixed for casting the elector's

4    ballot.

10:39:11  5         So are you agreed with me that Ohio law says you can't

6    restrain an elector from either coming in or leaving the

7    polling place?

8              MS. ARMSTRONG:  Yes, that's what Ohio law

9    says.

10:39:26 10             THE COURT:  And so I'm not sure what your

11   argument -- are you seeking -- is there -- earlier you seem

12   to be saying that the Plaintiffs are seeking to restrain

13   conduct that is allowed under Ohio law.

14             MS. ARMSTRONG:  Your Honor, I was referring to

10:39:44 15   the appointment of poll observers.

16        At that time, we were talking about appointment of

17   poll observers.  That is something which both parties engage

18   in every election.

19             THE COURT:  Yeah.  Okay.  And you don't

10:39:55 20   dispute that, do you?

21             MS. SMALLS:  No, your Honor.  We're not trying

22   to seek being -- an injunction against the Republican

23   Party's right to appoint poll observers.  We're only trying

24   to enjoin very clear indications of voter intimidation.

10:40:16 25             THE COURT:  Okay.

1        MS. ARMSTRONG:  And, your Honor, in the

2   absence of any evidence that the ORP has engaged in voter

3   intimidation or training for same, it's inappropriate to

4   include us in a TRO that would, you know, include the

10:40:30   5   Republican Party in any kind of activity which it doesn't

6   engage in, hasn't engaged in, isn't training people to

7   engage in and isn't proven that falls squarely under the

8   Perez case as an advisor and type of TRO and obey the law

9   type of TRO, and we would object to being included in that.

10:40:46  10        THE COURT:  Okay.  Thank you.

11      Let me ask for an opening statement from Mr. Readler.

12        MR. READLER:  Thank you, your Honor.  May it

13   please the Court.  Chad Readler on behalf of the Trump

14   Campaign and my colleague, Ken Gross, here with me today.

10:41:13  15      I think I'll start on one point that I suspect

16   everyone in the room can agree with, and that is that our

17   democratic system is unparalleled around the world.  We all

18   respect that.  And there are two critical pieces of that

19   process that are at issue today.

10:41:24  20      One is the right, anyone's right, everyone in Ohio's

21   right to engage in political speech.  And the other one is

22   the fact that change in this country comes at the ballot

23   box.  It doesn't come by stone or gun or otherwise.  We

24   change things at the ballot box, and Ohio has a prescribed

10:41:41  25   system for how that change will occur.

1          THE COURT:  What's the -- so 11 days before

2     the election observers are designated, what's the -- what's

3     the purpose of signing people up on your web site before

4     that?

5          MR. READLER:  That's a very good question,

6     your Honor, and my friend from New York may not appreciate

7     this.  I know Mr. McTigue would, but 3505.21, which

8     addresses this issue, allows the parties to amend that list

9     up until 4:00 P.M., the day before the election.  So both

10    campaigns --

11         THE COURT:  Given his comments, you know, that

12    are in the record, Trump's comments, I mean doesn't those

13    comments say we need people to come sign up with the

14    Republican Party to offer to serve as designated poll

15    observers?

16         MR. READLER:  Your Honor, he says -- I mean

17    most commonly quoted phrase is we're looking for poll

18    watchers.  Now, in Ohio the people registered to go inside

19    the poll to monitor, one Republican, one Democrat, they're

20    called poll observers.  But in many other states, they're

21    called poll watchers.

22         THE COURT:  But, he uses the poll watcher

23    language in Ohio, in Delaware --

24         MR. READLER:  Correct.  He uses that language

25    around the country.  Probably more common --

1          THE COURT:  That's the -- there's a difference

2    between observers under the statute and watchers generally.

3    Right?

4          MR. READLER:  The statute just refers to

10:43:07  5    observers, and that's what we call them in Ohio.

6          THE COURT:  Why would they ever be called poll

7    observers in some other state?

8          MR. READLER:  Because that's by statute what

9    they're called.  In fact, other states have different rules,

10:43:18 10    and there's another case pending in Nevada.  In Nevada, the

11    poll watchers can actually challenge the voter.  And there's

12    a process there and criminal penalties on another one.  Our

13    process is much different.  It's highly regulated.  And the

14    concern that we have is that, you know, a few days before

10:43:33 15    the election, the Plaintiffs have come in to try to upset

16    that process.

17          THE COURT:  What -- I mean the whole kind of

18    gist of this whole thing is his call to -- that there's

19    fraud in Ohio and fraud in other states.  What's your best

10:43:48 20    argument, what support does Trump have that there's been

21    fraud in the casting of Ohio ballots?

22          MR. READLER:  My first response, your Honor,

23    is we can disagree about how much fraud there is.

24          THE COURT:  No, what's the best -- what's the

10:44:01 25    best conviction you have?

1    MR. READLER:  Footnote 2 in the briefing filed

2    late last night or early this morning, Page 11.  It cites

3    five newspaper articles that report convictions in the state

4    of voter fraud.

10:44:15  5    THE COURT:  How many ballots?

6    MR. READLER:  How many ballots?

7    THE COURT:  Yeah.  How many ballots in the

8    state?  What percentage of the ballots would have resulted

9    in convictions?

10:44:23  10    MR. READLER:  Very small amount.

11    THE COURT:  So how many people vote in Ohio,

12    probably three million?

13    MR. READLER:  I think that's right.

14    THE COURT:  So you've got how many

10:44:31  15    convictions, three?

16    MR. READLER:  Well, there are five articles.

17    One of the articles, for example, one person was had -- was

18    convicted of voting eight times.

19    THE COURT:  I'm sorry.

10:44:41  20    MR. READLER:  One person convicted of voting?

21    Eight times.

22    THE COURT:  Eight times against what 3 or 4

23    million votes each time?

24    MR. READLER:  And in the last election,

10:44:50  25    Secretary of State Husted reported about 100 instances of

1    suspected voter fraud.

2                    THE COURT:  Suspected?

3                    MR. READLER:  I'm not here to debate the

4    numbers.  The numbers mcoul be low, the numbers could be

10:44:59  5    high.

6                    THE COURT:  This is in some ways argument.  Do

7    you actually believe, as an officer of the court, that there

8    is such a thing as voter fraud that impacts elections?

9                    MR. READLER:  Your Honor, I think there are

10:45:13 10    reported cases of --

11                    THE COURT:  No, I didn't ask you that.  I

12    asked you, as an officer of the court.

13                    MR. READLER:  Well --

14                    THE COURT:  Would you represent to a court

10:45:21 15    that there is any chance that voter fraud would impact an

16    election in Ohio?

17                    MR. READLER:  Your Honor, I don't know.  I'm

18    not a political scientist, and we do have elections that --

19    we've had elections that come down to coin flips because

10:45:36 20    they're tied.  In that race, if one vote was illegal, that

21    illegal vote decided the race.

22        Now the presidential level, I admit it's less likely.

23    But, really the fundamental point I want to make is this --

24                    THE COURT:  Kind of goes to -- they're

10:45:48 25    suggesting that this is all code words, that it's really an

1      incitement to harass democratic leaning, but more

2      specifically, African-American or Hispanic voters.

3                    MR. READLER:  Your Honor, and there's no

4      evidence of that.  And I think it was telling that in

10:46:07  5      Ohio --

6                    THE COURT:  Why would -- I guess some

7      evidence, why would your -- the words come from Trump's

8      mouth, why would he make those arguments?

9                    MR. READLER:  Well, your Honor, he's not a

10:46:16 10      fair characterization of --

11                    THE COURT:  It's been kind of a central

12      cornerstone of his campaign that there's this huge voter

13      fraud, which is kind of either a suggestion that he is

14      afraid he's going to lose and wants an excuse or suggestion

10:46:34 15      that the way to win is to somehow stop the vote by

16      repressing voter turn out.

17                    MR. READLER:  Well, he's never used the words

18      repress voter turn out.  He never used racial words --

19                    THE COURT:  What's he talking about when he

10:46:49 20      talks about certain parts of cities having a long history of

21      voting?

22                    MR. READLER:  Well, Mr. Trump is obviously of

23      the view that there is voter fraud in this country, and he

24      may be right or wrong about that.  That is a political

10:47:04 25      issue.

THE COURT:  It's not a political issue.  It's a fact issue, isn't it?

MR. READLER:  Well, it's both but --

THE COURT:  Motivation issue.  It's a -- whether an inference can be drawn that by using that language, he's trying to impede people from voting by harassing them.

MR. READLER:  That's true, that issue is before the Court, and I would say two things.  One, Mr. Trump, like every other American, has the right to free political speech.  And that -- as the nominee of a major party, he's engaging in that political speech.  That's what he's doing.  But, second, your Honor, I know you wouldn't do that without some evidence, some actual evidence that people have been -- people have not voted because they were confronted by someone harassing, left the poll.  And in Ohio, we've been voting for over three weeks.  Talk about Election Day, the election is very important, but almost nearly 400,000 people have voted in Ohio, your Honor.  And so far, we're not aware of one --

THE COURT:  Isn't there a different dynamic between absentee voting and voting at the Board of Elections?

MR. READLER:  There is, your Honor, but I was referring to --

1      THE COURT:  So in Ohio -- my apologies for my

2  ignorance on this.  Early voting would be what, either

3  through early mail voting or going to -- is it restricted to

4  the Board of Elections or are there other sites?

10:48:24  5      MR. READLER:  One voting center I think in all

6  major counties.

7      THE COURT:  So what inference can you draw

8  from that?

9      MR. READLER:  Quite a bit, your Honor, because

10:48:31 10  that's structured very much like a precinct.  There are --

11  there's a voting manager, which every precinct has, but

12  there's a vetting manager, there are precinct officials,

13  some Republican, some Democrat, and there also poll

14  observers, some Republican, some Democrat.  That's happened

10:48:49 15  in every center, most of the centers around the state.  And

16  of course, people are free to be more than 100 feet from the

17  polling place, free to express their political message,

18  whether it was pro-Clinton, pro-Strickland, pro-Portman,

19  whatever the message, people are free 100 feet away from

10:49:03 20  those centers as well.  So in many ways, it's very much like

21  the voting, except there are a number of people voting

22  because these are one location County-wide.  So quite a few

23  people there, and no instances that we know of, of problems.

24  And don't take my word for it.  Chairman --

10:49:18 25      THE COURT:  I think you're right, but the

1    question is how analogous is that to -- how many voting

2    locations in -- how many voting locations in Cuyahoga County

3    or the State of Ohio?

4            MR. READLER:  I think there's one in the

10:49:32  5    County.  But, if someone --

6            THE COURT:  No.  What I'm getting to in the

7    general election, how many individual voting locations would

8    there be in the State of Ohio.

9            MR. ERNST:  8,887 precincts, I think.

10:49:44 10            THE COURT:  In Ohio.  And there's what, 88

11   counties?  So 88 places where early voting's taking place?

12            MR. READLER:  Correct.  And I think density is

13   quite a bit higher because that's 100th of the number.  So

14   there are more -- there are more people coming to these

10:49:58 15   centers now.

16        And, again, I guess Mr. Pepper agreed with me in the

17   statement he made to The Enquirer and the statement he

18   submitted to this Court.  He's not aware of anything that's

19   happened.  So to grant an injunction on the basis of no

10:50:09 20   evidence that -- an injunction request, it is important to

21   remind you that an injunction request is that we follow Ohio

22   law.

23        And I say two things:  One, the observers are trained

24   to follow Ohio law.  That's a critical function of the

10:50:20 25   training.  There's no good to be done by having observers

1    violate the law.  And in fact, your Honor, asked what the

2    procedure would be.  If an observer steps out of line, the

3    voting location manager or the precinct officials can rein

4    them in, and if can't can, they can call law enforcement.

10:50:36  5        In our brief, we cited the Ohio statute that requires

6    law enforcement to detain anybody who is violating Title 31

7    of the Revised Code.

8                   THE COURT:  What about conduct outside the

9    election spot?

10:50:49 10                   MR. READLER:  So anything within 100 feet of

11    course is prohibited by Ohio law.

12                   THE COURT:  So if there's five observers that

13    get within 100 feet or get right on the line of 100 feet, if

14    there's no restraining order, what's the remedy for it?

10:51:08 15                   MR. READLER:  There's a couple things.  First,

16    the voting manager can come out, precinct official can come

17    out ask them to move.  And the second is law enforcement.

18    And as my friends on the other side noted, all of the

19    counties around the state are on notice about this election.

10:51:20 20    Everyone knows it's an important election, deeply contested

21    election.  And the Board of Elections Chairman here in

22    Cuyahoga County, he doesn't say he was concerned about the

23    election because of racial concerns.  He just said that he

24    has a heated election, and so he has law enforcement on

10:51:32 25    notice in case an issue does arise, they can address it

1    quickly.

2         And we've had elections for years and years and years,

3    of course, in Ohio, and that's the process that's carried us

4    forward.

5              THE COURT:  So there's been intimation

6    specifically with regard to Stone, that there's going to be

7    some polling or impediment created by polling, with

8    confession that I don't particularly understand this.  Why

9    would anybody ever do polling after an election?

10             MR. READLER:  Two things, your Honor.  One,

11   the Trump Campaign is not doing any exit polling.  So it's

12   not something we're doing.  I think it's done mostly by the

13   media.  So you turn on the TV at 7:00 on election night and

14   they want to start giving us early returns, and they'll give

15   us, for example --

16             THE COURT:  No.  I understand why the news

17   media does it.  But why would a campaign do it?  Or why

18   would Stone do it or why would Stone, in cooperation with

19   Trump, do it?

20             MR. READLER:  First of all, Trump's not doing

21   it.  As an officer of the Court, you have my statement

22   that --

23             THE COURT:  What's Stone -- by the way, what's

24   Stone's relationship; an advisor to Trump?

25             MR. READLER:  To my knowledge, they have no

1    relationship.  There's one statement in their complaint that

2    says he's been a long time advisor to Trump.

3                    THE COURT:  Has he been an advisor to Trump?

4                    MR. READLER:  To my knowledge, that is

5    completely false.  And I see no evidence to the contrary.

6    And Mr. Stone actually -- I know he's not here.  I think he

7    sent out a press statement.  He disavowed any affiliation

8    with the Trump Campaign.  I don't know much about him, but I

9    know he has nothing to do with the campaign.

10                   THE COURT:  He made me feel -- made me feel

11   old when I heard that he was around at the time of the '68

12   campaign, which sadly I'm old enough to generally remember,

13   so.

14        (Laughter.)

15                   MR. READLER:  Well, I'm going to stay silent

16   on that one.

17        (Laughter.)

18                   MR. READLER:  But --

19                   THE COURT:  Best argument is in spite of all

20   your client's comments about the, you know, fraud and so

21   forth, that people won't really kind of fall out of the

22   intimation that the election's being stolen?

23                   MR. READLER:  Well, your Honor, these are

24   political statements that are calling --

25                   THE COURT:  Why would you say it?  I mean why

1    would anybody say it unless they're trying to incite people

2    to come out and impede the election?

3              MR. READLER:  Your Honor, people say a lot of

4    things to get their voters out to the polls.

10:53:55  5              THE COURT:  Why would you -- if you're

6    coaching the Indians, and you're in the middle of the ninth

7    inning, you're going to bat, why would you go out and say to

8    somebody the game's been stolen from us, and if we lose,

9    it's because it's been stolen?

10:54:17 10              MR. READLER:  On the context of a political

11   campaign, there are a lot of ways to energize your base.

12   Let's use that phrase.  And all parties do it.  Lots of

13   different things.  Certainly the Democrats are --

14              THE COURT:  Why would that energize a base?

10:54:30 15   Wouldn't you be more in a position where you would depress

16   your base by telling people no matter what you do, it's

17   going to be stolen anyways?  So isn't the -- doesn't that

18   lead to a conclusion why should I vote?

19              MR. READLER:  You might be right.  I'm not

10:54:47 20   saying it's a good strategy.  I'm not a political

21   consultant.

22              THE COURT:  Unless the strategy is to

23   encourage people to impede.

24              MR. READLER:  Again, there's no word, no quote

10:54:57 25   of impeding or threatening or coerce.  Those are the words

1      of the statute that they're trying to have you enforce.

2      That requires harassment, intimidation, coercion.  Nothing,

3      no language of the sort.  And the language again is

4      encouraging people to get to the polls.  If the message is

10:55:13  5      we think it's going to be a close election that could be

6      stolen, Mr. Trump doesn't have trust in the system.  But

7      that goes beyond elections.  That goes to sort of the way in

8      which the country is run.  That's been his message

9      throughout the campaign, and the message that in different

10:55:25 10      ways, he's been stating to his supporters.

11                  THE COURT:  I thought he made some comment

12      down in Delaware, something to the impact of, "We've got to

13      get everybody to go out and watch and go out and vote.  And

14      when I say watch, you know what I'm talking about, right?"

10:55:48 15      What's he trying to say there?

16                  MR. READLER:  Well, your Honor, again, poll

17      watching is the sort of --

18                  THE COURT:  No, it's not the poll watching.

19      It's the followup, "And when I say watch, you know what I'm

10:56:00 20      talking about, right?"

21                  MR. READLER:  It's says two things to me.

22      Either one, it's the poll watchers because he references the

23      poll watchers in the prior sentence.  And again, that's the

24      term of art used in many other states.

10:56:11 25                  THE COURT:  What's he mean when he says, "You

1      know what I mean."

2                  MR. READLER:  His view is that the system is

3      rigged against a certain interest, and he's running against

4      those interests.  Again, I'm not a campaign manager,

10:56:21  5      political scientist, but encouraging his base to get out

6      there.

7                  THE COURT:  What's your understanding --

8      what's he saying when he says, "And you know what I mean"?

9                  MR. READLER:  Well, again I think one or two

10:56:32 10      things:  Either about encouraging poll watchers or getting

11      his voters out to vote.

12                  THE COURT:  Why would you use the phrase, "And

13      you know what I mean," if he's trying to encourage poll

14      watchers?

10:56:42 15                  MR. READLER:  Well, he's either trying to

16      encourage that or trying to --

17                  THE COURT:  Encourage what?

18                  MR. READLER:  Either trying to encourage

19      people to volunteer --

10:56:50 20                  THE COURT:  He said that in the sentence

21      before.  Why would he put the caveat or the qualifier, "You

22      know what I mean"?

23                  MR. READLER:  Well, your Honor, again, I think

24      it's a political message, as all the statements are --

10:57:01 25                  THE COURT:  How do we understand that?  What's

1     the -- I mean that language, what do you -- how else could

2     you understand that?

3             MR. READLER:  Well, I think that -- that's the

4     great beauty of speech, is it could be understood in

10:57:14  5     different ways by different people, and we don't restrict

6     political speech for that very reason because we like an

7     open exchange of ideas.

8             THE COURT:  That's true, but we're talking

9     here about whether it's presented as a threat.  And the

10:57:26 10    question is, "And you know what I mean," how else do you

11    take that?

12            MR. READLER:  Again, two answers, your Honor.

13    The first is I think, again, this is the political message

14    of the campaign; that the voters need to be active, either

10:57:39 15    volunteers of the polls or have a right -- voters have a

16    right to be 100 feet outside of a polling place.  They don't

17    have a right to intimidate or coerce anyone but that -- I

18    don't read that language to say that and, your Honor, if

19    that is what he was encouraging, then I suspect we would

10:57:54 20    have seen examples of this at the 88 polling places around

21    the country or around the state, where over 400,000 people

22    have voted.  And there's not -- no evidence of anything

23    happening inside the poll or outside of it.

24        So to grant a TRO based upon this statement, I think

10:58:10 25    reasonable minds can disagree about what it means or the

1    conclusion may be right, but reasonable minds could disagree

2    about this.  To grant a TRO based upon no evidence -- and

3    the TRO, again, is basically we have to follow the law, and

4    I have a couple issues with that:  One, courts typically

10:58:24 5    don't grant injunctions that follow the law.  Two --

6                THE COURT:  Looking at Pence's statement at

7    378, what's he mean?

8                MR. READLER:  I'm not -- sorry.  I don't have

9    that in front of me.

10:58:38 10                THE COURT:  If you've not yet volunteered to

11    participate in the electoral process of respectfully

12    providing accountability at the polling place, come Election

13    Day, then you haven't done all that you can do.  So when

14    he's saying, "To provide accountability at an election

10:58:57 15    place" --

16                MR. READLER:  That's a great -- I mean as I

17    started my statement, there are three ways in which voters

18    get involved:  One, they vote.  But two, Republicans and

19    Democrats both serve -- one serves as precinct judges.  So

10:59:13 20    the officials who are paid to work a precinct.  And also

21    poll observers.  And both parties go out to recruit people

22    to perform those critical functions.  I suspect that's what

23    he's talking about.  And if there's one thing the national

24    media has talked about in the election is the fact the

10:59:27 25    ground game by the Democrats is a much stronger one.

1          We can debate whether that' true or not, but the fact

2     is the Trump Campaign has had to recruit volunteers in a

3     different way and often done at the behest of the national

4     candidates asking for supporters to get out and help work

10:59:40  5     the polls.  I think that's the very reason --

6                    THE COURT:  This was apparently a statement on

7     October 16th, and I guess it was before the 11 --

8                    MR. READLER:  Again, that list --

9                    THE COURT:  The 11th day.

10:59:53 10                    MR. READLER:  That list could be amended

11     Monday.  That was the first point I started with.  That list

12     could be amended.  So new names can be added, taken off.

13     There are over 8,000 names on that list.  I mean it's a huge

14     list that covers the entire state.  And, of course, there

11:00:05 15     are going to be changes here to that list before election.

16                    THE COURT:  Any vacancies on the list?  Do you

17     know?

18                    MR. READLER:  I think the entire list is full

19     that we submitted.  Now, it may well be we have, you know,

11:00:16 20     someone who can't be -- of all the 9,000 people, surely some

21     won't be available and there will have to be some switching.

22     But every precinct in the state, the names have been

23     presented to be observers.

24          I want to emphasize, this relief remarkably sought

11:00:33 25     against the supporters of the Republican Party, I guess, and

1    that is -- first of all, those people aren't in front of the

2    court today.  Second of all, that is remarkably broad.  I

3    have no idea how we define who is a supporter, who is not.

4        My friend from New York talked about sort of this

11:00:48  5    being an election involving more, not the normal

6    Republicans, but I guess abnormal ones.  And I don't know

7    how we segregate out --

8                THE COURT:  You mean if an injunction had been

9    issued, sounds like your suggestion is it should forbid

11:01:01 10    harassing, intimidating, or impeding conduct by either

11    Democrats or Republicans.

12                MR. READLER:  If the Court was going to do it,

13    that would be the way to do it, but the fact is Ohio law,

14    that's verbatim Ohio law, it already requires all those

11:01:16 15    things, allows law enforcement to get involved.

16                THE COURT:  I know -- I understand, but

17    there's a lot of things that the injunctive relief's given,

18    even though there's available legal remedies.  So I'm not

19    sure that argument takes you very far.

11:01:30 20                MR. READLER:  A couple things.  One is there's

21    evidence also.  I don't think this issue is actually even

22    ripe for the Court because they haven't presented you with

23    any evidence of actual intimidation or coercion in Ohio to

24    suggest that this is going to be ramped up on Election Day,

11:01:44 25    according to Federal Court's intervention today.

1          THE COURT:  I mean as you know, we get

2     temporary restraining orders all the time.  And you know,

3     they seek to restrain businesses or other things.  And

4     almost invariably, there's -- the restraint is sought to

11:02:03  5     prevent harm, not restraint sought to remedy a harm.  Under

6     Rule 65, you know, restraining orders are -- injunctions are

7     less tied to whether there's a recoverable harm at this

8     point.

9          MR. READLER:  That's true, but there are two

11:02:23 10     things to point out.  One, it's extraordinary relief, and I

11     think many are sought, but few are granted because it is

12     extraordinary in nature.  And two, the test of whether there

13     will be a likelihood of success on the claims and likelihood

14     of irreparable harm.  And again, that turns on what evidence

11:02:40 15     has been presented, how imminent a threat is.  And that's

16     just lacking here.

17          You have straight -- many of which are not in front of

18     the Trump Campaign in the record.  You have no evidence of

19     actual evidence of intimidation.  And again, Mr. Pepper

11:02:53 20     seems to agree that he's seen no actual instances.  If

21     something occurs on Election Day, certainly, there's law

22     enforcement to turn to, there's the precinct judges to turn

23     to, this Court to turn to.  Not uncommon for parties to

24     litigate issues.

11:03:06 25          THE COURT:  How would this Court have any

1    authority if there's not a restraining order?  So if there's

2    a restraining order, there would be the contempt sanction,

3    but there's not a restraining order, how would this Court

4    have any?

11:03:18    5    MR. READLER:  The Court can issue one -- if

6    something actually happens -- and we have three days before

7    the election, but if something actually happens, the Court

8    can quickly --

9    THE COURT:  Probably three too many, probably

11:03:28   10    30 too many.

11    (Laughter.)

12    MR. READLER:  Maybe another point we can all

13    agree on.  But, a lot of remedies available to the Court and

14    I just -- I mean essentially a TRO in this context, in

11:03:39   15    addition to all the things I stated, would see essentially

16    federalize Ohio law, and I don't see a need for that in this

17    context as well.

18    And one other concern.  I mean the language of the --

19    what exactly this prohibits and doesn't prohibit, especially

11:03:55   20    outside the 100 feet, is very difficult to understand

21    because they talk about limits on being able to take

22    photographs, for example.  And I guess the concern would be

23    that someone's going to photograph something going to the

24    poll.  But, that would also prohibit someone standing 100

11:04:12   25    feet away from the precinct, taking a selfie of themselves

1       to say they voted that day.  Maybe they voted for Clinton,

2       Trump, who knows.  But, this injunction request sweeps so

3       broadly, it's going to bring in so much protected speech.

4       And there's one example, I mean they have one case -- they

11:04:28  5     have one case in their brief out of South Dakota that

6       involved the election of Tom Daschle.

7                   THE COURT:  Yeah, you're correct.  I think it

8       is distinguishable but kind of goes to the, you know,

9       whether it's going to threaten people with --

11:04:44 10                  MR. READLER:  That case, there was evidence

11      that Native Americans were being followed to the polls, that

12      photographs were being taken of their license plates, and

13      being followed away from the polls, and that no one condones

14      that conduct for the Court to get involved, but there's

11:04:58 15     nothing like that here.  So to request extraordinary

16      intervention by a federal court into an area that is

17      primarily regulated by the State, where there's no evidence

18      of wrongdoing so far in my mind, that would really exceed

19      the appropriate bounds of Rule 65.

11:05:12 20                  THE COURT:  Okay.

21                  MR. READLER:  So I think unless there's

22      another question from --

23                  THE COURT:  No.  I'm going to allow -- do you

24      have any witnesses you want to call?

11:05:24 25                  MR. McTIGUE:  May we have a moment, your

1    Honor?

2                    MS. SMALLS:  We do, your Honor; just need to

3    check and make sure she's here.

4                    MR. McTIGUE:  We're going to call State

11:06:00  5    Representative Howse.

6                    THE COURT:  Ma'am, you want to come forward.

7    And if you'll raise your right hand.

8                              STEPHANIE HOWSE,

9          of lawful age, a witness called by THE PLAINTIFFS,

11:06:14 10               being first duly sworn, was examined

11                        and testified as follows:

12             DIRECT EXAMINATION OF STEPHANIE HOWSE

13                    THE COURT:  If you'll take a seat.  And once

14    you get seated, pull yourself close to the microphone.  Tell

11:06:27 15    us your name and tell us how you spell your last name.

16                    THE WITNESS:  Hi.  My name is Stephanie Howse.

17    That's S-T-E-P-H-A-N-I-E.  Last name is H-O-W-S-E.

18                    THE COURT:  It's Mr. Alias?

19                    MR. WEST:  No.  Mr. Zack West, your Honor.

11:06:56 20                    THE COURT:  Okay.  Why don't you go ahead and

21    proceed.  I'm sorry.

22                    MR. WEST:  Yes, your Honor.

23                    THE COURT:  Insulting him or insulting you, I

24    don't know who, but why don't you go ahead and proceed.

11:07:07 25          (Laughter.)

1      MR. WEST:  Thank you, your Honor.

2  BY MR. WEST:

3  **Q.**   Representative Howse, can you state your employment,

4  please?

11:07:12 5  **A.**   I am the Ohio State Representative for the 11th

6  District that covers, let's say the east inner part of

7  Cleveland, Garfield Heights and Newburgh Heights.

8  **Q.**   Okay.  And how long have you held that office?

9  **A.**   Eighteen months, no about 20 months, 22 months.  I'm

11:07:31 10  sorry.  It's almost two years.  Sorry.

11  **Q.**   And how long have you lived in that district?

12  **A.**   Pretty much all of my life, outside of college.

13  **Q.**   Okay.  And, in fact, did your mother represent that

14  same district?

11:07:45 15  **A.**   She did from 2000 to 2006.

16  **Q.**   Were you involved in her campaigns?

17  **A.**   Yes.

18  **Q.**   Okay.  Can you describe your district?

19  **A.**   So when you look at Cleveland, I represent the

11:07:57 20  communities of Central, Fairfax, Slavic Village, St. Clair

21  Superior, Hough, Buckeye, Shaker, a sliver of Mt. Pleasant,

22  Union, Miles, and then the two entering suburbs of

23  Middleburg Heights and Newburgh Heights, African-American

24  and low income communities.

11:08:17 25  **Q.**   And based on your experiences as a state rep, working

| | |
|---|---|
| 1 | on your mother's campaign, and having lived in the district |
| 2 | most of your life, would you say you're able to speak |
| 3 | knowledgeably about your district's political behavior and |
| 4 | voting behavior? |
| 11:08:29  5 | **A.**   Yes. |
| 6 | **Q.**   Okay. |
| 7 | And to the best of your knowledge, are attitudes of |
| 8 | voters in your district and behavior of voters in your |
| 9 | district typical of most predominantly African-American |
| 11:08:40 10 | communities? |
| 11 | **A.**   Yes. |
| 12 | **Q.**   Okay. |
| 13 | As you know, today's case deals with voter |
| 14 | intimidation.  Let me start by asking whether you're aware |
| 11:08:48 15 | of any past efforts at voter intimidation, especially in |
| 16 | your district?  And for the sake of time, let's restrict it |
| 17 | to 2012 to the present. |
| 18 | **A.**   Right. |
| 19 | So in the last presidential election, and it was like |
| 11:09:01 20 | in October, there was specifically a billboard that was |
| 21 | placed in the Central community.  Specifically, they talked |
| 22 | about voter fraud and if you commit voter fraud, you would |
| 23 | be subjected to certain penalties of fines and imprisonment. |
| 24 | **Q.**   And you saw this billboard for yourself? |
| 11:09:20 25 | **A.**   Yes, I did. |

Howse - Direct

1    **Q.**    Okay.  And you said it was placed in the Central

2    Community?

3    **A.**    Correct.

4    **Q.**    Is that the name of the neighborhood?

11:09:27 5    **A.**    It's the name of the neighborhood.  It was on 36th and

6    Community College.

7    **Q.**    And can you describe that neighborhood?

8    **A.**    That is the area that has the highest concentration of

9    public housing here in Northeast Ohio, overwhelmingly

11:09:41 10   African-American and low income, low income community

11   members.

12   **Q.**    Okay.

13          And are you aware of whether any other billboards were

14   placed --

11:09:50 15   **A.**    Yes.  There was one that was on East 1085th, kind of

16   like the -- kind of where the Glenville area, they did

17   redistricting.  So I'm a little confused on where

18   specifically, but it was on the east side, like East 185th

19   Street.

11:10:04 20   **Q.**    Okay.

21          And were any of these billboards placed in

22   predominantly white communities?

23   **A.**    No.

24                  MR. READLER:  Objection.

11:10:11 25                  THE COURT:  Overruled.

Howse - Direct

1    **Q.**    And what were -- did you speak to any of the residents

2    in your district about these billboards?

3    **A.**    Well, Councilwoman Phylis, and then senator Nina

4    Turner, they were receiving several calls, people had talked

11:10:29  5    about it at the ward, specifically Ward 5 about people's

6    anger and frustration of being targeted and dispatched

7    during an election season.

8    **Q.**    Okay.

9         Did anyone say they were concerned or intimidated by

11:10:44 10    the billboards?

11    **A.**    Yes.

12              MR. READLER:  Your Honor --

13              THE COURT:  Sustained.

14    **Q.**    All right.

11:10:50 15         Based on your experience as a candidate and working on

16    your mother's campaigns and your knowledge of your

17    district's political views and voting behavior, what affect

18    did the billboards have on residents in your district?

19    **A.**    It caused the people and it had people being very

11:11:07 20    hesitant to participate in the electoral process.

21         If you actually look at this, it is an area that is

22    already, you know, struggling to get people to be active

23    participants.  And you have many return citizens and many

24    communities specifically in the African-American community,

11:11:27 25    when it comes to law enforcement and understanding now the

| | 1 | criminal justice reform that this country is going through, |
| | 2 | justice is not necessarily very -- specifically when it |
| | 3 | looks at African-Americans, and when there are issues of |
| | 4 | intimidation that happened in 2012. |

11:11:44  5     Q.    I'm sorry.  I would -- I phrased that poorly.

6     Specifically, what affect did the billboards have on

7     residents?

8     A.    You have people that were very hesitant to actually

9     vote.

11:11:54 10    Q.    Okay.

11          And as you may know, the Defendants in this case have

12    been encouraging their supporters to become poll watchers.

13    For instance, last month, Mr. Trump said you've got to go

14    out, and you've got to get your friends and you've got to

11:12:06 15   get everybody you know and you've got to watch the polling

16    booths, how would you interpret that statement?

17    A.    Basically, go out and specifically watch in

18    communities that aren't supportive of the candidate to make

19    sure it's not a rigged election as to candidate,

11:12:23 20   specifically said several times.

21    Q.    Okay.

22          And when he tells largely white audiences that it is,

23    quote, "Important that you watch other communities because

24    we don't want this election stolen from us," how would you

11:12:34 25   interpret that statement?

Howse - Direct

1    **A.**    To go to the black communities.

2    **Q.**    And based on your knowledge of your district's

3    political views, how would others in your district interpret

4    that?

11:12:42  5    **A.**    Go look at the black community, come to our

6    communities.

7    **Q.**    And when Mr. Trump told supporters at a rally in Akron

8    that, "You have to get everybody to go out and watch.  And

9    when I say watch, you know what I'm talking about, right,"

11:12:56 10    do you know what he's talking about?

11    **A.**    He's specifically talking about going out and watching

12    the black communities.

13    **Q.**    Okay.  And --

14    **A.**    And that is how it's interpreted by many people that

11:13:05 15    look like me.

16                    MR. READLER:  Your Honor, objection.

17                    THE COURT:  I'll sustain the objection as to

18    how other people interpreted it, but overrule as to how she

19    interprets it.

11:13:14 20                    MR. READLER:  Thank you very much.

21    **Q.**    All right.

22         And we discussed Mr. Trump's statements.  I also like

23    to discuss some of the things that his supporters have said.

24         For instance, at an Ohio rally in August or September,

11:13:27 25    I believe, a Trump supporter said that he planned on quote,

| | |
|---|---|
| 1 | "Well it's called racial profiling.  I'm going to go right |
| 2 | up behind them.  I'll do everything legally.  I want to see |
| 3 | if they're accountable.  I'm not going to do anything |
| 4 | illegal.  I'm going to make them a little bit nervous." |
| 11:13:41  5 | Based on your knowledge of your district resident's voting |
| 6 | behavior, how would residents in your district react if they |
| 7 | were followed into the polling place by someone who wants |
| 8 | to, quote, make them a little bit nervous? |
| 9 | **A.**    They would be -- |
| 11:13:53 10 | THE COURT:  Well, I think it's opinion |
| 11 | testimony.  I'll allow her to answer. |
| 12 | MR. READLER:  Also object to foundation. |
| 13 | THE COURT:  Okay. |
| 14 | Well, you know, whether it's a Trump supporter or just |
| 11:14:02 15 | somebody off the street, I think that goes to weight.  So go |
| 16 | ahead and answer. |
| 17 | THE WITNESS:  First of all, I think that |
| 18 | people in my district would be very offended and that will |
| 19 | cause people hesitation.  And I think that would lead to |
| 11:14:21 20 | confrontation, unnecessary confrontation. |
| 21 | **Q.**    And what about being questioned about their |
| 22 | eligibility to vote on the way in or out of the polls? |
| 23 | **A.**    Again, that would not go well with people.  And again, |
| 24 | I believe other people would share that information on |
| 11:14:36 25 | social media, and it's a technologically savvy generation, |

1    people put stuff on social media.

2    **Q.**    Someone handing out literature outside a polling place

3    saying voter fraud is a crime or purporting to define voter

4    fraud?

11:14:54  5    **A.**    That would be something people would be very hesitant

6    to understand why they're getting the information.

7    **Q.**    Okay.

8         And what about if somebody wasn't interacting with

9    voters but instead was a self-described citizen journalist,

11:15:06  10   who was just standing there outside of a polling place with

11   a camera or recording people going in and out or recording

12   cars coming into the parking lot?

13   **A.**    Again, I think that's something that people would be

14   very, you know, upsetting to the voters in the community;

11:15:23  15   again, why is a person doing this and who else may be

16   getting this type of treatment.

17   **Q.**    Okay.

18        Do many people in your district view social media in

19   whatever form?

11:15:32  20   **A.**    I would say yes.

21   **Q.**    And if this sort of activity occurs at a polling

22   place, would they post about it on social media?

23   **A.**    Yes.

24   **Q.**    Okay.

11:15:41  25        And, again, based on your knowledge of your district's

Howse - Direct

1    voting behavior, if they read about these incidents

2    occurring at their polling place, what likelihood would it

3    have?

4    **A.**    It would definitely hinder people's ability, the

11:15:56  5    people that are already hesitant in this election cycle, to

6    exercise their right to vote because, again, not wanting

7    confrontation.

8              MR. WEST:  I have nothing further at this

9    time, your Honor.

11:16:07 10              THE COURT:  Cross-examination, Ms. Armstrong

11    or Mr. Ernst?

12              MS. ARMSTRONG:  Your Honor, we have no

13    questions.

14              THE COURT:  Okay.  Mr. Readler, do you have

11:16:16 15    questions?

16              MR. READLER:  Just a couple, your Honor.

17

18

19

20

21

22

23

24

25

1      CROSS-EXAMINATION OF STEPHANIE HOWSE

2    BY MR. READLER:

3    **Q.**    Representative, it's nice to meet you.  And thank you

4    for your service?

5    **A.**    Thank you for your service, too.

6    **Q.**    Thank you.

7         I'd like to ask you about the billboard that you saw

8    on 2012.  It's not still up today in that neighborhood,

9    correct?

10   **A.**    Correct.  It was taken down.  That was after -- it was

11   taken down after cries from the Mayor, the residents, and

12   City Council, and clear channel --

13              MR. READLER:  May I strike that as

14   nonresponsive?

15              THE COURT:  Overruled.

16   BY MR. READLER:

17   **Q.**    Ms. Howse, do you agree that voter fraud is illegal?

18   **A.**    Yes.

19   **Q.**    And in the 2012 election -- sounds like you have a

20   good sense of your district.  Generally, I think that

21   election was thought to have the highest turn out of

22   African-American voters of any election in history.  Was

23   there also a very high turn out of African-American voters

24   in your district?

25   **A.**    I would say higher than usual.

1    **Q.**    Representative Howse, are you planning on voting this

2    year?

3    **A.**    I've already voted.

4    **Q.**    Okay.

5         Were you dissuaded from voting by anything you've

6    heard in the media this year?

7    **A.**    No.

8    **Q.**    And you said you're familiar with social media?

9    **A.**    Correct.

10   **Q.**    And you're familiar with social media posts from

11   people in your district?

12   **A.**    Yes.

13   **Q.**    And to your knowledge, no one has posted on social

14   media postings that they have not voted this year because of

15   some kind of intimidation or coercion, correct?

16   **A.**    I actually received a post, a post from an older woman

17   in the St. Clair/Superior Avenue, and there was a young man

18   who returned, a citizen, they forwarded me a post about --

19   it was like there is a post that's currently going on about

20   a woman that was talking about she voted and then the voted

21   for a candidate Hillary Clinton, and it was switched to

22   Donald Trump.  And several people within my community have

23   sent that to me; which again, it was like, see there's going

24   to be funny business going on in the election.  Again,

25   without full context.  And I had to explain to them about

 1   early voting, how it happens in Ohio, that we're not doing

 2   electronic voting.  So this is something that's currently

 3   going on here, and that two specific of the residents that I

 4   represent sent the information to me via social media.

11:19:01  5   **Q.**   To be clear, that was an example of something

 6   happening actually in the voting booth or --

 7   **A.**   Correct.

 8           MR. READLER:  Your Honor, I have no further

 9   questions.

11:19:10 10           THE COURT:  Do you have any redirect?

11           MR. WEST:  No, your Honor.

12           THE COURT:  Okay.  Thank you.  Thanks, ma'am.

13           THE WITNESS:  Thank you.

14           THE COURT:  Would you call your next witness.

11:19:22 15           MR. KAUFMAN:  We have no further witnesses

16   your Honor.

17           THE COURT:  Okay.  And do you move the

18   admission of the exhibits that were attached to the

19   retraining order, motion?

11:19:33 20           MR. KAUFMAN:  We would.

21           THE COURT:  Any objection to those?  Okay.

22   I'll receive those.

23      Would you call your first witness, Ms. Armstrong?

24           MS. ARMSTRONG:  Yes, your Honor.  Thank you.

11:19:45 25   We would very briefly like to call Katie Eagan to the stand.

Eagan - Direct

1          THE COURT:  Okay.

2          MR. KAUFMAN:  Your Honor, I may clarify we've

3    also submitted a declaration last night.  It wasn't attached

4    to the filing, but it was filed last night.

5          THE COURT:  Okay.  I had not seen that.

6    But --

7          MR. KAUFMAN:  Mr. Pepper's declaration.

8          THE COURT:  Okay.  Ma'am, would you come

9    forward.  Would you --

10                    KATIE EAGAN,

11        of lawful age, a witness called by THE DEFENSE,

12              being first duly sworn, was examined

13                 and testified as follows:

14          DIRECT EXAMINATION OF KATIE EAGAN

15          THE COURT:  If you'll take a seat.  Get

16   yourself close to the microphone.  Tell us your name and

17   tell us how you spell your last name.

18          THE WITNESS:  My name is Katie Eagan,

19   K-A-T-I-E, Eagan, E-A-G-A-N.

20          THE COURT:  Ms. Armstrong.

21          MS. ARMSTRONG:  Thank you, your Honor.

22   BY MS. ARMSTRONG:

23   Q.  Mr. Eagan, could you tell us your current position?

24   A.  Executive Director of the Ohio Republican Party.

25   Q.  And how long have you been in that position?

1       **A.**    Since March of 2015.

2       **Q.**    Could you just very briefly talk about your experience

3       with political activity in the party prior to your current

4       position?

11:21:00  5   **A.**    I've been politically active in Republican politics in

6       Ohio since 2000.  So for 16 years.

7       **Q.**    I am going to hand you what, with the Court's

8       indulgence, what I'd like to have marked as Exhibits 1 and

9       2.

11:21:16 10              THE COURT:  Okay.

11              MS. ARMSTRONG:  Thank you.

12              THE COURT:  Have you given a copy to them?

13              MS. ARMSTRONG:  Absolutely.

14       BY MS. ARMSTRONG:

11:21:46 15   **Q.**    Mr. Eagan, if you would please tell me what is Exhibit

16       1?

17       **A.**    Exhibit 1 is a piece of information that we provided

18       to the volunteers that had signed up to be poll observers.

19       It is kind of a document that explains the role of the

11:22:05 20   observers, the do's and the do not's and explicitly explains

21       what an observer can and cannot do in their role.

22       **Q.**    Can you tell us then what is Exhibit 2?

23       **A.**    Exhibit 2 is a document outlining voter ID guidelines.

24       It also talks about -- it also actually reiterates what poll

11:22:25 25   observers can and cannot do in their role.

1    Q.    Turning to Exhibit 1, there is several headings there,

2    always, never, following, must always be reported to.

3          Could you please summarize what a poll worker never

4    does --

11:22:43  5              THE COURT:  Wait.  I'm sorry.  Are you

6    referring --

7                  MS. ARMSTRONG:  I'm sorry.

8                  THE COURT:  Did I get a copy of Exhibit 1?

9                  MS. ARMSTRONG:  I believe so.

11:22:49 10              THE COURT:  I got 2.  Okay.  Thanks.  Why

11   don't you go ahead.

12                  THE WITNESS:  A poll observer can never

13   attempt to interfere with a person's attempt or ability to

14   vote.  They cannot seek to sway someone's vote.  They cannot

11:23:08 15  seek to intimidate or harass someone voting.  They're there

16   to simply observe and not to interfere with the goings on of

17   voting during the day.

18   Q.    Are these the instructions that are given to every

19   poll observer?

11:23:24 20  A.    Yes, they are.

21   Q.    And are poll observers also trained --

22   A.    Yes.

23   Q.    -- on these tactics?

24         I'll turn to the never part of Exhibit 1.

11:23:35 25        Does it prohibit poll workers from confronting any

1    voter, elected official, or anyone else?

2    **A.**    It does, yes.

3    **Q.**    Does it prohibit from using a camera or any type of

4    recording device?

5    **A.**    Yes.

6    **Q.**    Does it prohibit them from campaigning or advocating

7    for a candidate within 100 feet?

8    **A.**    Yes.

9    **Q.**    Ms. Eagan, will you tell us a little bit, please, how

10   poll workers or poll observers, I'm sorry, are identified by

11   the party?

12   **A.**    Sure.

13         We are -- we participate with all of our Republican

14   candidates to obtain volunteers who are interested in poll

15   observing.  We then certify those poll observers to the

16   Board of Elections and the Board of Elections provide a

17   certificate to the certified poll observers that they are to

18   present, upon arriving at their poll on Election Day.

19   **Q.**    To your knowledge, is that the same general procedure

20   used in previous elections?

21   **A.**    Yes, it is.

22   **Q.**    To your knowledge, does the Democratic Party also

23   appoint poll observers?

24   **A.**    I'm unaware of their plans for this election, but yes,

25   they have in the past.

1    **Q.**    Thank you.

2          Have you or anyone in the Republican Party or any of

3    the trainings ever asked a poll worker or a poll observer to

4    wear a red shirt?

11:25:00  5    **A.**    Absolutely not.

6    **Q.**    To intimidate, coerce, or threaten a voter?

7    **A.**    No.

8    **Q.**    How about to approach voters before or after they

9    vote?

11:25:07 10    **A.**    Definitely not.

11    **Q.**    How about asking voters about their eligibility to

12    vote?

13    **A.**    No, absolutely not.

14    **Q.**    Distributing literature of any kind?

11:25:16 15    **A.**    No.

16    **Q.**    Advising voters about criminal laws or describing

17    penalties about voting violations?

18    **A.**    No.

19    **Q.**    What about filming, recording, following voters,

11:25:26 20    taking pictures of voters?

21    **A.**    No.

22    **Q.**    Engaging in exit polls or serving as a citizen

23    journalist?

24    **A.**    No.

11:25:33 25    **Q.**    Otherwise engaging in any kind of intimidation,

1    harassment, coercion?

2    **A.**    Absolutely not.

3            MS. ARMSTRONG:   Thank you, Ms. Eagan.

4    **Q.**    Has the Ohio Republican Party had any communication

11:25:44  5    with Roger J. Stone or Stop the Steal?

6    **A.**    We have not.

7    **Q.**    Has the party had any communication with Trump or its

8    representatives about intimidating voters or engaging in

9    voter harassment?

11:25:58 10    **A.**    We have not.

11    **Q.**    Did you tell me poll observers have been placed in the

12    early voting centers?

13    **A.**    Yes, they are -- they have.

14    **Q.**    How long have they been there?

11:26:09 15    **A.**    They were there, certified to be there, starting on

16    October 12th, the first day of early voting.

17    **Q.**    So roughly three weeks?

18    **A.**    Um-hum.

19    **Q.**    Do you have any idea how many people have voted during

11:26:20 20    those three weeks?

21    **A.**    In-person voting numbers, we are between 700,000 and

22    one million voters.

23    **Q.**    Have you heard of any single instance of voter

24    intimidation problems, complaints at those early voting

11:26:36 25    centers?

1    **A.**    Not one.

2    **Q.**    I asked you earlier to check on a number of Ohioans

3    listed in the pleadings that were prepared here and

4    presented here.

11:26:48  5        Can you tell me did you check the list of approved

6    poll observers that your organization's put together?

7    **A.**    I did.

8    **Q.**    Did you find Steve Webb there?

9    **A.**    No.

11:27:01 10   **Q.**    Did you find Leon Nisias there?

11   **A.**    No.

12   **Q.**    Mildred (unintelligible)?

13   **A.**    No.

14   **Q.**    James Pinell?

11:27:07 15   **A.**    No.

16   **Q.**    Anyone with any kind of a moniker, deplorable patriot?

17   **A.**    No.

18   **Q.**    What about Lady Liberty?

19   **A.**    No.

11:27:14 20   **Q.**    So none of those individuals are any part of the Ohio

21   Republican Party poll watcher, poll observers?

22   **A.**    That's correct.  And we've taken measures to ensure

23   that if they attempt to become a poll worker, they will not

24   be certified by the party.

11:27:30 25   **Q.**    Ms. Eagan, can you tell me a little bit more about the

1    types of training, I believe you testified that all of the

2    observers have actually been trained.  Did you sit in on any

3    of those trainings?

4    **A.**    I have sat in on trainings, yes.

11:27:44  5    **Q.**    Approximately how many?

6    **A.**    One.

7    **Q.**    How many people were there approximately?

8    **A.**    I would say between 50 and 60, approximately.

9    **Q.**    At the training that you actually observed in relation

11:27:55  10   to the training materials, were any of these items

11   discussed, was there ever any training that would border on

12   voter intimidation or harassment?

13   **A.**    No, not at all.

14   **Q.**    Okay.

11:28:06  15            MS. ARMSTRONG:  Your Honor, if I could have a

16   minute, please.

17                THE COURT:  Um-hum.

18            MS. ARMSTRONG:  Your Honor, we would move

19   Exhibits 1 and 2 into evidence.

11:28:22  20            THE COURT:  Okay.

21       Well, do you have any other questions?  We usually

22   move the admission of exhibits when you close your case.

23            MS. ARMSTRONG:  Sorry.  Getting ahead of

24   myself.  No other questions.  Thank you.

11:28:31  25            THE COURT:  Cross-examination.

1      MR. McTIGUE:  Thank you, your Honor.

2           CROSS-EXAMINATION OF KATIE EAGAN

3    BY MR. McTIGUE:

4    **Q.**   Ms. Eagan, my name is Don McTigue for the Ohio

11:28:50  5    Democratic Party.

6           As you know, the deadline for listing observers was 11

7    days before the election, correct?

8    **A.**   Um-hum.

9    **Q.**   Okay.

11:29:03 10          How many people -- how many names were submitted 11

11   days before the election by the Ohio Republican Party?

12   **A.**   I don't have an exact figure for that, but the number

13   was in the very high 100s of names.

14   **Q.**   Okay.  And to clarify --

11:29:27 15          THE COURT:  So for state-wide, it was only

16   high hundreds.

17          THE WITNESS:  I would say the number probably

18   bordered, you know, a thousand.

19          THE COURT:  Okay.

11:29:36 20   Just -- and I apologize for interrupting.  There had

21   been some talk that names are sometimes supplemented,

22   perhaps when somebody can't serve for some late reason.

23          Any idea how frequently that happens?

24          THE WITNESS:  Your Honor, I'm not aware how

11:29:53 25   frequently that happens.

```
 1            THE COURT:  Okay.  Mr. McTigue, why don't you
 2   go ahead.
 3            MR. McTIGUE:  Thank you.
 4   Q.   Ms. Eagan, is it -- do you appoint one observer per
 5   precinct or one per polling location?
 6   A.   We observe one per precinct ideally.
 7   Q.   Right.
 8        So if there are, say three or four precincts within a
 9   polling location, you could appoint three or four observers
10   if you --
11   A.   We could, um-hum.
12   Q.   Okay.
13        And you have until actually Monday, the day before the
14   election, to swap out any of the people that you appointed
15   on the 11th day; is that correct?
16   A.   Yes, that's correct.
17   Q.   Okay.
18        And of the people that you appointed on the 11th day,
19   we don't know the exact number, but -- any of those, do you
20   anticipate any of those people simply being place holders
21   that will be swapped out for other people?
22   A.   There are likely some place holders on the list, yes.
23   Q.   Okay.
24        Do you have any idea how many of the individuals are
25   likely place holders?
```

1    **A.**    Not -- not offhand, I do not.

2    **Q.**    Okay.

3          And, in fact, you can say, for example, let's say you

4    were going to appoint 11 days before the election 100

11:31:16  5    observers for 100 different precincts, that could actually

6    be all one person and then you could swap out all 100 or 99,

7    correct?

8    **A.**    We are allowed to do that under Ohio law.

9    **Q.**    Okay.

11:31:30 10          Do you happen to know of the number that you

11    submitted, how many of those people on the list were

12    appointed for more than one precinct?

13    **A.**    I don't have that number at hand.

14    **Q.**    Okay.

11:31:43 15          Now, I'm going to read you a statement from Exhibit 2,

16    which is attached to the declaration -- declaration of

17    evidence submitted with the motion for a temporary

18    restraining order, which is an article from the New York

19    Times, and it states that -- and this is in quotes at the

11:32:12 20    beginning, "The numbers this year," and it's referring to

21    the numbers of people asking to be appointed as observers,

22    "are on par with the numbers we saw in 2012, said Ms. Katie

23    Eagan, the Executive Director of the Ohio Republican Party,

24    which is handling the appointment of poll watchers for the

11:32:36 25    Trump Campaign throughout the state."

1       So is that a fair statement that the Republican Party

2   of Ohio is handling the appointment of poll watchers for the

3   Trump Campaign throughout the state?

4   **A.**     We're handling the appointment of observers for all of

11:32:56  5   our campaigns.  They've all provided volunteers to take part

6   in this, in these roles.

7   **Q.**     And how many have -- how many names have been

8   submitted by the Trump Campaign?

9   **A.**     I don't have that exact figure.

11:33:09 10   **Q.**     Okay.

11                   THE COURT:  What's the ball park?

12                   THE WITNESS:  I would say if I had to guess a

13   number, I would say probably 2 or 300 names.

14                   THE COURT:  And how would that compare to

11:33:27 15   other state-wide candidates?

16                   THE WITNESS:  They have submitted obviously

17   the state-wide campaign center.  Portman's team has also

18   submitted a similar number of --

19                   THE COURT:  Okay.

11:33:40 20                   THE WITNESS:  -- names.

21   BY MR. McTIGUE:

22   **Q.**     Ms. Eagan, are you aware of Mr. Trump's comments

23   throughout the campaign alleging that the election is rigged

24   or if he doesn't win, that's because it was stolen?

11:34:06 25   **A.**     Yes.

1   **Q.**   And you're also aware of his many comments about there

2   being voter fraud?

3   **A.**   I am aware those comments have been made.

4   **Q.**   By both Mr. Trump and Governor Pence, correct?

11:34:27  5   **A.**   Yes, that's correct.

6   **Q.**   Okay.

7        And are you -- are you personally aware of any voter

8   fraud?

9   **A.**   No, I am not.

11:34:39 10   **Q.**   All right.  And -- when Mr. Trump says or urges people

11   to go to the polls and watch what's going on, and says, "You

12   know what I mean," do you, how do you interpret that?

13   **A.**   I can't speak to the intention of what Mr. Trump is

14   saying.

11:35:08 15   **Q.**   But, you are aware of his many exhortations for his

16   supporters to go to polling locations to watch and make sure

17   that there's no fraud and that the election is not stolen,

18   correct?

19   **A.**   I'm aware of his statements to encourage his

11:35:27 20   supporters to take part in this election, yes.

21   **Q.**   Well, that wasn't really my question.

22        Can I have the Court Reporter read it back so we can

23   give it to you exactly?

24             THE COURT:  But, are you aware of his many

11:35:52 25   requests that supporters go to polling locations to walk and

1   make sure that there's no fraud and that the election is not

2   stolen?

3            THE WITNESS:  Yes, I'm aware of those

4   statements.

11:36:04  5   **Q.**    And you also are aware of his statements encouraging

6   individuals who are willing to do this to go to polling

7   places in urban areas?

8   **A.**    I'm not aware of any specific direction to urban

9   areas.

11:36:24 10   **Q.**    Are you aware of his statements encouraging them to go

11   to polling places to watch what's going on in areas where

12   fraud is likely to occur?

13   **A.**    I'm aware that Mr. Trump has made statements

14   encouraging his supporters to observe the goings on at the

11:36:46 15   polls.  I am not aware of any statements in which he

16   specifically directs to any certain polling locations.

17   **Q.**    Now, have -- with regard to the -- I think you said

18   you were estimating about 2 to 300 names have been submitted

19   by the Trump Campaign to the Ohio Republican Party to be

11:37:14 20   appointed as observers, correct?

21   **A.**    Um-hum.

22   **Q.**    Okay.  And did the Ohio Republican Party reject any of

23   those?

24   **A.**    I believe some have been rejected.  Exact numbers, I

11:37:32 25   do not have.  We have done the vetting process on these

1    individuals.

2    **Q.**    And -- but again, you don't know how many?

3    **A.**    I don't have that number.

4    **Q.**    Or any particular names of who was rejected?

11:37:48 5    **A.**    Not off -- not at hand, no.

6    **Q.**    Let me turn to Exhibits 1 and 2, which I think are

7    still up there.  These are, I think you described these as

8    training materials of the Ohio Republican Party, correct?

9    **A.**    That is correct.

11:38:04 10    **Q.**    And these are provided to every person who's an

11    observer?

12    **A.**    Yes, that's correct.

13    **Q.**    Okay.

14    Would that include the individuals who are swapped in

11:38:19 15    on Monday, the day before the election?

16    **A.**    Yes.

17    **Q.**    Okay.

18    And are the -- you also mentioned something about

19    doing training.  In addition to these two -- providing these

11:38:34 20    two documents.

21    **A.**    Yes.

22    **Q.**    How was that training done?

23    **A.**    In-person trainings.

24    **Q.**    Okay.

11:38:40 25    **A.**    Um-hum.

1    **Q.**    And is there in person training planned for Monday

2    before the election?

3    **A.**    For individuals that have to be swapped in, we've done

4    phone trainings.

11:38:51 5    **Q.**    Um-hum.

6    And with regard to the automatic of -- well, let me

7    back up one second.  The Trump Campaign is relying upon the

8    Ohio Republican Party to name the observers, correct?

9    **A.**    Yes.

11:39:20 10    **Q.**    Because the Trump Campaign, under Ohio law, cannot do

11    that on its own correct?

12    **A.**    Correct, only the state parties can.

13    MR. McTIGUE:  Your Honor, if I could have a

14    second.

11:39:39 15    THE COURT:  Do you have any redirect?

16    MR. McTIGUE:  I have no further questions,

17    your Honor.

18    THE COURT:  Okay.  Do you have any redirect?

19    MS. ARMSTRONG:  No, your Honor.  No other

11:39:45 20    questions.

21    THE COURT:  Okay.  Thank you, ma'am.

22    THE WITNESS:  Thank you very much.

23    THE COURT:  And would you call your next

24    witness.

11:39:50 25    MS. ARMSTRONG:  Your Honor, we have no other

1    witnesses.

2              THE COURT:  Do you move the admission of

3    Defense Ohio Republican Party's Exhibits 1 and 2?

4              MS. ARMSTRONG:  Yes, please, your Honor.

11:40:00  5         MR. KAUFMAN:  Your Honor, I have an extra copy

6    for you of the declaration of Mr. Pepper.

7              THE COURT:  I received that, so.

8              MR. KAUFMAN:  You did.  Okay.

9              THE COURT:  So is there any objection to Ohio

11:40:13  10   Republican Party 1 or 2?

11             MR. KAUFMAN:  No.

12             THE COURT:  Those will be received.

13        Do you have any other witness then?

14             MS. ARMSTRONG:  No, your Honor.

11:40:19  15        THE COURT:  And on behalf of Defendant Trump,

16   do you have any witnesses?

17             MR. READLER:  We do not have any witnesses,

18   your Honor.

19             THE COURT:  Okay.

11:40:27  20        MR. READLER:  Can I -- just to clarify, the

21   Pepper declaration was moved into evidence?

22             MR. KAUFMAN:  I did move it into evidence

23   earlier.

24             THE COURT:  Okay.  Yeah.  And I'll receive

11:40:37  25   that.

1          MR. READLER:  Okay.  And we have no exhibits.

2          THE COURT:  All right.

3      Do you have any final argument?

4          MS. SMALLS:  Yes, your Honor.

11:40:43  5          THE COURT:  Why don't you go to the podium.

6      CLOSING ARGUMENTS ON BEHALF OF THE PLAINTIFF

7          MS. SMALLS:  Your Honor, counsel for the Trump

8      Campaign calls the relief that we are requesting

9      extraordinary, and I would proffer to the Court that this is

11:41:06 10    an extraordinary election.

11         We sued under the Ku Klux Klan Act in a year where the

12     Ku Klux Klan has officially endorsed Donald Trump for

13     president.

14         We have -- we are in a setting where Neo-Nazi leaders

11:41:23 15    and white nationalist leaders have called on their

16     supporters, really building on Trump's statements to come

17     out and watch the polls.  And it is really remarkable to sit

18     in this courtroom and watch everybody, one, try to distance

19     themselves from the statements of Mr. Trump.

11:41:48 20         He is the Republican nominee for president.  He is --

21     has a joint fundraising activity and committee with the

22     Republican National Committee.  The State Party is a member

23     an agent of the Republican National Committee, and the

24     efforts of Defendants and Mr. Trump are really inextricably

11:42:15 25    linked.

1      THE COURT:  Let me ask with regard to

2   Defendant Ohio Republican Party, what do you envision the

3   irreparable injury would be?

4      So individual precincts or polling locations, there's

5   one observer, perhaps for each precinct.

6      If there's some conduct of either approaching or

7   otherwise campaigning or otherwise harassing of voter, isn't

8   that fairly easily remedied?

9      MS. SMALLS:  No, your Honor.  I direct you to

10   our Exhibit 38 and our declaration where we have an article

11   that interviews and quotes Calendar Election Director Pat

12   McDonald, who, quote, says, "We've never had this rhetoric

13   coming out of the candidates where Trump is basically

14   telling his supporters to be watch dogs of the polling

15   locations."

16      THE COURT:  I guess what I'm wondering, isn't

17   it a more controlled atmosphere in the actual voting -- the

18   precinct or the polling location?  And so you've got one

19   Republican observer, one Democratic observer.  Somebody

20   starts to act out.  Is there an irreparable injury if they

21   have to call the County Sheriff and have the Trump supporter

22   removed?

23      MS. SMALLS:  Yes, your Honor.  And that would

24   be on the basis that any interference with a voter's right

25   to vote, the focus should be on the voter, not the person

1      that seeks to be a watch dog.  There's no constitutional

2      right to being a poll watcher.  There is a -- you know, it's

3      the right that preserves all other rights to vote free and

4      unencumbered.  We have indications that this is coming.

11:44:28    5              THE COURT:  What do you -- what evidence is

6      there that there's been instructions given to designated

7      poll workers to impair peoples's vote?

8              MS. SMALLS:  Well, I can only rely on -- and

9      this is where I was going before.  I'm sorry I took a little

11:44:49   10   too long to get there.  But, the Republican person that is

11      responsible for running the elections says that he is

12      worried about more instability this year than in other

13      years.  So this isn't speculation.  The person that's

14      actually responsible for the integrity of elections is

11:45:10   15   saying that he has concerns.  And so with those concerns and

16      the charged rhetoric and the incidences which he cites in

17      his article of Trump supporters showing up at polling

18      locations saying that they are poll watchers, and having to

19      be turned away, this is at early vote where things are

11:45:30   20   slower, that there is more of an inability to deal with

21      that.

22          There has been, I'll use the word rogue, but you know,

23      noncertified poll observers that have shown up to early vote

24      sites and said that they are poll watchers.  You know, when

11:45:51   25   we go from 88 locations to over 8,000, the ability to deal

1    with that in real time in a way that does not, you know,

2    impede on a voter's right to vote I think would be seriously

3    limited, so.

4              THE COURT:  What would be the injunctive

11:46:11  5    relief you would try to give to the Republican Party?

6              MS. SMALLS:  Well, your Honor, I'll start

7    where I said in my opening statement.  It's clearly in their

8    training materials.  Nevers and don'ts, but some things that

9    aren't there.  I don't think there's a statement about

11:46:34 10    photographing people, you know.  There are other -- I

11    don't -- I didn't have a chance to fully read an

12    internalized exhibit, but there is -- there's clearly

13    behavior that people have been encouraged to do that is

14    impermissible, and I don't know whether that training is

11:46:56 15    prophylactic.

16              THE COURT:  Exhibit 1 does direct the poll

17    worker not to use a camera inside the polling location.  So

18    it does seem to say they -- photographs shouldn't be taken.

19              MS. SMALLS:  And, you know, you zeroed in on

11:47:16 20    this point early on.  We are in no way trying to interfere

21    or enjoin with the State Republican Party's right to appoint

22    poll observers in the proper activity of poll observers for

23    Republicans and Democrats.  Our position is that you cannot

24    carve out the State Republican Party.  I mean from the

11:47:44 25    statements that were made, you would think that they hadn't

1    met the Trump Campaign; whereas in reality, they -- they

2    have staff they share.  They're in shared offices, that

3    there is a -- it is very hard to draw a hard line between

4    the State Party and the broader efforts of the Trump

11:48:08  5    Campaign.

6                    THE COURT:  Okay.

7          So with regard to the Trump Campaign, what injunctive

8    relief are you seeking as to that Defendant?

9                    MS. SMALLS:  Well, we are seeking broad

11:48:23 10    injunctive relief that is, I should say, tailored on

11    injunctive relief.

12                    THE COURT:  Slip of the tongue, right?

13                    MS. SMALLS:  Yep, slip of the tongue.

14          (Laughter.)

11:48:34 15                    MS. SMALLS:  To publicize and make clear what

16    is allowable, going to stop encouraging people to act as a

17    poll watcher.  We've confirmed while we've been in court

18    that the web site is still up, encouraging people to sign up

19    and show up as poll observers on the Trump web site.  So

11:48:58 20    that's Point Number 1.  We've had the certification process.

21    I understand they can be subbed out, but they have a mirror

22    of a thousand people.  I'm not sure what the -- what the

23    benefit is of continuing to encourage people that may be

24    coming for less than civic reasons, that have not been

11:49:21 25    trained and will not have an opportunity to be trained

| | |
|---|---|
| 1 | before Election Day.  So I'd say that is point 1. |
| 2 | Point 2, there are very clearly examples of what |
| 3 | people are saying they will do in terms of voter |
| 4 | intimidation.  And so enjoining any acts -- and again, it is |
| 11:49:44  5 | an Ohio law, what is permissible and not permissible, but we |
| 6 | have both the statement from the man that runs elections, we |
| 7 | have statements from supporters saying that they are going |
| 8 | to do things that are textbook examples of voter |
| 9 | intimidation, and enjoin any of those acts so that is clear. |
| 11:50:02 10 | THE COURT:  Would this be trying to enjoin |
| 11 | those acts both within and outside the 100-foot, you know |
| 12 | voting area? |
| 13 | MS. SMALLS:  It would be limited by the 100, |
| 14 | the buffer zone. |
| 11:50:19 15 | THE COURT:  So you're only trying to stop them |
| 16 | from approaching or accosting or campaigning within the |
| 17 | 100 -- |
| 18 | MS. SMALLS:  Well, I mean I would say, your |
| 19 | Honor, that you know, we're not trying to enjoin anyone from |
| 11:50:34 20 | taking a selfie, but we've had examples in other states |
| 21 | where Trump supporters stand at whatever that buffer zone is |
| 22 | and really harass and scream at people and charge for a |
| 23 | fight, voters saying that they were, based on those |
| 24 | experiences, they were afraid to leave their car to go vote |
| 11:50:55 25 | because they were afraid that they were going to be |

1    vandalized while that happened.  And these are real life --

2    so I mean, the activity within the buffer zone is already

3    prohibited, but there's also the potential to just stand

4    right at the buffer zone and do some of these prohibited

11:51:15    5    activities.

6                    THE COURT:  Okay.  And then with regard to

7    Stone, what's the remedy sought?

8                    MS. SMALLS:  I think again, the continued call

9    for people who are not certified as -- as poll watchers, and

11:51:37  10    will not be trained -- will not know the boundaries of what

11    is permissible or not, counsel made the statement that there

12    was no relationship between the Trump Campaign and Stone.

13    Stone was a staff member on the Trump Campaign and, you

14    know, there are news reports that he was fired at some point

11:51:56  15    and continues to be as supportive as he can as the

16    candidate, but it really is quite a statement to say that

17    there is no relationship between Stone and Trump.  And so,

18    you know, as we allege in our papers that we -- we believe

19    whether everyone is aware of every element that every other

11:52:21  20    conspirator is doing, that they are acting in concert for,

21    you know, a voter suppression strategy.  And again, it's

22    cited in our papers, but a senior Trump official used those

23    words, said, "Our campaign strategy is a three-prong

24    strategy of voter suppression; white liberals, young women,

11:52:42  25    and African-Americans," out of their mouth.

1        So I have to take them at their word.  I have to take

2   them at, you know, their supporters at their word.

3                THE COURT:  I mean that same article would

4   largely be to dissuade African-Americans by pointing out

11:52:59  5   Clinton's statement.

6                MS. SMALLS:  That's right.  And it was largely

7   a profile of Trump's Communications Director, but I would

8   proffer that voter fraud is not a lay term.

9                THE COURT:  Yeah.  And so --

11:53:13  10                MS. SMALLS:  And so, I would be surprised if

11   that person came up with it on their own.

12                THE COURT:  Okay.  Let me afford Mr. Readler.

13                MR. KAUFMAN:  May I have just a moment with

14   Ms. Smalls for just one moment.

11:53:25  15                THE COURT:  Yeah.

16         (Counsel conferring.)

17                MS. SMALLS:  Your Honor my colleagues also

18   pointed out that Stone is the only Defendant that is

19   actually putting forward the proposed exit polling strategy

11:53:58  20   that, you know --

21                THE COURT:  Yeah.

22                MS. SMALLS:  So that -- that is also why he is

23   a critical part of the injunction.  It doesn't -- I mean as

24   we lay out in our papers and in our declaration, it has no

11:54:13  25   basis in any scientific -- doesn't resemble in any fashion

1    any actual poll.

2         So without Stone and Stop the Steal, those efforts

3    would continue and are, on their face, facially improper.

4    And, you know, Election Day is Election Day.  We have --

11:54:33  5    we're all going to vote ourselves.  Many of us have been

6    involved in campaigns.  Things happen quickly, and it can be

7    very, very hard to get redress in real time.  And, you know,

8    calling law enforcement, or whatever remedies, you know,

9    it -- it often, as someone who has done elections, I can

11:54:56 10    tell you that things are often imperfect.  They don't happen

11    as you would outline them to, just because, you know, a

12    panoply of just things that occur on Election Day.

13         You know, the redress that, you know, Defendants

14    offer, it's just going to be too slow, and it's not going to

11:55:19 15    prevent the irreparable harm that will occur if a voter is

16    dissuaded or somehow interfered with.  And as we heard from

17    our witness, you know, people understand, I know what it

18    means, she knows what it means, when he says, "Do you know

19    what it means," and we have an ability to respond to that,

11:55:43 20    and to enjoin further calls for people that also know what

21    that means from coming to the polls and interfering.

22                   THE COURT:  With regard to Trump?

23                   MS. SMALLS:  Yes, sir.

24                   THE COURT:  So are you seeking to enjoin the

11:56:05 25    sign up to be an observer?  I mean how do you restrain that?

1    I mean isn't that -- I mean there's a lot of intimations

2    what he's really doing is trying to get people to sign up so

3    he can sell their names and e-mail addresses for family

4    profit.  I mean how do you stop him from doing that?

11:56:26  5              MS. SMALLS:  I don't know, your Honor.  I mean

6    I think --

7              THE COURT:  Isn't that fairly First Amendment

8    if somebody wants to give his e-mail address out to some

9    commercial enterprise that --

11:56:39  10              MS. SMALLS:  That's true, but it doesn't mean

11   that those people then get a pass to Defendant to -- the

12   State Ohio Republican Party.

13              THE COURT:  Probably getting pretty late for

14   that, isn't it?

11:56:52  15              MS. SMALLS:  It's not because --

16              THE COURT:  When's the final list three days

17   before?  When's the final --

18              MR. READLER:  It's Monday at 4:00.

19              THE COURT:  Monday at 4:00.  Okay.  I mean

11:57:07  20   restrain him today from operating the, "Give me your name

21   and e-mail address."  I mean how much time do they have to

22   collect more names to either make a profit on or forward to

23   the Republican Party?

24              MS. SMALLS:  Your Honor, I would also proffer

11:57:26  25   that an injunction -- I mean we have been months of --

1        THE COURT:  You're not -- as silly as his

2   statements may be about voter fraud, under First Amendment

3   privileges, isn't it kind of incumbent upon voters to parse,

4   you know, what's ridiculous and what's not ridiculous?  How

11:57:54  5   do you restrain his campaign from making, you know, comments

6   about voter fraud with --

7        MS. SMALLS:  Your Honor, we're not -- we did

8   not sue Donald Trump as an individual.

9        THE COURT:  I mean with the campaign.

11:58:10  10        MS. SMALLS:  Right, right.

11   I take your point.  But, I would offer --

12        THE COURT:  Are you seeking any kind of

13   injunctive relief against him continuing to say there's

14   voter fraud?

11:58:23  15        MS. SMALLS:  No, we're not, your Honor.

16        THE COURT:  Okay.  And I apologize for perhaps

17   misunderstanding.

18        MS. SMALLS:  No.

19        THE COURT:  Anything else?

11:58:31  20        MS. SMALLS:  No, your Honor.

21        THE COURT:  Okay.

22        MS. SMALLS:  Thank you.

23        THE COURT:  Mr. Readler.

24

25

1           <u>CLOSING ARGUMENTS ON BEHALF OF THE DEFENSE</u>

2           THE COURT:  I'm going to ask a question just

3 out of curiosity, which has got little or nothing to, you

4 know -- but, how against the statutory or election

11:58:57 5 procedures in Ohio, how do you do voter fraud?  So the Board

6 of Elections maintains a list of voters, right?  A voter has

7 to come to the list, has to come to the precinct, voting

8 place, right?

9           MR. READLER:  Correct.

11:59:21 10           THE COURT:  And he then has to present a photo

11 or some ID?

12           MR. READLER:  Correct.

13           THE COURT:  And he then has to sign the

14 sign-in sheet, right?

11:59:33 15           MR. READLER:  Yes.

16           THE COURT:  And that sign-in sheet is then

17 compared against signature on file?

18           MR. READLER:  Yes, they have that in front of

19 them.

11:59:41 20           THE COURT:  How do you -- how -- what's

21 Trump's theory on how you -- how do people -- how do you

22 commit fraud?  How do people impersonate others against that

23 backdrop?

24           MR. READLER:  Well, look, I'm not a voting

11:59:59 25 fraud expert, but there are examples of --

1      THE COURT:  Tell me just give me -- and I'm

2  not asking you for a particular case, but how do you -- how

3  do you do that, how does Trump say you do that?  I mean you

4  go to your polling place or my polling place or somebody

12:00:19  5  else's.

6      MR. READLER:  A couple responses.  First of

7  all, if there's something in question --

8      THE COURT:  I'm sorry.

9      MR. READLER:  If there's something in question

12:00:26 10  about the voter, they oftentimes wrote provisionally.

11  That's one way we try to curve voter fraud.  If there's a

12  concern the address doesn't look correct or the wrong

13  precinct or name doesn't match up, they can vote

14  provisionally.  And those are ballots that are under

12:00:41 15  question because there's some lack of conformity, and those

16  reviewed after the election.  And that -- there are a

17  number, I mean there are thousands of those every election.

18      THE COURT:  But, that typically involves, you

19  know, an address or some change.

12:00:55 20      MR. READLER:  Correct, most of those, there's

21  no problem with.  Although there was a problem at the poll.

22  But, it's possible -- I mean some of those potentially

23  could -- someone could not be the person they purport to be.

24      THE COURT:  So with an explanation that I've

12:01:08 25  properly presided over 30 mail fraud cases, how do you --

1     you're paid to be a -- fraudulently vote for somebody who's

2     dead, okay.  How --

3                    MR. READLER:  Hypothetically?

4          (Laughter.)

12:01:29  5                    THE COURT:  So say you're paid.  You park your

6     car, you go into the polling station, you wait around, you

7     go through the thing.  What are the chances that you're able

8     to impersonate the deceased voter's signature?  I mean if

9     you had -- even if you'd seen that signature ten minutes

12:01:58 10    before you approached the table, how likely is it that you

11    could duplicate that signature, such that the poll workers

12    wouldn't catch you?

13                    MR. READLER:  With all due respect to the

14    volunteer poll workers who volunteer probably twice a year

12:02:15 15    for this function and form a critical public service but

16    they're not handwriting experts.

17                    THE COURT:  The handwriting, name and

18    signatures, it's not real hard to distinguish.

19                    MR. READLER:  I mean there are -- I've seen

12:02:26 20    them, as I'm sure you have.  There are photocopies of your

21    signature.  So even then, they're not reproduced all that

22    well for comparison purposes.  Hypothetically, if you're a

23    parent of the same sex passed away, maybe they lived in your

24    home, it would be easy to take a bill or something, showing

12:02:40 25    their name and address.  You could -- I think you could

1   forge anyone's --

2            THE COURT:  The cases I've had, what they've

3   typically done is they've taken an actual signature and

4   because it's so difficult to duplicate a signature, they've

12:02:55  5   taken an actual signature, put it against the glass pane,

6   put a check or something else on top of that, and then

7   traced the signature over an exemplar that was immediately

8   underneath it.

9       It's -- I mean I think most handwriting experts would

12:03:16  10   tell you it's near impossible.

11            MR. READLER:  I think a post-election review

12   -- and they do happen from time to time at the polling

13   sites, a number of people coming in, I think it's more

14   difficult -- I'm not having -- I'm not --

12:03:32  15            THE COURT:  Let's go back.  Say you even could

16   get somebody who found out that somebody was dead, and

17   somehow manufactured an ID to vote for that person, and then

18   somehow worked for some period of time to duplicate that

19   person's signature, and then went in and voted.  How many of

12:04:06  20   those is your -- is Trump's version that you could complete

21   in a day?

22            MR. READLER:  Your Honor, I have no idea.

23            THE COURT:  I mean could you do -- what's his

24   theory?  You could do two an hour or -- because you couldn't

12:04:21  25   do -- you couldn't do the same polling location, right?

1    They'd want to know if you came back an hour later with a

2    different ID, wouldn't they?

3                    MR. READLER:  Most likely.

4                    THE COURT:  So you have to go to a different

12:04:33  5    polling location?

6                    MR. READLER:  That's true.

7                    THE COURT:  And so how many can you do in a

8    day even if you could pull off duplicating the signature,

9    getting the ID, knowing who's dead?

12:04:47  10                    MR. READLER:  Your Honor, I have no idea.

11                    THE COURT:  Well, then what's -- what's his

12    theory on how his election's being stolen by people voting,

13    you know, numerous times during the same election?

14                    MR. READLER:  Well, your Honor, we're not here

12:05:04  15    on a case that's been brought by Mr. Trump to somehow prove

16    voter fraud.

17                    THE COURT:  But, it motivates these people to

18    intimidate voters under some fear that it's occurring.

19                    MR. READLER:  Two responses to, that your

12:05:21  20    Honor.  First of all, we discussed earlier, our positions

21    that these are political messages to get Mr. Trump's

22    supporters to the polls; one, to vote, and two, if they're

23    able to come in as a public service.

24                    THE COURT:  I kind of return to what we talked

12:05:35  25    about before, but that doesn't persuade.  I mean it would

1   just the opposite.  If you had a chance to go to the Indians

2   game and somebody came to you and said it's already been

3   fixed, the umpires have already decided to give it to

4   Chicago, is it more likely you're going to go to the game or

12:05:58  5   is it less likely?

6               MR. READLER:  Again, your Honor, I don't know,

7   and I --

8               THE COURT:  I would think it's less likely.

9   And I don't think it's plausible to say more likely.

12:06:07 10               MR. READLER:  You may well be right.

11               THE COURT:  Unless they're going to intimidate

12   people, what's the purpose of -- how do you incentivize

13   people, more of your supporters, to go to the polls by

14   selling them that it's not going to matter what you vote

12:06:21 15   because it's going to be stolen anyways?

16               MR. READLER:  Well, your Honor, I think --

17   you're right.  This cuts right to the chase here, which is

18   these are political messages.

19               THE COURT:  What's the message if it's not to

12:06:32 20   stir up people to intimidate voters?

21               MR. READLER:  Exactly as I said it is; to get

22   Mr. Trump's supporters --

23               THE COURT:  I thought you just agreed with me

24   that voters would be less likely to go out if they knew that

12:06:46 25   their vote wouldn't matter because it was going to otherwise

1    be stolen.

2              MR. READLER:  Your Honor, I said that's

3    possible.  And again, these are political messages.  They

4    may not be effective political messages.  The message may

12:06:57 5    have the exact impact that you're predicting.  And if so,

6    that will not be helpful to Mr. Trump's election.  But, the

7    point is these are political messages that candidates engage

8    in all the time.  Sometimes you motivate voters --

9              THE COURT:  Who else is engaged in similar

12:07:11 10   type of time after time arguments that elections have been

11   stolen?  Which was the last campaign where that was

12   dominated?

13             MR. READLER:  Well, this has been -- I mean

14   the issue --

12:07:23 15             THE COURT:  You just said it happens all the

16   time.  Which was the last one you --

17             MR. READLER:  Well, your Honor, I said

18   political messages.

19             THE COURT:  No, you just said it happens all

12:07:31 20   the time in political campaigns.  I've asked you a question.

21   When was the last campaign that that happened?

22             MR. READLER:  Your Honor, where election fraud

23   occurred?

24             THE COURT:  No.  When somebody stood before

12:07:45 25   voters and said that you've got to get out to the polls and,

1    "You know what we mean because elections are stolen.  My

2    election's going to be stolen"?

3                    MR. READLER:  I mean this may -- this may be

4    the first one.  I'm not certain.

12:08:00  5                    THE COURT:  Your statement to me was the point

6    is these are political messages that candidates engage in

7    all the time.  So I'm asking you which was the last campaign

8    that used that type of message?

9                    MR. READLER:  Your Honor, I'm saying this is a

12:08:16 10    political message I'm not saying every candidate has used

11    this precise political message here, but at the end of the

12    day --

13                    THE COURT:  No.  Your statement to me, just a

14    second ago, these are political messages that candidates

12:08:26 15    engage in all the time.

16                    MR. READLER:  Candidates engage in sending

17    political messages.  I apologize if I misspoke.  I wasn't

18    referring to this specific political message.

19                    THE COURT:  So you don't have any other

12:08:38 20    candidate that said, "My campaign's being stolen to -- or my

21    election's being stolen"?

22                    MR. READLER:  Richard Nixon may have said that

23    in 1960, but you know, I don't think there's a history of

24    that.  I really don't know, your Honor.  I'm not a political

12:08:52 25    scientist.  My point to you is that these are -- that is a

1   political message among many political messages communicated

2   to voters by candidates on all sides of the aisle and

3   whether they effectively work, get people out to vote for

4   that candidate is left probably to study after the election,

12:09:09   5   but that is plainly protected by the First Amendment.

6   There's no doubt about that.

7       But, your Honor, if -- if we're going to proceed along

8   the line of your thinking, this may be some way to

9   discourage people from voting.  You heard no evidence today

12:09:25 10   of a single Ohio voter who has not voted or is thinking

11   about not voting because of a message they heard from

12   Mr. Trump.

13       The only thing you heard was apparently in 2012, it

14   was worse.  Apparently in 2012, obviously not Mr. Trump,

12:09:41 15   obviously someone put up a sign here in an inner city

16   neighborhood about voter fraud.  Setting aside, as the

17   witness agreed, voter fraud is illegal.  That sign is not

18   there anymore.  If there was a problem, it was in 2012.

19               THE COURT:  Apparently what -- part of what

12:09:57 20   they're seeking to restrain is the handing out of leaflets

21   or otherwise, saying these are the voter fraud laws and you

22   can be subject to criminal penalty.  I thought that -- I

23   thought that was what they're, in part, seeking to restrain.

24   And I thought that's what her testimony was offered in

12:10:20 25   support of.

1          MR. READLER:  I don't think there's evidence

2     that that's actually happening or that has happened.

3          THE COURT:  Of course, it couldn't have

4     happened if they're handed out at the polls.

12:10:29  5          MR. READLER:  It could have happened with the

6     40,000 people who already voted across the state.

7          THE COURT:  You're correct about that.

8          MR. READLER:  No evidence that happened, and I

9     think it goes to the extraordinary request here.  Despite

12:10:41 10     the fact that there's been no evidence, and despite the fact

11     the witness today, Mr. Pepper in his declaration, there's

12     been no actual evidence.  The argument is you should still

13     somehow enter a TRO with no evidence, essentially saying

14     that Ohio law has to be followed in this election.  And,

12:10:57 15     your Honor, this is not the first election we've had.  Some

16     of the testimony -- you would think this is the first time

17     there's ever been voting in Ohio.  We've had voting for

18     years and years and years.  At every election, there's

19     hiccups, some problems along the line at every election.

12:11:12 20     And I think people are more prepared for this election than

21     any time in our history.  If you look at the article

22     referred to from Mr. McDonald here from the Board of

23     Elections in Cleveland, he says exactly that.  He's in touch

24     with his board --

12:11:25 25          THE COURT:  Republican official, correct?

1          MR. READLER:  Correct.

2          THE COURT:  And he's contending he thinks --

3   hasn't he asked for more security?

4          MR. READLER:  He has.

5          THE COURT:  He has a fear.

6          MR. READLER:  Well, first of all, he has

7   contacted the Sheriff to make sure that things are --

8          THE COURT:  Yeah, but that means it's

9   expressing some concern that there's more than a small

10  likelihood of an issue.

11         MR. READLER:  I mean the rules are the rules

12  every time.  You can never do this.  The police are always

13  allowed to arrest people for this.  The point is -- first of

14  all, his statement, I think you suggested earlier

15  somehow that Mr. McDonnell said something about there's a

16  racial component to this.

17      There's nothing in that article that talks about a

18  racial component to what he says.  He just says that this is

19  more a fervent election than in the past, and he wants to be

20  prepared.  Thank goodness he's prepared, and we're all

21  prepared.

22         THE COURT:  So going to the Rule 65 standards,

23  what's your argument whether the Plaintiff would suffer any

24  irreparable injury if injunction has not been given?

25         MR. READLER:  First of all, there's no --

1          THE COURT:  So if something comes up and

2     there's a bunch of people outside the 100 feet or something

3     in close proximity, and they get into a major issue, I mean

4     how do you repair that?

12:12:55   5          MR. READLER:  There's a number of ways.  First

6     of all, the election, precinct judges there at the time,

7     Republican and Democrat, and the manager, they can resolve

8     the issue.  If they can't, the Board of Elections can

9     resolve, including Mr. McDonnell here in Cuyahoga County.

12:13:10  10     If they can't, law enforcement will get it resolved.  That's

11     how every election has been done.

12          THE COURT:  What if it's happening at 25

13     different locations?

14          MR. READLER:  Well, we have -- I mean we have

12:13:23  15     law enforcement all around the state, all around the County.

16          THE COURT:  What if it's coordinated and

17     there's 100 locations?  How do you repair that?

18          MR. READLER:  There are a lot of hypotheticals

19     that we could run through.  But, the fact is, one, there's

12:13:36  20     no evidence of that; and two, Ohio law already prohibits all

21     the things you're talking about.

22          THE COURT:  So if there's a restraint on

23     people harassing people, at or near the -- restraint on

24     Trump-related people from facilitating, harassing of people

12:13:58  25     within the 100 feet or immediately outside it, what

1    substantial harm would occur to Trump?

2                    MR. READLER:  Well, a couple things.  First of

3    all, 100 -- it's already prohibited within 100 feet.

4                    THE COURT:  Yeah, but if the restraining order

12:14:15  5    enforces it, he's not to set up some kind of coordinated

6    accosting of voters.

7                    MR. READLER:  First of all, you're enjoining

8    one party from engaging in conduct that apparently the other

9    party isn't being engaged in.

12:14:31 10                    THE COURT:  So say it's joint, say it's -- the

11    thing is a joint order no one accosts voters?

12                    MR. READLER:  Well, again, first of all, Ohio

13    law bars that.  Second of all, what you mean by what's meant

14    by accost?

12:14:44 15                    THE COURT:  Where I'm going to -- one of the

16    factors you pointed out we need consider is whether the

17    issuance of an order would substantially harm Trump, and.

18                    MR. READLER:  Correct.  And it does have -- so

19    the concern is, first of all, the proposed injunction.  And

12:15:02 20    again, this seems to go to the moving target in terms of

21    what's trying to be enjoined, I'm not exactly sure, but for

22    the position you're talking about, one concern is that this

23    applies to his -- actually Republican supporters and

24    volunteers.  And who exactly those people are, we don't

12:15:18 25    know.  Those people are not here in front of the Court.

1    And, unfortunately, the message -- because this is -- I

2    suspect there's some attention to the media to this hearing

3    today.  The message would be that a Federal Judge has

4    ordered Republicans to stay away from the polls and to not

12:15:32    5    harass people.  And that, in my mind, is significant harm to

6    Republicans, to lots of people in this state, even if not

7    Republicans who want to get involved.  It's a chill on their

8    activity, and again --

9             THE COURT:  What kind of activity does he want

12:15:45    10   to do that's going to be chilled?

11            MR. READLER:  Well, people, anyone in Ohio is

12   allowed to come and stand more than 100 feet from a precinct

13   and hand out voting cards.

14            THE COURT:  Under Ohio law, are they in any

12:15:57    15   way allowed to impede voters coming in or going out, whether

16   within 100 feet or outside?

17            MR. READLER:  Yes, that is illegal under Ohio

18   law.

19            THE COURT:  So he's restrained from doing

12:16:08    20   that.  What's the -- what's the harm?

21            MR. READLER:  Well, one question is why you

22   would do that because there's no evidence to -- been no

23   evidence presented to suggest that it's imminent or likely.

24            THE COURT:  You got him going on and on about

12:16:25    25   it everyday.

```
 1              MR. READLER:  But the --

 2              THE COURT:  He's apparently doing it long

 3       after you would think he would be assembling the list of

 4       observers.

 5              MR. READLER:  Actually I think most of the

 6       quotes that have been referred to, many are taken out of

 7       context but are not -- like this week, for example --

 8              THE COURT:  October 16th.  I don't know,

 9       probably some after that.

10              MR. READLER:  The -- it's still both in Ohio

11       and nationally, it is still appropriate to be soliciting

12       volunteers, observers, but --

13              THE COURT:  Back to the Rule 65 issue.  I'm

14       not sure I understand your response.  What's the substantial

15       harm to him if injunctive relief is granted?  Say you know

16       basically allowing ingress, egress without harassment?

17              MR. READLER:  Two things; one, that's Ohio

18       law, but two, there are a lot of people on both sides of the

19       aisle who engage in protected political activity 100 feet

20       from the poll.  So that could include, for example, asking

21       someone when they come to the poll are you Republican or

22       Democrat.  And when you find that out, if you're from that

23       party and you have the slate card, you hand them a slate

24       card so they have that to go into the poll to know who to

25       vote for with that party.  The injunction has the
```

12:16:35
12:16:46
12:17:03
12:17:24
12:17:36

1    possibility of chilling that kind of activity because what's

2    the line between encouragement versus -- I mean that is

3    you're questioning someone.  When does that become conduct

4    that someone might consider illegal?  We don't know.  And

12:17:53  5    that's one of the reason courts are careful in the First

6    Amendment context issue, this kind of extraordinary relief.

7    And if we had a record of things actually happening, that

8    would be one thing, but that is completely absent here.  So

9    this hypothetical idea of what kind of speech we might

12:18:08 10    restrict, I mean it's a real concern in terms of how far

11    this would reach.  And speech --

12                    THE COURT:  So back to the substantial harm

13    that the injunction would impose.  Are you indicating that

14    there might be somebody giving out cards to Republican

12:18:27 15    voters who might be dissuaded because of concern that they

16    would be cited for contempt?

17                    MR. READLER:  Absolutely, your Honor.  And

18    there's also --

19                    THE COURT:  Is there any other substantial

12:18:41 20    harm that would --

21                    MR. READLER:  Yes, your Honor.  For example,

22    people -- not everyone's coming with a slate card, but maybe

23    a group of supporters want to, or anyone wants to stand more

24    than 100 feet from the poll and chant, "Make America great

12:18:56 25    again."

1        Now, is that considered a threat?  I think it's pretty

2    clearly protected speech, but one could be concerned if a

3    Federal Judge issues an injunction that limits the seemingly

4    protected activity outside of 100 feet of the precinct.

12:19:12  5    They don't know what their rights are in that context.  And

6    I think the most likely, they don't show up.  So you --

7            THE COURT:  If the restraining order is only

8    limited giving within ten feet of voters or only limited

9    them from impeding ingress or egress, how would they be --

12:19:34 10    how would there be substantial harm to them, or to Trump,

11    specifically?

12            MR. READLER:  You can't hand someone, neither

13    Democrat or Republican, even if the requirement's as long as

14    mine, you can't hand someone a card within ten feet.  So

12:19:50 15    there is a restriction.  I'm not sure where the ten feet

16    comes from, but in that example, that is a low restriction

17    from actually making voter contact.  There's nothing wrong

18    with making voter contact.  In fact, our country's

19    encouraged that for centuries.

12:20:02 20        That is the whole point of our political system and --

21            THE COURT:  And admittedly, my experience is

22    not part of the record, but when was the last time you voted

23    that somebody was waiting outside to hand you a ballot card?

24            MR. READLER:  I often vote absentee.

12:20:22 25            THE COURT:  When was the last time you

1    requested the absentee0, when was the last time you voted in

2    person?

3                    MR. READLER:  I've seen it -- I actually live

4    in the City of Columbus.  And I have had people I approach,

12:20:36  5    it's a very active polling place and people ask me which,

6    you know, which party I'm with.  And if I say the right

7    party, they'll give me a card.  And if I don't, they don't

8    give me one.  So those voter cards, slate cards are

9    extremely common.  Both parties engage in that actively to

12:20:53 10    help people when they're voting.

11        So the concern here is the broad sweep of this

12    injunction that affects a host of parties not before the

13    Court and has a real chance of chilling the First Amendment

14    rights.  Balanced against no evidence in front of the Court

12:21:08 15    and then balanced against a general prohibition or refrain,

16    or at least significant apprehension before we issue an

17    injunctive emergency injunctive relief in the First

18    Amendment context.

19                    THE COURT:  Finally, the issue as to whether

12:21:23 20    the public interests would be served.

21                    MR. READLER:  I think the answer is no for the

22    reasons I just explained.  This country honors and cherishes

23    political involvement and political activity and political

24    speech.  Perhaps nothing more than that.

12:21:39 25        And an injunction from the Court, especially if it's

1    one-sided, but even if it goes to everyone, actually doubles

2    the effect of it having the likelihood of discouraging

3    people from engaging in ordinary political conduct they

4    would engage in --

12:21:55  5          THE COURT:  Ohio Revised Code, I mean it --

6    isn't the general motion that we approach polling places and

7    we like vote -- we let our citizens vote without impediment

8    or harassment?

9          MR. READLER:  Absolutely.  And if there are

12:22:14 10   problems, they get corrected, just like in any other year.

11          THE COURT:  Okay.

12          MR. READLER:  And, again, you haven't heard --

13    only example you heard today, someone was at a poll and were

14    voting and something happened in the voting booth where a

12:22:28 15   vote was changed, but we've heard no evidence of any of this

16    stuff happening.  And I think it would be remarkable in this

17    context, always extraordinary relief, but especially in this

18    context.  Things you've heard are -- first of all, a lot of

19    this has been exaggerated.

12:22:41 20          THE COURT:  They're all your client's

21    comments.

22          MR. READLER:  Correct.

23          THE COURT:  I mean you're not much in a

24    position to complain about the comments.  The comments that

12:22:50 25   they've cited to are Trump's comments.

1          MR. READLER:  No.  And my friend aside, in

2     closing, references to Neo-Nazis and the KKK.  Mr. Trump's

3     made no reference --

4          THE COURT:  That's fair and you're correct.  I

12:23:05  5     think that -- that evidence is of, you know, only marginal

6     importance.

7          MR. READLER:  And even the suppression point

8     that you caught on and I very much appreciate; there's an

9     anonymous quote from an anonymous official associated with

12:23:20 10     the campaign talking about voter suppression.  But when you

11     read the article, it was political messages that would make

12     people, who are traditionally Hillary Clinton supporters, to

13     be disinclined to vote for them.

14          THE COURT:  I think the argument at least --

12:23:33 15     they'll correct me if I'm wrong, but their argument is that

16     Trump's targeted to keep probably college educated, targeted

17     to keep Hispanics, African-Americans from voting.  And then

18     he's accompanied that with his stolen election theory.  And

19     are those -- are those two parts of the same sandwich?

12:24:01 20          MR. READLER:  Can I take on the first part,

21     the idea that Trump has targeted these people to stop them

22     from voting?

23          THE COURT:  Not stop, discourage them to vote.

24          MR. READLER:  Either way, what is the evidence

12:24:10 25     that Mr. Trump is targeting these people to stop them from

1    voting?

2                THE COURT:  I agree there's a hearsay issue,

3    but it sounds like it was your -- somebody associated with

4    your campaign.  Bloomberg isn't lying.

12:24:24  5                MR. READLER:  Again, the -- words from

6    Mr. Trump's mouth, we have the poll watching.  Talked about

7    that quite a bit.  With respect to that article, the article

8    was somewhat talking about political messages, for example

9    we want to tell white liberal voters that Secretary

12:24:41 10   Clinton's in favor of TPP.  Again, if that's a good or bad

11   political message, I don't know, but the notion was to let

12   her, you know, constituent voters know a message they may

13   not agree with.  And exact same thing is happening on the

14   other side.  Certainly, a big focus of Mrs. Clinton's

12:24:57 15   campaign this time is to find Republican voters who may not

16   agree with the message of their candidate, and this is

17   completely appropriate and it's going to be an incredibly

18   interesting election to see how it turns out, but this -- a

19   whole bunch of messages regarding political themes are being

12:25:12 20   exchanged this year.  This is a unique election in that

21   sense but certainly not one in this record that requires

22   injunctive relief.  There is an -- I mean there have been

23   other cases filed which I'd like to know.  This case is not

24   unique, which I think is telling.

12:25:31 25               The Democrats picked five states that all happen to be

1    very close this year in the election.  They filed

2    essentially the exact same lawsuit in each of those cases.

3    They did so right before the election.  I mean keep in mind

4    if the concern was that somehow poll observing is a bad

12:25:48  5    thing, that it would have -- disincentivize from voting,

6    they could oppose the constitution of that law any time

7    since it's been in existence for ten years, so.

8                  THE COURT:  Kind of back to -- and I'll give

9    them a chance to respond, but -- so poll watching, if you're

12:26:10 10    not interacting with a voter, what's Trump's theory?  So if

11    you're standing outside the 100 feet, and you're just

12    watching, how does that -- how is his campaign benefited?

13                  MR. READLER:  Some people may go to stand

14    outside 100 feet to watch because they're interested in his

12:26:36 15    voting or they -- Election Day and want to be a part of

16    voting, but most people that do that is for a reason, to

17    help promote the candidate of their choice.

18                  THE COURT:  How does that help you stand 100

19    feet away and you don't -- you don't, in any way, interact

12:26:53 20    with the voter?

21                  MR. READLER:  Well, that is the last

22    opportunity after -- we all agree this is a long election.

23    That is the last opportunity to reach that voter before that

24    voter goes to cast.

12:27:06 25                  THE COURT:  But, you are not interacting with

1    them.  How are you reaching the voter?

2              MR. READLER:  You are interacting, allowed to

3    ask who they're voting for, allowed to wear a Clinton or

4    Trump T-shirt.  You can give them information about a

12:27:20  5    particular candidate, ask them if they care about taxes.  If

6    they do, you give them a pamphlet on tax issues that might

7    influence their vote.  A myriad of ways to do that.  Very

8    common.  Every precinct has had, in a general election, has

9    had someone campaigning legally within 100 feet of the

12:27:38  10    campaign.  That's very common, and I think if you ask

11    Mr. McTigue --

12              THE COURT:  You're not sworn in and I'm not.

13              MR. READLER:  That's true.  That's a good

14    thing.

12:27:46  15              THE COURT:  I've never seen it.

16              MR. READLER:  Maybe you can ask Mr. McTigue

17    because I'm pretty sure he's a dealer in this area, that he

18    can tell you about the type of things completely legitimate

19    that both parties do outside election places.

12:27:58  20              THE COURT:  Okay.  Do you want to respond?

21              MS. SMALLS:  Yes, your Honor.  Would you like

22    me to do so from here or --

23              THE COURT:  Why don't you go to the podium.

24              MS. SMALLS:  Okay.

12:28:17  25         Your Honor, counsel for the campaign mentioned that we

1    have filed other lawsuits, and we have.  We filed lawsuits

2    in Nevada, Arizona, Ohio, and Pennsylvania.  And there are

3    many -- while the -- there are very contested elections in

4    each of those states.  We -- there are many more

12:28:42  5    battleground states than those four states.  We chose where

6    we initiated action based on where we -- where the Donald

7    Trump made his statements.  Where he was directing his

8    supporters, so I mean he specifically mentioned cities when

9    he's talking about with large majority of minority

12:29:06  10    populations, just in case anybody didn't get the thrift --

11    the thrust of what he was saying in the first instance.  And

12    so that is the basis of where we have chosen to bring this

13    action is based on where we've seen the evidence, where

14    this -- the candidate and his surrogates have made these

12:29:31  15    charged states where they have directed them, and where we

16    have seen incidences of his supporters responding in kind.

17                THE COURT:  So you're seeking to stop engaging

18    in any poll watching or poll monitoring inside or outside

19    the polling places, so only seeking to watch -- restrain

12:30:01  20    this poll watching within 100 feet?

21                MS. SMALLS:  Your Honor we -- we are -- we are

22    seeking to enjoin what's called the vigilante poll watchers.

23                THE COURT:  I'm sorry.  I missed that.

24                MS. SMALLS:  The vigilante poll watchers that,

12:30:29  25    by every indication, will descend on polling locations,

1        whether it's in direct coordination --

2                    THE COURT:  You say they do, but they stay

3        away from the voters, how -- how -- why should they be

4        restrained?

12:30:46  5        MS. SMALLS:  I don't think they have any

6        intention of staying away from voters.  They specifically

7        said I'm going --

8                    THE COURT:  Say they're restrained from

9        interfering with the voter, how is the mere presence -- he

12:30:59 10       made the argument that they've got a right to be outside the

11       100 feet and have a right to, you know, in some ways

12       peacefully demonstrate out there.

13                   MS. SMALLS:  I would agree with that, your

14       Honor.  They have a right to --

12:31:15 15                  THE COURT:  So your concern is some kind of

16       interaction with the voter.

17                   MS. SMALLS:  Activity can be legal if used to

18       intimidate or coerce a voter.  So we're not disputing what

19       is lawful behavior.  What we are disputing is what we

12:31:35 20       believe will be used to intimidate and coerce voters.

21       Nothing wrong with standing outside a poll.

22                   THE COURT:  What specifically --

23                   MS. SMALLS:  Well, I gave you the example;

24       again, didn't happen in the state, but again, we filed

12:31:50 25       multiple lawsuits in tracking the incidents across the

1     country.  There was a group of Trump supporters that stopped

2     a truck entering a polling location, asked him who he was

3     voting for, wanted to talk about Trump, he didn't want to.

4     He tried to drive around, they started screaming at him.

12:32:07 5     One of the Trump supporters tore off his T-shirt, charging

6     for a fight.  And this is the kind of stuff and this

7     happened at an early vote location in Florida, and we have a

8     declaration from the poll observer, the poll watcher that

9     had to be engaged in that specific incident in Florida.

12:32:25 10         So again, they were at the entrance of a polling

11     location.  Nobody is disputing their ability -- their right

12     to be there, but how they actually conducted themselves at

13     that egress and to the point where that voter said he did

14     not want to go in to vote any longer because he was afraid

12:32:45 15     that the Trump supporter would have vandalized his car.

16             THE COURT:  It's the conduct that you're

17     trying to restrain rather than the presence?

18             MS. SMALLS:  That's correct, your Honor.

19             THE COURT:  Okay.

12:32:56 20         And what's -- he's not seeking to, in some ways, take

21     down the vote for the web site, right?

22             MS. SMALLS:  I'm sorry; Stop the Steal or what

23     do you mean?

24             THE COURT:  You're not trying to take that

12:33:12 25     down or take down the Trump sign-up page, are you?

1           MS. SMALLS:  They're welcome to have their

2     page up.  But, in terms of -- I think there is a direct

3     connection between Trump's calls to action, which I think on

4     its face are racially tinged, and then connecting these

12:33:35  5     people with being poll observers.

6           So to that extent those people are not being placed

7     with a certification or a badge inside polling locations,

8     and there are measures that are taken that -- you know, the

9     people that are signing up in response to Trump's calls for

12:34:00 10     action, you know, we have an issue.

11           THE COURT:  Okay.

12           MS. SMALLS:  I also want to respond to

13     something that counsel for the campaign said about both

14     campaigns do it or engage in political speech.  This is a

12:34:15 15     highly contested election, and you know, campaigns are

16     fighting very hard for their candidates.  As an officer of

17     the court, I will state that we are not engaged in any modes

18     of concerted efforts of misinforming to tell our voters that

19     they can vote by text --

12:34:37 20           THE COURT:  But, you would agree that we don't

21     get into -- well, if a restraining order was issued, it

22     would be general.  So if there were democratic voters

23     engaging in some threatening behavior, they should be cited

24     for contempt, the same as if Republican?

12:34:53 25           MS. SMALLS:  That's correct, your Honor.

1          THE COURT:  Okay.  So -- okay.

2          MS. SMALLS:  Thank you.

3          THE COURT:  Thank you.

4      Anything else you want to say?

12:35:03  5          MR. KAUFMAN:  Your Honor, the only thing I

6   would add into the -- it's in the record, but we submitted

7   electronically on the second form of TRO, the order itself

8   that was very particularized, what we were seeking to enjoin

9   and how and that -- that defines and limits what it is that

12:35:21 10  we're asking for.

11          THE COURT:  Yeah.  Okay.

12      You know, I have considered, and I thank the parties

13   for their offer.  But, I have considered all the things.

14   What I'm going to do is I'm going to deny the TRO as against

12:35:38 15  the Ohio Republican Party.  I think there's insufficient

16   evidence to support the issuance of an injunction as against

17   them.

18      I am going to grant a restraining order as against the

19   Trump Campaign and Stone.  And I reviewed your proposed

12:35:56 20  order.  I think it's overbroad.  I'm going to limit it, and

21   I hope to get something out this afternoon.  I think your

22   requested injunctive relief is overly broad.  And so I'm

23   going to try to restrict that, but the main intent is going

24   to be to try to avoid the assemblage of harassing or

12:36:21 25  intimidating conduct -- well, first of all, to forbid that

1    within the polling location; second of all, to forbid that

2    within the 100 feet and also to forbid that for people

3    attempting to enter the polling location or leave the

4    polling location.

5    So the requested remedy will be narrower than that you

6    had requested.  And I'll try to get something out regarding

7    that this afternoon.

8    If we have time, we'll try to prepare an opinion on

9    it, but it more likely than not, it would not come out until

10   early next week.

11   So I'll -- do you have any argument regarding bond in

12   this?

13              MR. KAUFMAN:  We don't think that a bond is

14   really necessary, and I think --

15              THE COURT:  I'm surprised.  I'm shocked you

16   would make that argument.

17   From the Trump Campaign, any particular argument

18   regarding bond?

19              MR. READLER:  I don't think so at the moment,

20   your Honor.  We're not --

21              THE COURT:  Okay.  I'm not sure what damages

22   would flow if it was ultimately found to have been

23   improperly issued.  But, I'll more likely than not impose a

24   $1,000 bond, something in that range.

25   I'll try to get an order out some time this afternoon,

1    though.

2              MR. KAUFMAN:  And, your Honor, the only thing

3    I would just add, and it's in the proposed order that we did

4    submit, in addition to whatever parties are enjoined, those

12:38:08  5    acting in concert or participating with them, we would, you

6    know, ask you to consider that language regardless of who

7    the parties are.

8              THE COURT:  You'll have the -- and with regard

9    to any contempt sanction, you'd have the problem of showing

12:38:21 10    some notice to be able to have somebody held in contempt.

11              MR. KAUFMAN:  Right.  I understand that, and

12    you know, I take counsel for the party at their word.  I

13    respect your Honor's decision as to them.  Obviously, if the

14    party did do something that constituted a participation,

12:38:40 15    which they're saying they wouldn't, then they would have --

16              THE COURT:  You mean the Ohio Republican

17    Party?

18              MR. KAUFMAN:  Yes.  In other words, they may

19    not be enjoined, but they might, through some actions that

12:38:49 20    haven't occurred yet, participate or act in concert, then we

21    would deal with them.  Not suggesting they will, but anybody

22    acting in concert, even if they're not a Defendant, would be

23    subject to the Court's order if they have notice.

24              THE COURT:  Okay.

12:39:03 25              MR. READLER:  Your Honor may, I address that

1    point?  This was really one of the fundamental points I

2    tried to address.  These are not parties before the Court

3    for one, and two, I'm not sure how we identify or how

4    someone's supposed to know if they're a supporter,

12:39:16   5    volunteer, or interested party.  It's an incredibly valiant

6    request, and I really don't know how we're supposed to

7    police that, who's to know they're subject to it or not.

8                THE COURT:  The order did -- my intent on the

9    order would be it would be more generic.  I think I

12:39:31  10    mentioned this a moment ago.  And so I'm not -- I think the

11    order would be with regard to any harassing conduct, whether

12    it's a Democrat harassing a Republican voter or a Republican

13    voter harassing a democratic voter.

14        It wouldn't be any attempt to particularly identify

12:39:53  15    someone as being a Trump supporter or not.  So I thought

16    your point was well argued that it should be more evenly

17    balanced, and we're not trying to pick one side or the

18    other.  They should come under the same rules.  So I think

19    that is what you're going at, right?

12:40:16  20                MR. READLER:  May I, for the record, may I --

21    obviously, our primary position is we don't think it's an

22    issue, but the Court is issuing it, that's the better

23    course.  But, I just want to preserve my first position in

24    case we have to argue this somewhere else.

12:40:28  25                THE COURT:  You're probably the first party

1   appearing before me in all these years that has not agreed

2   with something I've decided.

3       (Laughter.)

4       MR. KAUFMAN:  Your Honor, the only other item

12:40:39  5   is the Stone and Stop the Steal Defendants, which we believe

6   we properly served them.  Ms. Smalls submitted a very

7   detailed declaration as to what we have done.  We certainly

8   know they know about the suit because they've been talking

9   about it in the media.  I think you've seen that.  So we

12:40:56 10   would ask that they be enjoined as well.

11       THE COURT:  Well, the injunction would go as

12   against them as well, but again, I'm going to try to

13   restrict specific conduct or, you know, facilitating certain

14   conduct as opposed to just simply taking positions.  Okay?

12:41:16 15       Thanks, everyone.

16       MR. KAUFMAN:  Thank you, your Honor.

17       (Proceedings adjourned at 12:41 p.m.)

18

19

20

21

22

23

24

25

1

2   DIRECT EXAMINATION OF STEPHANIE HOWSE          49

3   CROSS-EXAMINATION OF STEPHANIE HOWSE           59

4   DIRECT EXAMINATION OF KATIE EAGAN              62

5   CROSS-EXAMINATION OF KATIE EAGAN               70

6

7   OPENING STATEMENTS ON BEHALF OF THE PLAINTIFF   7

8   OPENING STATEMENTS ON BEHALF OF THE DEFENSE     16

9   CLOSING ARGUMENTS ON BEHALF OF THE PLAINTIFF    79

10  CLOSING ARGUMENTS ON BEHALF OF THE DEFENSE      90

11

12              C E R T I F I C A T E

13          I certify that the foregoing is a correct

14  transcript from the record of proceedings in the

15  above-entitled matter.

16

17

18

19  s/Shirle Perkins
    Shirle M. Perkins, RDR, CRR
20  U.S. District Court - Room 7-189
    801 West Superior Avenue
21  Cleveland, Ohio 44113
    (216) 357-7106
22

23

24

25